UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-21830-ALTMAN/Reid

SIMON GERALD SULLENBERGER,

*Plaintiff,*

*v.*

THE CITY OF CORAL GABLES, *et al.,*

*Defendants.*

_____/

## ORDER

On the night of December 2, 2017, two City of Coral Gables police officers responded to a burglar alarm at the home of our Plaintiff, Simon Gerald Sullenberger. Instead of finding a burglar, the officers found Sullenberger standing in his yard and holding his lawfully owned shotgun. After a standoff and altercation, the officers tased and handcuffed Sullenberger.

The State Attorney's Office brought (and would eventually drop) criminal charges against Sullenberger, who responded by suing the City (and the officers who arrested him) in state court. But, after having litigated that Florida case for two-and-a-half years, Sullenberger abandoned it and brought this new action here—in federal court. Before us now is Sullenberger's Second Amended Complaint (the "SAC") [ECF No. 34], which the Defendants have moved to dismiss, *see* Defendants' Motion to Dismiss Sullenberger's Second Amended Complaint (the "MTD") [ECF No. 45]. After careful review, we **GRANT** the MTD, **DISMISS** Sullenberger's claims under 42 U.S.C § 1985 *with prejudice*, **DISMISS** his claims under 42 U.S.C. § 1983 *without prejudice*, and **DECLINE** to exercise our supplemental jurisdiction over his state-law claims.

### THE FACTUAL AND PROCEDURAL HISTORY

On the evening of December 2, 2017, Sullenberger's home security alarm went off, apparently

by mistake. *See* SAC ¶ 7. Officers Natalie Flores and Jecabseel Nuñez of the Coral Gables Police Department arrived at Sullenberger's home thirty minutes later. *See id.* ¶¶ 7, 15–16. According to Sullenberger, the officers "appeared out of nowhere, dressed in dark clothing." *Id.* ¶ 7. By then, Sullenberger was in his front yard holding a shotgun. *See* CCTV footage at 19:55:08.[1] Officer Nuñez approached Sullenberger with his service weapon drawn—alongside Sullenberger's neighbor, Dr. Luis Santamaria, who seemed intent on trying to defuse the situation.[2] *Id.* at 19:55:20.

While speaking to (and gesticulating at) the two approaching men, Sullenberger—shotgun still clutched in his left hand—slowly backed away. *See id.* at 19:55:20–25. Although the CCTV footage has no sound, it's clear from the men's body language and affect that they weren't discussing the weather: Again, Sullenberger was brandishing a shotgun, which he refused to put down, while vigorously pointing at Officer Nuñez; Officer Nuñez, in turn, was aiming his pistol at Sullenberger while appearing to shout back at him; and Dr. Santamaria, for his part, was looking back and forth nervously at the other two while speaking and motioning with his arms in an apparent effort to deescalate the situation. *See id.* at 19:55:20–35. Sullenberger eventually moved back across the yard towards Officer Nuñez and Dr. Santamaria before finally dropping his shotgun, which Officer Flores secured. *See id.*

---

[1] Both Sullenberger and the Defendants rely on the same CCTV footage. The Defendants filed a Motion for Conventional Filing of Video Footage [ECF No. 46], which we granted, *see* January 24, 2023, Paperless Order [ECF No. 47]. Since both parties rely on it, we've watched it ourselves and will cite it throughout this Order. *Cf. Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023) ("Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed. . . . Evidence is 'undisputed' in this context if its authenticity is unchallenged." (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002))); *see also McDowell v. Gonzalez*, 424 F. Supp. 3d 1214, 1223 (S.D. Fla. 2019) (Bloom, J.), *aff'd*, 820 F. App'x 989 (11th Cir. 2020) (finding that the incorporation-by-reference doctrine applies to video evidence—including body camera footage—where, as here, both parties referred to it in their motion-to-dismiss briefing).

[2] Throughout this interaction, Dr. Santamaria was also on Sullenberger's property. *See* CCTV footage at 19:55:10–56:54. Although the CCTV footage doesn't include audio, Santamaria appears to be pleading with Sullenberger. *See id.* at 19:55:12–56:30. When the officers eventually took Sullenberger down, Santamaria was also part of the fray—trying (it seems) to break things up. *Id.* at 19:56:32–50.

at 19:55:32–56:06.

With the shotgun out of the way, Officer Nuñez holstered his own gun, approached Sullenberger slowly, and then placed his hand on Sullenberger's outstretched wrist. *See id.* at 19:56:11–16. A few seconds later, with the two men still talking to one another, Sullenberger removed his arm from Officer Nuñez's grip and backed away from him. *See id.* at 19:56:24–28. When Officer Nuñez took a step towards Sullenberger, it appears—though we can't say with *complete* certainty—that Sullenberger threw a punch at Officer Nuñez. *See id.* at 19:56:31.[3] The two men then began to stand-up wrestling—with Santamaria trying to break them up—and, for a second or two, Sullenberger managed to get Officer Nuñez in a kind of bear hug from behind. *See id.* at 19:56:31–34. Officer Nuñez quickly broke loose, however, and he and Sullenberger (with Santamaria beside them) crashed around the yard for several more seconds before falling over a low border wall, where Officer Flores tased Sullenberger. *See id.* at 19:56:34–46.[4] With Sullenberger finally subdued, the officers arrested him. *See id.* ¶ 24 ("As a result of the false arrest, the Defendants took Sullenberger into Custody and unjustly deprived him of his liberty.").

All in all, the video shows two officers who demonstrated remarkable restraint in the circumstances. Indeed, given his egregious conduct, Sullenberger is lucky to be alive.[5] The State Attorney's Office eventually charged Sullenberger with two counts of resisting an officer with violence and with a firearm, two counts of aggravated battery on a law enforcement officer, and two counts of

---

[3] Sullenberger clearly (and suddenly) launched his arm forward, and Officer Nuñez staggered backwards. *See id.* at 19:56:31. Whether the strike Sullenberger offered was a punch or a slap or a push, we can't really say.

[4] According to Sullenberger, he "was calmly standing, not resisting [when] Officer Flores shot him with her Taser." SAC ¶ 18. Although the CCTV footage doesn't show us *exactly* what Sullenberger was doing in the moments before Officer Flores tased him, "calmly standing" and "not resisting" are about the furthest things from it. *See* CCTV footage at 19:56:31–46.

[5] Officer Jorge Puga—who would eventually be "assigned as 'Lead Investigator'"—didn't arrive on the scene until after the arrest. SAC ¶ 14.

attempted murder of a law enforcement officer in the second degree. *See* Arrest Affidavit [ECF No. 1-3] at 2.[6] But—after roughly three years of pursuing this prosecution—the State dropped all criminal charges against Sullenberger on December 14, 2020. *See* SAC ¶ 5.

On November 8, 2019—one year before Sullenberger's criminal charges were dropped and two years after his arrest—Sullenberger sued the City and Officers Flores, Nuñez, and Puga in Florida's Eleventh Judicial Circuit in and for Miami-Dade County.[7] In that state-court civil case, Sullenberger asserted counts of assault-and-battery against Officers Flores and Nuñez, false imprisonment against all Defendants, and negligence against the City. *See generally* Initial State Court Complaint [State Docket Entry ("DE") No. 1]. The Defendants filed separate motions to dismiss, which the state court granted in part and denied in part. *See* State-Court Order on Defendants' Motions to Dismiss [State DE No. 35].[8] Specifically, the state court dismissed without prejudice the assault-and-battery claims against Officers Flores and Nuñez and the negligence claim against the City. *Id.* at 2–3. But it denied the motions to dismiss the false-imprisonment claim against all Defendants. *Id.* at 2.

Sullenberger responded with his first amended state-court complaint, asserting only[9] assault-

---

[6] We don't know how long Sullenberger was detained because he never tells us. *See* SAC; *see also* Response.

[7] This is case number 2019-033136-CA-01, and the filings are publicly available at www2.miamidadeclerk.gov. In resolving a motion to dismiss, we may take judicial notice of state-court proceedings and pleadings. *See Talley v. Columbus, Ga. Hous. Auth.*, 402 F. App'x 463, 465 n.4 (11th Cir. 2010) ("Although the district court was ruling on a motion to dismiss, the court properly examined extrinsic documents detailing [the plaintiff's] previous state and federal court cases[.]"); *see also Cave v. Stone*, 2021 WL 4427451, at *1 (S.D. Fla. Sept. 27, 2021) (Altman, J.) ("Even if the Motion [to Dismiss] hadn't advanced a factual challenge under Rule 12(b)(1), though, we'd likely take judicial notice of these extrinsic documents anyway. Federal Rule of Evidence 201 permits a federal court to take judicial notice of state-court records because, generally, those records 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting FED. R. EVID. 201(b))). And we do so here.

[8] This Order has also been filed as an exhibit on our docket. *See* [ECF No. 45-2].

[9] Sullenberger ultimately dropped his negligence claim against the City. *See* First Amended State Court Complaint [State DE No. 38].

and-battery charges against Officers Flores and Nuñez and a false-imprisonment claim against all four Defendants. *See* First Amended State-Court Complaint [State DE No. 38]. The state court dismissed the assault-and-battery claims without prejudice for failure "to allege facts giving rise to independent torts" and dismissed[10] the false-imprisonment claim as to the officers (but not as to the City). *See* State-Court Order on Defendants' Motion to Dismiss Amended Complaint [State DE No. 54].[11]

On September 10, 2021, Sullenberger filed his second (and final) amended state-court complaint. *See* Second Amended State-Court Complaint [State DE No. 55]. In it, he asserted assault-and-battery claims against Officers Flores and Nuñez and a false-imprisonment claim against the City. *See generally ibid.*[12] The City denied all liability on the false-imprisonment claim, *see generally* City's Answer and Affirmative Defenses [State DE No. 57], and Officers Flores and Nuñez sought dismissal of the assault-and-battery claims, *see generally* Defendant Officers' Motion to Dismiss the Second Amended State-Court Complaint [State DE No. 58].

On June 15, 2022, while the state-court case was pending, Sullenberger filed this federal lawsuit *pro se*. *See* Initial Complaint [ECF No. 1]. In this federal case, Sullenberger sued Officers Puga, Flores, and Nuñez—as well as the City—under 42 U.S.C. § 1983, alleging a "violation of his Fourth Amendment right to be free of unlawful seizures." *Id.* ¶ 29. As redress, he sought compensatory damages for "actions taken by Defendants, including: Unlawful and humiliating arrest, assault, battery, false imprisonment, and negligence." *Id.* ¶ 30. He also requested punitive damages against the City for "recklessly disregarding [his] Constitutional right to be free of unlawful seizures." *Id.* ¶ 31. After Officer Puga filed a Motion to Dismiss [ECF No. 10], Sullenberger filed his First Amended Complaint

---

[10] The state court didn't say whether this dismissal was with or without prejudice. *See* State-Court Order on Defendants' Motion to Dismiss Amended Complaint [State DE No. 54].

[11] This is [ECF No. 45-3] on our docket.

[12] For whatever reason, Sullenberger didn't sue Officer Puga this time. *See* Second Amended State-Court Complaint [State DE No. 55] at 1.

[ECF No. 12], asserting claims under § 1983 against all four Defendants for violating *both* his "Fourth Amendment right to be free of unlawful seizures" *and* his right to "due process under the Fourteenth Amendment." First Amended Complaint ¶ 33. He also asserted state-law claims for unlawful arrest, assault, battery, false imprisonment, and negligence. *Ibid.*

On October 18, 2022, the *state* court discovered this new *federal* proceeding and dismissed Sullenberger's Second Amended State-Court Complaint. *See generally* Order of Dismissal [State DE No. 86].[13] According to the state court:

> Plaintiff filed a Notice of Removal to United States District Court and attached a copy of First Amended Complaint filed in the Southern District of Florida. Plaintiff did not attach a Civil Cover Sheet indicating that this State Case had been removed to federal court. . . . Plaintiff stated on the record that it is his intention to dismiss this action and proceed in federal court. . . . Based upon the Plaintiff's notice of removal and Plaintiff's stated intention to dismiss this action and proceed in federal court, this case is hereby dismissed.

*Id.* ¶¶ 3, 5, 7.[14]

Back in federal court, all four Defendants filed a Joint Second Motion to Dismiss [ECF No. 26]. Sullenberger filed a Motion for Leave to File a Second Amended Complaint [ECF No. 31], which we granted, *see* December 6, 2022, Paperless Order [ECF No. 32]. In doing so, however, we warned Sullenberger that "[n]o further amendments [beyond the Second Amended Complaint] will be permitted." *Ibid.*

---

[13] This is [ECF No. 45-4] on our docket.

[14] It's hornbook law that a *plaintiff* cannot remove a case from state to federal court. *See* 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed *by the defendant or the defendants*, to the district court of the United States[.]" (emphasis added)); *see also Rigaud v. Broward Gen. Med. Ctr.*, 346 F. App'x 453, 454 (11th Cir. 2009) (affirming a district court's conclusion that "a plaintiff . . . could not remove her own action" (per curiam)). We don't know why the state-court judge didn't mention this. Either way, this issue isn't relevant to our analysis because Sullenberger's claims fail for more obvious reasons. If Sullenberger files a new action in state court or a third amended complaint here in federal court—and should the Defendants (again) assert their statute-of-limitations and *res-judicata* defenses, *see* MTD at 7–12, 21–22—a deeper dive into this irregular pleading maneuver may be warranted.

Sullenberger filed this (now operative) SAC two days later. In it, Sullenberger advances the following state-law claims: assault against Flores and Nuñez (Count I), *see* SAC ¶ 17; battery against Flores and Nuñez (Count II), *see id.* ¶¶ 18–22; false imprisonment against all Defendants (Count III), *see id.* ¶¶ 23–29; and malicious prosecution against a non-party, the State Attorney's Office (Count V), *see id.* ¶¶ 37–41. As for his federal claims, he's shoehorned all of them into Count IV, which he's unhelpfully titled "Section 1983, 1985." *See id.* ¶¶ 30–36. The gist of Count IV seems to be that the Defendants (1) conspired to write a false arrest report to justify Sullenberger's arrest; (2) "deliberately and maliciously" brought and maintained an unlawful prosecution against him; and (3) harassed Sullenberger and his family "by revving their engines in front of [Sullenberger's] house in the middle of the night, flooding [the] house with their spotlights, parking on [Sullenberger's] street, and installing cameras on [the nearby] stop sign." *Ibid.* The Defendants now ask us to dismiss all five counts with prejudice. *See* MTD at 6.[15]

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will

---

[15] The MTD is ripe for adjudication. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Second Amended Complaint (the "Response") [ECF No. 65]; *see also* Defendants' Reply in Support of Their Motion to Dismiss Plaintiff's Second Amended Complaint (the "Reply") [ECF No. 66].

reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

Of course, "*pro se* [filings], however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erikson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) ("We also construe the complaint liberally because it was filed *pro se*."); *cf.* FED. R. CIV. P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). Still, while we treat *pro se* litigants with some leniency, "this leniency does not give a court license to serve as *de facto* counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action." *Schwarz v. Ga. Composite Med. Bd.*, 2021 WL 4519893, at *2 (11th. Cir 2021) (cleaned up). Notably, the requirement that "a complaint must contain sufficient facts, accepted as true, to state a claim for relief that is plausible on its face . . . also applies to *pro se* complaints." *Wells v. Miller*, 652 F. App'x 874, 875 (11th Cir. 2016); *see also Saunders*, 766 F.3d at 1266 (recognizing that *Twombly* and *Iqbal* apply to *pro se* complaints).

ANALYSIS

## I.    Sullenberger's Federal Claims

As we've said, Sullenberger has jammed his various federal claims into Count IV—which, as a result, is a classic shotgun pleading. For three reasons, though, these claims also fail on the merits. *First*, § 1985 isn't applicable to our case. *Second*, the officers enjoy qualified immunity against Sullenberger's § 1983 claims. *Third*, Sullenberger hasn't done nearly enough to state viable § 1983

claims against the City for malicious prosecution or false arrest.[16]

### A.    Count IV is a shotgun pleading.

Sullenberger awkwardly—and impermissibly—jams his federal claims together into one count (Count IV). To comply with federal pleading standards, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Plaintiffs must also "state [their] claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." FED. R. CIV. P. 10(b). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). And "[c]ourts in the Eleventh Circuit have

---

[16]    Some of Sullenberger's federal claims may also be barred by Florida's statute of limitations, but we won't resolve that issue here. "Claims under § 1983 and § 1985 are governed by the statute of limitations for personal injury actions in the state in which the cause of action arose." *Villalona v. Holiday Inn Express & Suites*, 824 F. App'x 942, 946 (11th Cir. 2020) (per curiam). In Florida, that period is four years. *See* FLA. STAT. § 95.11(3)(n) (setting a four-year statute of limitations for "[a]n action for assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort"). But, while state law governs the length of the statute of limitations, "[f]ederal law governs when a federal civil rights claim accrues." *Karantsalis v. City of Miami Springs, Fla.*, 17 F.4th 1316, 1322 (11th Cir. 2021). And, under federal law, a civil-rights cause of action accrues "when 'the plaintiff has a complete and present cause of action' and 'can file suit and obtain relief.'" *Villalona*, 824 F. App'x at 946 (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

"In order 'to determine the beginning of the limitations period for a warrantless false arrest, a court must determine when the plaintiff's false imprisonment came to an end.'" *White v. Hiers*, 652 F. App'x 784, 786 (11th Cir. 2016) (quoting *Wallace*, 549 U.S. at 389 (cleaned up)); *see also Hayward v. Lee Cnty. Sheriff's Off.*, 2017 WL 6550866, at *2 (M.D. Fla. Oct. 30, 2017) ("The statute of limitations begins to run for a federal false arrest claim when the false imprisonment comes to an end."). For Sullenberger, that came sometime after his December 2, 2017, arrest. But a malicious-prosecution cause of action "accrues when the prosecution against the plaintiff terminates in his favor." *Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020). The State didn't drop all charges against Sullenberger until December 14, 2020. *See* SAC ¶ 5.

When we add four years to each of those dates, we find that his §§ 1983 and 1985 claims for malicious prosecution are *timely* because their four-year limitations periods expired *after* June 15, 2022 (the day Sullenberger filed this action in federal court). On the other hand, his §§ 1983 and 1985 claims for false arrest are *untimely* because their four-year windows closed *before* June 15, 2022. Even as to these latter claims, however, Sullenberger *might* be able to show that this federal action relates back to his state-court suit (or that equitable tolling applies)—in which case his false-arrest claims *may also* be timely. Again, these are questions we won't resolve today.

little tolerance for [them]." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018). As

the Eleventh Circuit has explained, a complaint is a shotgun pleading if it:

> (1) contains multiple counts where each count adopts the allegations of all preceding
> counts; (2) is replete with conclusory, vague, and immaterial facts not obviously
> connected to any particular cause of action; (3) fails to separate into a different count
> each cause of action; or (4) asserts multiple claims against multiple defendants without
> specifying which defendant is responsible for which act.

*Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019). Shotgun pleadings share

two characteristics: *First*, they "fail to one degree or another, and in one way or another, to give the

defendants adequate notice of the claims against them and the grounds upon which each claim rests."

*Dorman v. Palm Beach Cnty.*, 2020 WL 2078527, at *1 (S.D. Fla. Apr. 30, 2020) (Altman, J.) (quoting

*Weiland*, 792 F.3d at 1323). *Second*, they "waste scarce judicial resources, inexorably broaden the scope

of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the

courts." *Ibid.* (quoting *Vibe Micro,* 878 F.3d at 1295 (cleaned up)).

Count IV of the SAC violates the third and fourth *Embree* categories. As to the third category,

Sullenberger "fails to separate into a different count each cause of action." *Embree*, 779 F. App'x at

662. Even the title of Count IV alone—"Section 1983, 1985"—reveals that Sullenberger is advancing

multiple causes of action in one count. SAC at 10. And then, within the body of Count IV,

Sullenberger proceeds to allege: (1) that the Defendants "*conspired* and proceeded in reckless disregard

of the truth to *write a false arrest report*" to justify the unlawful arrest of Sullenberger to avoid a civil suit,"

*id.* ¶ 30 (emphasis added); (2) that the "Defendants without a doubt knew, or have reason to know,

they materially *misled a magistrate and prosecution* based on a dishonest, falsified probable cause," *ibid.*

(emphasis added); (3) that the Defendants had the "willful intent to make the affidavit misleading to

*cause a malicious prosecution* and harm to the Plaintiff," *id.* ¶ 31; and (4) that "CGPD Officers Gangstalked

our home in an attempt to intimidate our family and instill fear by revving their engines in front of

our house in the middle of the night, flooding our house with their spotlights, parking on our street,

and installing cameras on our stop sign," *id.* ¶ 33. Here, in one count, Sullenberger seems to be advancing claims of false arrest, malicious prosecution, some kind of pervasive harassment, and conspiracy—all under the auspices of §§ 1983 *and* 1985. In short, Sullenberger has—in Count IV—committed the "sin of not separating into a different count each cause of action or claim for relief." *Weiland*, 792 F.3d at 1323.

Count IV also violates the fourth *Embree* category by "assert[ing] multiple claims against multiple defendants without specifying which defendant is responsible for which act." *Embree*, 779 F. App'x at 662. In Count IV, Sullenberger alleges that "[the City,] the aforementioned officers[,] and their Command staff conspired and proceeded in reckless disregard of the truth to write a false arrest report." SAC ¶ 30. Sullenberger has thus identified *four* different Defendants—and a non-party (the command staff), whoever or whatever that is. And how exactly these individuals and entities so conspired is more or less left to the imagination.[17] We therefore have no idea which Defendants "conspired and proceeded in a reckless disregard of the truth to write a false arrest report," who "Gangstalked" the Sullenberger home, and who "had an opportunity to correct their actions" but instead "chose[ ] to deliberately and maliciously continue their pursuit of causing harm to Sullenberger." *Id.* ¶¶ 30, 33–34. That, of course, makes it "*virtually* impossible to know which allegations of fact are intended to support which claim(s) for relief." *Weiland*, 792 F.3d at 1325 (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

While we could end our analysis of Count IV here, we do have an obligation to construe the SAC liberally. *See Saunders*, 766 F.3d at 1266 ("We also construe the complaint liberally because it was filed *pro se*."). So, we'll disentangle Count IV and try our best to deduce what exactly Sullenberger is claiming here. As we've said, Count IV alleges that "[t]he City of Coral Gables the aforementioned

---

[17] Sullenberger does offer detailed, concrete allegations against Officer Puga. *See* SAC ¶ 32.

officers and their Command staff *conspired* and proceeded in reckless disregard of the truth to *write a false arrest* report to *justify the unlawful arrest* of Sullenberger to avoid a civil suit. . . . [T]hey materially *misled a magistrate and prosecution* based on a dishonest, falsified probable cause . . . . Confident their lies would go overlooked and having the willful intent to *make the affidavit misleading to cause a malicious prosecution* and harm to Plaintiff." SAC ¶¶ 30–31. We therefore read Count IV as advancing—against all Defendants—(1) § 1983 claims for false arrest and malicious prosecution, and (2) § 1985 claims for conspiracy to arrest Sullenberger falsely and conspiracy to carry out a malicious prosecution.[18] As we'll see, however, these claims fail on the merits.

**B.      § 1985 doesn't apply here.**

Sullenberger fails to state a claim under § 1985. As a threshold matter, he doesn't specify which of § 1985's three subsections he's proceeding under, *see generally* SAC ¶¶ 30–36—thus leaving us in the uncomfortable position of guessing at his intentions. But, because the SAC "contains no allegations about a conspiracy to prevent an officer from performing his duties," Sullenberger "states no claim for relief under section 1985(1)." *Lumpkin v. Atty Gen., Fla.*, 703 F. App'x 715, 717 (11th Cir. 2017) (per curiam). Nor does Sullenberger state a "claim for relief under the first portion of section 1985(2), which applies only to conspiracies alleged to have deterred testimony in federal court." *Ibid*. Instead,

---

[18] As we've mentioned, Count IV also claims that "CGPD Officers Gangstalked our home in an attempt to intimidate our family and instill fear by revving their engines in front of our house in the middle of the night, flooding our house with their spotlights, parking on our street, and installing cameras on our stop sign." SAC ¶ 33. But this conduct—revving engines, shining spotlights, parking cars, or installing cameras in public places—doesn't amount to any constitutional violation we're aware of. It thus cannot support Sullenberger's claims under §§ 1983 or 1985. *See infra* at 15–16 (discussing the elements of § 1983); *see also infra* at 13–14 (summarizing the elements of § 1985).

Sullenberger must be invoking *either* the second half of § 1985(2)[19] *or* the entirety of § 1985(3),[20] or both. But even these subsections provide him no relief.

"The Ku Klux Klan Act of 1871 gave rise to 42 U.S.C. §§ 1985 and 1986, still in effect today. Section 1985 provides a federal civil cause of action against persons who conspire to deprive a person of federally protected civil rights." William M. Carter, Jr., *The Anti-Klan Act in the Twenty-First Century*, 136 HARV. L. REV. F. 251 (2023). To prevail on a § 1985(2) claim, a plaintiff must prove "the following elements: (1) a conspiracy; (2) for the purpose of impeding, hindering, obstructing or defeating the due course of justice in a state or territory, (3) *with the purposeful, discriminatory intent of denying a citizen the equal protection of the laws*, (4) under color of state law or authority." *Shahawy v. Lee*, 1996 WL 33663633, at *16 n.32 (M.D. Fla. Dec. 13, 1996) (Nimmons, J.) (emphasis added). And "[t]he elements of a cause of action under § 1985(3) are: (1) a conspiracy, (2) *for the purpose of depriving, either directly or indirectly, any*

---

[19] This second portion of § 1985(2) states:

> [I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws . . . the party so injured may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

[20] In relevant part, § 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws*; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Trawinski v. United Techs.*, 313 F.3d 1295, 1299 (11th Cir. 2002) (emphasis added). To satisfy the third element of § 1985(2) "requires an allegation of class-based animus." *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1292 (11th Cir. 2002). The second element of § 1985(3) likewise requires an allegation that the plaintiff "is a protected person or class or that he was the subject of class-based animus." *Overcash v. Shelnutt*, 753 F. App'x 741, 746 (11th Cir. 2018); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ("The language [from § 1985(3)] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind conspirators' action.").

"Two types of classes come within § 1985(3)'s protection: (1) classes having common characteristics of an inherent nature—i.e., those kinds of classes offered special protection under the Equal Protection Clause, and (2) classes that Congress was trying to protect when it enacted the Ku Klux Klan Act." *Brown v. Anderson*, 2023 WL 1102568, at *3 (11th Cir. Jan. 30, 2023) (quoting *Childree v. UAP/GA AG Chem., Inc.*, 92 F.3d 1140, 1147 (11th Cir. 1996)). While it's theoretically possible for a white male (like Sullenberger) to fit himself into one of these classes, Sullenberger has made no effort to do so here. *See generally* SAC ¶¶ 30–36. Because Sullenberger "has failed to allege the existence of a 'racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action,' he has stated no claim for relief under section 1985(3)." *Lumpkin*, 703 F. App'x at 717 (quoting *Childree*, 92 F.3d at 1147). "For the same reason," Sullenberger "states no claim for relief under the second portion of section 1985(2), which also applies only if the conspirators act 'with intent to deny to any citizen the equal protection of the laws,' or to injure a person who seeks to enforce 'equal protection of the laws.'" *Ibid.* (quoting 42 U.S.C. § 1985(2)).

We therefore **DISMISS** Sullenberger's § 1985 claims **with prejudice**. In doing so, we recognize our obligation to grant Sullenberger (a *pro se* plaintiff) "at least one chance to amend the complaint before [dismissing] the action with prejudice." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1132 (11th Cir. 2019). But we've already done that. *See* December 6, 2022, Paperless Order (granting Sullenberger leave to file the SAC). In any event, we needn't grant Sullenberger leave to amend where "further amendment would be futile." *Silberman*, 927 F.3d at 1133 (cleaned up). And, given the facts of this case—in which Sullenberger has *never* suggested that he was targeted because he was a white male (or for any other class- or race-based reason)—we don't think Sullenberger could ever state a plausible § 1985 claim. In dismissing this claim **with prejudice**, we note (too) that we've already warned Sullenberger that "[n]o further amendments [beyond the SAC] will be permitted." December 6, 2022, Paperless Order [ECF No. 32].

### C.    The officers are immune from Sullenberger's § 1983 claims.

"Section 1983 provides a federal cause of action for persons subjected to the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' by persons acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State[.]'" *Shepherd v. Wilson*, 663 F. App'x 813, 817 (11th Cir. 2016) (per curiam) (quoting 42 U.S.C. § 1983). Sullenberger contends that the Defendants deprived him of his Fourth Amendment rights when they falsely arrested—and then maliciously prosecuted—him. *See* SAC ¶ 3 ("State and federal law enforcement officers may be sued for violating a person's Fourth Amendment rights under either section 1983 or Bivens."); *see also id.* ¶ 30 ("The [City] the aforementioned Officers and their Command Staff conspired and proceeded in reckless disregard of the truth to write a false arrest report to justify the unlawful arrest of Sullenberger to avoid a civil suit."); *id.* ¶ 32 ("Officer Puga was instructed to write his arrest affidavit without performing an investigation."); *id.* ¶ 35 ("The Defendant[s] wrote their arrest affidavit with the intent to lie . . . . The reports contained false information[.]"). The Defendants counter that Sullenberger's

federal claims should be dismissed because the officers are entitled to qualified immunity. *See* MTD at 7–9, 13–19, and 26–29. We agree.

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). If the government official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Ibid.* To qualify as clearly established, a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)). "Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (cleaned up). In our District, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here,

the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237

(11th Cir. 2007). In sum, "the doctrine of qualified immunity protects 'all but the plainly incompetent

or those who knowingly violate the law.'" *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021)

(quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

There's no doubt that the officers were acting within their discretionary authority when they

responded to Sullenberger's home and (later) arrested him.[21] *See, e.g.*, *Peters v. Caldwell*, 2012 WL

13020713, at *8 (N.D. Ga. Sept. 10, 2012) (Murphy, J.) ("Here, Defendant officers were acting within

their discretionary authority in responding to an alarm [that had been] set off[.]"); *Turk v. Crytzer*, 2021

WL 4478616, at *8 (M.D. Fla. Sept. 30, 2021) (Honeywell, J.) (same); *see also McDowell v. Gonzalez*, 820

F. App'x 989, 991 (11th Cir. 2020) ("A police officer generally acts within the scope of his discretionary

authority when making an arrest."). "Qualified immunity will shield [police officers] from a claim of

false arrest without probable cause if there was arguable probable cause, i.e., if a reasonable police

officer, knowing what [the Defendants] knew, could have believed there was probable cause for the

warrantless arrest." *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999). And "[t]he correct legal

standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a

reasonable officer could conclude . . . that there was a substantial chance of criminal activity."

*Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022). The scope or degree of that criminal activity

is irrelevant because, "[i]f an officer has probable cause to believe that an individual has committed

---

[21] Sullenberger's allegations about the three officers are consistent with our conclusion that they were
acting within their discretionary authority. *See* SAC ¶ 15 ("Officer Flores . . . was employed and acting
in her capacity as a recently hired Police Officer under the authority of the Coral Gables Police
Department [when she] assaulted, unlawfully arrested Sullenberger at his home, and conspired with
command staff to fabricate a false arrest report[.]"); *see also id.* ¶ 16 ("Officer Nuñez . . . was employed
and acting in his capacity as a Police Officer under the authority of the Coral Gables Police
Department [when he] assaulted, unlawfully arrested Sullenberger at his home, and conspired with
command staff to fabricate a false arrest report[.]"); *id.* ¶ 14 ("Officer Puga . . . was employed and
acting in his capacity as a recently hired Police Officer under the authority of the Coral Gables Police
Department[.]").

even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Lorenzo v. City of Tampa*, 259 F. App'x 239, 241 (11th Cir. 2007) (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Notably, "[p]robable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (emphasis added). In other words, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey v. Bd. of Cnty. Com'rs of Alachua Cnty. Fla.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992).

Taking Sullenberger's allegations together with what we see in the CCTV footage, our officers had (at the very least) arguable probable cause to arrest Sullenberger. *First*, they had a legitimate law enforcement reason to respond to Sullenberger's house: the activated security alarm. *See* SAC ¶ 7 ("Defendant[s] arrived at [Sullenberger's] home almost 30 minutes after an accidental audible alarm[.]"). *Second*, when they arrived, the officers found Sullenberger outside the home holding a shotgun. *See* CCTV footage at 19:55:02. *Third*, the officers had no way of knowing whether Sullenberger was a lawful resident of the home (or a burglar), whether he lawfully owned the weapon he was brandishing, or what his intentions with that weapon were. *Fourth*, Sullenberger refused to drop the weapon for nearly a whole minute after the officers arrived—even though Officer Nuñez was approaching him with his gun drawn and clearly ordering him to comply with his commands. *See id.* at 19:55:02–53. *Fifth*, Sullenberger unquestionably resisted the officers when they tried to detain him by refusing to surrender himself, removing his arm from Officer Nuñez's grip, punching (or striking) Officer Nuñez, wrapping his arms around Officer Nuñez in a bear hug, and evading the officers in the moments before he was tased. *See id.* at 19:55:53–56:46. Taken together, that's plenty of probable cause—and certainly arguable probable cause—to justify an arrest for two separate crimes:

brandishing the shotgun and resisting arrest.[22] *See Davis v. City of Apopka*, 78 F.4th 1326, 1334–35 (11th Cir. 2023) (noting that probable cause depends on the "totality of the circumstances" and adding that a "substantial chance [of criminal activity] is all that is required, 'not an actual showing of such activity'" (quoting *Wesby*, 583 U.S. at 57)).

For the crime of brandishing a shotgun, the Eleventh Circuit's decision in *Pierre v. City of Miramar, Fla., Inc.*, 537 F. App'x 821 (11th Cir. 2013), supports our conclusion that the officers had (arguable) probable cause to arrest Sullenberger. After hearing "banging on the front door of his home," the owner in that case searched his yard for burglars while holding a baseball bat and a shotgun. *Id.* at 823. During that search, the owner discussed the banging with his neighbor, who said he would call the police. *Ibid.* The owner reentered his house—and, a short while later, several police officers arrived. *Ibid.* Those officers interviewed the neighbor and eventually phoned the homeowner, ordering him to come out of his house with his hands up. *Ibid.* When the owner complied, the officers searched his house and found the shotgun. *Ibid.* Even though the homeowner told the officers that he owned the shotgun, *id.* at 826, they arrested him and (later) charged him with (1) the reckless display of a weapon, in violation of FLA. STAT. § 790.053, and (2) openly carrying a weapon, in violation of FLA. STAT. § 790.10, *id.* at 823. The homeowner later sued the officers and the city, asserting § 1983 claims for false arrest and false imprisonment. *Id.* at 825–26. The district court granted the defendants'

---

[22] Sullenberger disagrees with this characterization of the available facts. *See* SAC ¶ 23 (stating in Count III that the Defendants "falsely arrested Sullenberger without probable cause or legal justification"). Normally, in adjudicating a motion to dismiss, we would "accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek*, 832 F.3d at 1246. "But where a video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account." *Baker*, 67 F.4th at 1277–78 (cleaned up); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (noting—albeit in the summary-judgment context—that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts"). In our case, the video—especially when taken together with Sullenberger's allegations—shows that the officers had arguable probable cause to arrest him.

motion to dismiss under FED. R. CIV. P. 12(b)(6), *id.* at 825–26, and the Eleventh Circuit affirmed, *id.* at 826. "Based on the facts known to Defendant Officers at the time of [the homeowner's] arrest," the Eleventh Circuit explained, "probable cause existed to suspect that [he] was guilty of violating FLA. STAT. § 790.053 [openly carrying a weapon]. Thus, [the homeowner] cannot state a claim for relief under section 1983 that is plausible on its face." *Ibid.*

For three reasons, our facts present an even stronger case of qualified immunity. *One*, Pierre never actually brandished the firearm in the officers' presence—which means *both* that they never saw him publicly displaying the weapon *and* that they were never endangered by it. Our officers, of course, approached a dark scene in the middle of the night with an unknown man who continued to hold a shotgun for nearly a minute after they arrived. *Two*, Pierre immediately complied with the officers' commands, whereas Sullenberger (it's clear from the video) refused to drop the shotgun for almost a whole minute while Officer Nuñez approached him with his gun drawn. *Three*, Pierre (unlike Sullenberger) never resisted the officers when they tried to arrest him.[23]

Our case is also more straightforward than the facts Judge Gayles (of our Court) confronted in *Forrest v. Pustizzi*, 2017 WL 2472537 (S.D. Fla. June 7, 2017) (Gayles, J.). In that case, police officers responded to the report of a "potential domestic violence incident." *Id.* at *4. When they arrived at the home, the officers told the man at the door that "a woman had been heard crying out for help." *Ibid.* When the man turned to tell two women to come downstairs, the officers noticed that he "had been holding a gun behind his back." *Ibid.* "The Officers then demanded that [he] drop the gun," but "he did not immediately surrender the gun" and instead "turned to put the gun on the stairs." *Ibid.*

---

[23] We recognize that Sullenberger wasn't charged with violating FLA. STAT. § 790.053 (openly carrying a weapon). But *Pierre* makes clear that he easily could have been, and (as we've said) "[p]robable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners*, 891 F.3d at 969 (emphasis added).

(cleaned up). Judge Gayles rightly found that "[a] reasonable officer under these circumstances, possessing the knowledge that [the officers] possessed at the time, *could* believe that probable cause existed to arrest [the man] for resisting an officer without violence. That [the man] alleges that he intended to place the gun on the stairs is immaterial; all that is critical is the *Officers'* knowledge at the time and whether that knowledge gave the Officers arguable probable cause to arrest." *Ibid.* (emphasis in original).

Our officers, as we've said, are on even firmer ground. For one thing, unlike the man in *Forrest*—who, by calling out to the women upstairs, appeared to be lawfully in the home—Sullenberger was standing and holding a shotgun in the middle of the night in the front yard of a house whose alarm had just been set off. From the *officers'* perspective, in other words, there was no way to know— as there was in *Forrest*—whether the man they were confronting was the homeowner (or the burglar). For another, the man in *Forrest* immediately complied with the officers' commands by turning around and placing the gun on the staircase. Sullenberger, as we've seen, held onto the shotgun for nearly a whole minute while Officer Nuñez approached with his gun drawn. Finally, unlike Sullenberger, there's no indication that the man in *Forrest* resisted arrest, struck the arresting officer, or placed the officer in a bear hug.

The officers thus had arguable probable cause to arrest Sullenberger for openly carrying a shotgun.[24]

---

[24] By way of comparison, our case differs in salient ways from *Mann v. Joseph*, 805 F. App'x 779 (11th Cir. 2020) (per curiam), where the police were conducting a criminal investigation in a woman's apartment when her boyfriend arrived with his holstered (and lawfully owned) handgun. *Id.* at 781. Because the plaintiff in that case neither brandished his weapon nor resisted the officers, the district court found—and the Eleventh Circuit agreed—that the officers lacked arguable probable cause to arrest him. *See ibid.* (noting that, because the plaintiff "*immediately complied* with the officers' orders to surrender his gun and lay on the ground[,] . . . [t]he officers . . . could not have reasonably thought that [the man's] compliance constituted obstruction" (emphasis added & cleaned up). Those are just not our facts. As we've said, Officer Nuñez—his service weapon drawn—engaged Sullenberger for nearly a whole minute before Sullenberger finally relinquished his (brandished) shotgun. And, when

As we've indicated, however, the officers also had arguable probable cause to arrest Sullenberger for resisting arrest. "In Florida, an individual commits the offense of resisting an officer without violence when they 'resist, obstruct, or oppose any [law enforcement] officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer.'" *Harris v. Wingo*, 845 F. App'x 892, 896 (11th Cir. 2021) (quoting FLA. STAT. § 843.02).[25] "[T]o support a conviction for obstruction without violence, the State must prove: (1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty.'" *Ibid.* (quoting *C.E.L. v. State*, 24 So. 3d 1181, 1185–86 (Fla. 2009)). Indeed, a defendant can even be lawfully arrested for fleeing an initially *unlawful* arrest. *See United States v. Bailey*, 691 F.2d 1009, 1018–19 (11th Cir. 1982) (holding that a defendant had "no right to flee and to strike [a federal agent] in an effort to escape [that agent's] attempts to recapture him" after an initially unlawful detention and concluding that the agent could "thus . . . validly arrest [the defendant]").

On this issue, the Eleventh Circuit's decision in *Zivojinovich v. Barner*, 525 F.3d 1059 (11th Cir. 2008), is instructive. The officers in that case—responding to a disturbance at a Ritz Carlton hotel— "were lawfully executing their legal duty by informing [a rowdy and disruptive New Year's Eve reveler] that he was no longer allowed to be on the Ritz's property, escorting him out, and giving him a trespass warning." *Id.* at 1071. "As [the reveler] and the deputies were entering the stairwell [to leave], [the

---

Officer Nuñez moved in to arrest him, Sullenberger—far from peacefully submitting—resisted arrest by moving away from the officer, pulling his hand out of the officer's grip, striking the officer, placing the officer in a bear hug, and then grappling or wrestling with the officer. *Mann* thus cannot guide us here.

[25] We recognize that Sullenberger was charged with—among other things—violating FLA. STAT. § 843.01 ("resisting officer *with* violence to his person"), *see* Arrest Affidavit [ECF No. 1-3] at 2 (emphasis added), and not FLA. STAT. § 843.02 (resisting an officer *without* violence). But (again) "[p]robable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners*, 891 F.3d at 969 (emphasis added).

reveler] lurched forward[ and] pulled his arm partially free of [the officer's] grip." *Id.* at 1064 (cleaned up). The officer pushed the reveler and—with the help of his partner—"attempt[ed] to handcuff" the man. *Ibid.* A "struggl[e]" ensued, which ended only after the officers tased the reveler. *Ibid.* Although the reveler was "tried for resisting an officer *with* violence," he ultimately pled "no contest to resisting *without* violence." *Ibid.* (emphasis added). After his plea, the reveler sued the officers under § 1983, asserting—among other things[26]—claims of excessive force. *Id.* at 1061–62. The district court granted summary judgment to the officers*, id.* at 1065, and the Eleventh Circuit affirmed, *id.* at 1073. Along the way, the Eleventh Circuit found that "the deputies had probable cause to arrest [the reveler] for resisting arrest without violence" because he had "disobeyed a command by members of law enforcement to sit while they executed their lawful duties." *Id.* at 1072. Our case is very similar. Like the reveler who "lurched forward" and "pulled his arm partially free of [the officer's] grip," *id.* at 1064, Sullenberger pulled his arm away from Officer Nuñez's grip, struck the officer, put the officer in a bear hug, and then grappled with the officer before the two men fell over a low wall. The holding in *Zivojinovich* thus supports our officers' request for qualified immunity here.

The Eleventh Circuit came to the same conclusion in *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993)—a case involving a police code team visit to a "crowded" restaurant the officers suspected of violating the city's maximum-capacity ordinances. *Id.* at 1558–59 When they arrived at the restaurant, the officers confronted the manager (whom they believed had "recently resisted arrest with violence"). *Id.* at 1559. This time, the manager kept "talking after [one of the officers] told him to be quiet.*" Ibid.* When the officers informed the manager that he was under arrest, the manager "raised his hands." *Ibid.* As in our case, the state brought criminal charges against the manager— though, as here, those charges were ultimately dropped. *Id.* at 1556. The manager then sued the officers

---

[26] The reveler also brought claims against the Ritz and its manager, but those claims aren't relevant to our case. *See Zivojinovich*, 525 F.3d at 1065.

under § 1983, asserting claims of—among other things—false arrest and excessive force. *Id.* at 1555–56. The district court denied the defendants' request—at summary judgment—for qualified immunity, but the Eleventh Circuit reversed. *See ibid.* In the Circuit's view, because a "reasonable officer . . . could have believed [the manager's] repeated comment in seeming defiance of a police instruction indicated that [he] was interfering or about to interfere with the code team"—and since a "reasonable officer . . . could have interpreted [the manager's unprompted] raising of hands as resistance"—the officers had "probable cause to arrest." *Id.* at 1559. Our case (again) is very similar. Far more than the manager who "raised his hands," *id.* at 1559, Sullenberger pulled his arm away from Officer Nuñez before striking him, putting him in a bear hug, and wrestling with him. *Post* thus likewise supports our conclusion that the officers had arguable probable cause to arrest Sullenberger for resisting arrest without violence.

We're guided, lastly, by *Andrade v. Sheriff of Lee Cnty., Fla.*, 2023 WL 6389812 (11th Cir. Sept. 29, 2023). Police officers in that case responded to a local beach after they learned that a man had groped a woman there. *Id.* at *1. As the officers went to arrest the man, his female "acquaintance" (not the woman who had been groped) "followed the arresting officers to their patrol vehicle." *Ibid.* The acquaintance "approached the vehicle while the officers placed [the man] in the back seat, yelling at the officers." *Ibid.* "The officers ordered [her] to back away," which she did—only to "return[ ] to the vehicle and again yell[ ] at the officers." *Ibid.* "The officers again ordered [the acquaintance] to back away," which she did. *Ibid.* But, by then, other individuals were involved, and a "scuffle ensued"—a scuffle the acquaintance did not initiate. *Ibid.* One of the officers "secured [the acquaintance] on the ground with his knee and hand, stood her up, and handcuffed her." *Ibid.* The acquaintance was charged with "resisting a police officer without violence." *Ibid.* The acquaintance later sued the officers under § 1983 and state law, asserting claims of false arrest, false imprisonment, excessive force, malicious prosecution, and battery (among others). *Ibid.* "The district court granted

summary judgment for the officers on all the claims." *Ibid.* Although the woman didn't appeal the court's denial of her § 1983 claims, she did appeal—among other things—the court's ruling on her state-law, false-arrest claim. *Ibid.* But the Eleventh Circuit affirmed, finding—based on video footage—that the officers had probable cause to arrest the acquaintance because "they were engaged in the lawful execution of their legal duty by arresting [the alleged groper], transporting him to the patrol car, securing the area for their investigation, and ordering [the acquaintance] to back away from the car. And [the acquaintance], by combination of her words and conduct, obstructed and resisted that lawful duty when she defied that order." *Id.* at *4. Even more so than in *Andrade*, where the woman's initial disobedience resulted in a scuffle, Sullenberger *caused* the altercation in our case by refusing to submit to the officer, pulling his hand from the officer's grip, striking the officer, putting him in a bear hug, and then wrestling with him. *Andrade*, then, likewise supports our officers here.

In each of these cases, as here, the defendants "obstructed and resisted" law enforcement officers who were engaged in the lawful execution of their legal duties through words or conduct. And, in each of these cases, the Eleventh Circuit granted the officers immunity from suit because, based on that resistance, the officers had arguable probable cause to arrest the defendants. So too here. Because our officers had arguable probable cause to arrest Sullenberger *both* for brandishing the shotgun *and* (separately) for resisting arrest without violence, they didn't violate his Fourth Amendment right to be free from unreasonable seizures. *See Baxter v. Roberts, III*, 54 F.4th 1241, 1265 (11th Cir. 2022) ("[A] warrantless arrest *without* probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." (quoting *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) (cleaned up & emphasis added))).

For similar reasons, the officers also enjoy qualified immunity against Sullenberger's § 1983 claim for malicious prosecution. "In order to prove a § 1983 claim for malicious prosecution, the plaintiff must establish a violation of his Fourth Amendment right to be free from unreasonable

seizures and the elements of the common law tort of malicious prosecution, which under Florida law, requires the plaintiff to establish that the officers lacked probable cause to initiate the proceeding." *Lomax v. Diaz,* 390 F. App'x 900, 901 (11th Cir. 2010) (per curiam). As we just discussed, however, the officers did have probable cause—or, at the very least, arguable probable cause. As a result, Sullenberger's malicious-prosecution claim necessarily fails. *See ibid.* ("Accordingly, if an arrest is supported by probable cause, a plaintiff cannot maintain a § 1983 malicious prosecution claim."); *see also Paez v. Mulvey*, 915 F.3d 1276, 1290 (11th Cir. 2019) (finding that, because the underlying "arrests were not unreasonable and did not violate the Fourth Amendment . . . , [the defendant officers] were entitled to qualified immunity on each of the § 1983 malicious prosecution claims").

Since we've already granted Sullenberger leave to amend this claim once before, *see* December 6, 2022, Paperless Order [ECF No. 32], we needn't give him any more chances, *see Woldeab v. Dekalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) ("Where a more carefully drafted complaint might state a claim, a [*pro se*] plaintiff must be given at least *one chance* to amend the complaint before the district court dismisses the action with prejudice." (cleaned up)). This is especially so because we've warned Sullenberger that "[n]o further amendments [beyond the SAC] will be permitted." December 6, 2022, Paperless Order. Plus, as we've explained, the CCTV footage—coupled with Sullenberger's own allegations—support the officers' view that they had probable cause to arrest him. In these circumstances—remember, this is Sullenberger's *sixth*[27] attempt at stating a viable claim against these officers—we're confident that any further amendment would be futile. *See L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020) ("Although a district court 'should freely give leave [to amend] when justice so requires,' it may deny leave, *sua sponte* or on motion, if amendment would be

---

[27] *See* Initial State Court Complaint [State D.E. No. 1]; *see also* First Amended State Court Complaint [State D.E. No. 38]; Second Amended State Court Complaint [State D.E. No. 55]; Initial Complaint [ECF No. 1]; First Amended Complaint [ECF No. 12]; SAC.

futile. Leave to amend would be futile if an amended complaint would still fail at the motion-to-dismiss or summary judgment stage." (quoting FED. R. CIV. P. 15(a)(2) (cleaned up))); *see also Jemison v. Mitchell*, 380 F. App'x 904, 907 (11th Cir. 2010) ("When it appears that a *pro se* plaintiff's complaint, if more carefully drafted, might state a claim, the district court should give the *pro se* plaintiff an opportunity to amend his complaint instead of dismissing it with prejudice. Dismissal with prejudice is proper, however, . . . if a more carefully drafted complaint could not state a valid claim." (cleaned up)). But, because this is the first time *we've* addressed Sullenberger's claims on the merits, we **DISMISS** his § 1983 claims against the officers **without prejudice**.

### D.       Sullenberger has failed to state a viable § 1983 claim against the City.

Sullenberger's § 1983 false-arrest and malicious-prosecution claims against the City fare no better. "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *see also Phillips v. City of West Palm Beach*, 2018 WL 3586179, at *9 (S.D. Fla. July 26, 2018) (Bloom, J.) ("We have consistently refused to hold municipalities liable [for § 1983 claims] under a theory of respondeat superior." (quoting *Bd. of Cnty. Comm'r of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997))). To establish this causal connection, Sullenberger must allege that the City has a "policy or custom that caused his injury." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (cleaned up). "A policy is a 'decision that is officially adopted by the law enforcement agency, or created by an official of such a rank that he or she could be said to be acting on behalf of the law enforcement agency.'" *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1299 (11th Cir. 2023) (quoting *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1356 (11th Cir. 2022)). And "[a] custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." *Ibid.* (quoting *Christmas*, 51 F.4th at 1356).

Sullenberger has identified no such policies, *see generally* SAC, and the closest he comes to challenging an unconstitutional custom is his allegation that "CGPD failed to train de-escalating techniques, failed to discipline officers, failed to supervise investigations, and condon[ed] the use of excessive force and unlawful arrest[.]" SAC ¶ 13. That isn't nearly enough. For one thing, on his claim that the City failed to train or supervise its officers, Sullenberger has a high bar to clear. *See Anderson v. Fulton Cnty. Gov't*, 485 F. App'x 394, 396 (11th Cir. 2012) (per curiam) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *see also Mindler v. Clayton Cnty., Ga.*, 831 F. Supp. 856, 861 (N.D. Ga. 1993) (Carnes, J.) ("As the Eleventh Circuit Court of Appeals has observed, when interrelated claims of failure to train and failure to supervise and provide corrective training are raised, the court should focus on the element common to both claims: the alleged failure to train." (citing *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1555 (11th Cir. 1989))). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference to the rights of persons* with whom the police come into contact." *Gold*, 151 F.3d at 1350 (emphasis added) (quoting *City of Canton*, 489 U.S. at 388). And, "[i]n order to establish a municipality's deliberate indifference, . . . 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise *in a particular area* and the municipality made a deliberate choice not to take any action.'" *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) (per curiam) (emphasis in original) (quoting *Gold*, 151 F.3d at 1350). Sullenberger has made no such showing here. *See generally* SAC. He, in fact, never alleges that the City knew of the need to train in any specific area—and he never says that the City was deliberately indifferent to that need. For another, Sullenberger's allegation that the City "failed to discipline officers [and] condon[ed] the use of excessive force and unlawful arrest," SAC ¶ 13—two sides of the same coin—comes up short because he has "not alleged any sort of departmental history of abuse that

would have put" the City "on alert." *Nunnelee v. Morgan*, 550 F. App'x 716, 718 (11th Cir. 2013) (per curiam).[28]

Sullenberger's § 1983 claims against the City also fail because he hasn't identified any other civil rights violations by the City beyond *his* arrest and prosecution.[29] *See* SAC ¶ 6 ("Nature of Case: Plaintiff . . . is suing under Sections 1983 and 1985. Where the [City] and [the Defendant officers] unreasonably invaded and violated *Sullenberger's* constitutional and federal rights." (emphasis added)). And it's well-settled that a plaintiff cannot establish an illegal policy or custom based only on the unconstitutional conduct the government officials directed at him. *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality. A pattern of similar constitutional violations is ordinarily necessary." (cleaned up)); *see also Marantes v. Miami-Dade Cnty.*, 649 F. App'x 665, 672 (11th

---

[28] True, "[u]nder certain circumstances, municipal liability may also be based on a single decision by a municipal official with final policymaking authority." *Davis*, 78 F.4th at 1352 n.7. But Sullenberger has offered no such allegations here. *See generally* SAC.

[29] Sullenberger does mention that the officers "proceeded to arrest [his] neighbor Luis Santamaria, hours later, in his home, warrantless, dragging him out of bed and charging him with a misdemeanor." SAC ¶ 8. But Santamaria's arrest was inextricably intertwined with Sullenberger's. *See* Initial Complaint ¶¶ 4, 10, 11 (noting that Sullenberger and Santamaria had been interacting on the night of December 2, 2017, and explaining that the latter was on the former's property when the officers arrived); *see also id.* ¶ 24 ("Approximately 4 hours after the initial incident, Sergeant Ike with the Coral Gables Police ordered the arrest of my neighbor Luis Santamaria while in his bed. A 65 year old dentist and charged him with interfering. This action removed him as a witness in my criminal case. His charges were dropped soon after when he accepted a deal that he would not sue."). So, it's not evidence of a "longstanding and widespread practice." *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011).

In any event, Santamaria's arrest doesn't resemble Sullenberger's at all. Remember that the crux of the unconstitutional custom Sullenberger is complaining about is the City's (alleged) failure to train its officers against the excessive use of force—or to discipline them when they do use force. *See* SAC ¶ 13. But he never alleges that the officers used excessive force against Santamaria. *See* SAC ¶ 24. The Santamaria arrest thus doesn't get Sullenberger any closer to "establish[ing] a *pattern* of substantially similar constitutional violations[.]" *Landau v. City of Daytona Beach*, 2023 WL 6622208, at *17 (11th Cir. Oct. 11, 2023) (per curiam) (emphasis added).

Cir. 2016) (per curiam) ("To establish the existence of a custom, the plaintiff must show a 'longstanding and widespread practice.'" (quoting *Craig*, 643 F.3d at 1310)).

Still, because Sullenberger *might* be able to allege that "the inadequacy of [the City's] police training . . . amounts to *deliberate indifference to the rights of persons* with whom the police come into contact," *Gold*, 151 F.3d at 1350 (citation omitted), an amendment here *might* not be futile. We therefore **DISMISS** Sullenberger's § 1983 claims against the City **without prejudice**.

## II.      Sullenberger's State-Law Claims

Although Sullenberger has asserted several state-law claims (Counts I–III and V), his "federal claims are the only mechanism by which we [can] exercise original jurisdiction over this case." *Floyd v. Broward Cnty. Sheriff's Dep't*, 2019 WL 4059759, at *4 (S.D. Fla. Aug. 28, 2019) (Altman, J.). And a district court may decline to exercise supplemental jurisdiction over a state-law claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966) (outlining these factors). The power to hear cases via pendent jurisdiction "need not be exercised in every case in which it is found to exist." *Gibbs*, 383 U.S. at 726. As the Supreme Court has said, supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *Ibid.* "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Ibid.*; *accord Vibe Micro*, 878 F.3d at 1296 ("When all federal claims are dismissed before trial, a district court should typically dismiss the pend[e]nt state claims as well."). Given the failure of Sullenberger's federal claims, we'll follow the Supreme Court's admonition and decline to exercise our supplemental jurisdiction over Sullenberger's

state-law claims (Counts I–III and V) here.[30] Of course, Sullenberger may refile these state-law claims—either in state court or in his third amended complaint here. *See Vibe Micro*, 878 F.3d at 1296 ("[T]o whatever extent that the [complaint] include[d] state law claims, the [district court's] dismissal should have been without prejudice as to refiling in state court.").

\* \* \*

To recap: We've dismissed all of Sullenberger's federal claims[31]—though we'll give him one final chance to state viable § 1983 claims against the officers and the City. We've also elected not to exercise our supplemental jurisdiction over Sullenberger's state-law claims until he can prove that his federal claims have merit. Sullenberger may therefore file **ONE FINAL** amended complaint by **February 23, 2024**, in which he may assert § 1983 claims against the officers and the City. He may also advance whatever non-frivolous, state-law claims he thinks he still has. But Sullenberger will be

---

[30] Exercising supplemental jurisdiction over these state-law claims would be particularly inappropriate here—where the Defendants have moved to dismiss them on purely state-law grounds. *See* MTD at 12 (arguing that Sullenberger's state claims are barred by Florida's statute of limitations); *id.* at 19–21 (arguing that Counts I and II should be dismissed because Sullenberger failed to state claims for assault or battery under Florida law); *id.* at 22–23 (same, but for Count III's false-imprisonment claim); *id.* at 24 (same, but for the malicious-prosecution claim in Count V); *id.* at 24–26 (arguing that the officers are entitled to statutory immunity under Florida law). For reasons of fairness and comity, these exclusively state-law questions should be handled by a state-court judge (which is how they were being handled for nearly three years before Sullenberger abandoned that suit and filed his complaint here in federal court).

[31] We note that Sullenberger "[d]emands punitive damages in the amount of $29,012,542.40," SAC ¶ 49, and "[r]equests [apparently additional] punitive damages the Court may deem proper and just," *id.* ¶ 52. But punitive damages are not available in claims against municipalities under § 1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."); *see also Truesdell v. Thomas*, 889 F.3d 719, 724–25 (11th Cir. 2018) (noting that under § 1983—"which is silent about damages"—"the common law tradition of not assessing punitive damages against municipalities" applies). And the standard for securing punitive damages against individual police officers under § 1983 is quite high. *See Pounds v. Dieguez*, 850 F. App'x 738, 742 (11th Cir. 2021) ("Punitive damages may be awarded under § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others.'" (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983))). So, Sullenberger will only be able to seek punitive damages in his third amended complaint if he can make a particularly compelling showing—under § 1983 or state law—in his claims against the individual officers.

given no more chances. If we dismiss his third amended complaint, we *will* dismiss it **with prejudice**.

**DONE AND ORDERED** in the Southern District of Florida on January 23, 2024.

 

 

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record
       Simon Gerald Sullenberger, *pro se*