UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-21830-ALTMAN/Reid

**SIMON GERALD SULLENBERGER**,

       *Plaintiff*,

*v.*

**THE CITY OF CORAL GABLES**, *et al.*,

       *Defendants.*

_____/

## ORDER

On the night of December 2, 2017, two City of Coral Gables police officers responded to a burglar alarm at the home of our Plaintiff, Simon Gerald Sullenberger. Instead of finding a burglar, the officers found Sullenberger, standing in his yard and holding his lawfully owned shotgun. After a standoff and altercation, the officers tased and handcuffed Sullenberger. The State Attorney's Office brought (but eventually dropped) criminal charges against Sullenberger, who responded by suing the City and the officers who arrested him in state court. But, after litigating his Florida case for two-and-a-half years, Sullenberger abandoned it and brought this new action here—in federal court.

Before us now is Sullenberger's Third Amended Complaint (the "TAC") [ECF No. 81],[1] which the Defendants have moved to dismiss, *see* Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (the "TAC MTD") [ECF No. 86]. After careful review, we **GRANT in part** and **DENY in part** the TAC MTD and **DISMISS** *with prejudice* most of Sullenberger's claims, except for (1) his 42 U.S.C. § 1983 claim for excessive force against Officer Flores, (2) his state-law battery claim

---

[1] Sullenberger botches the numbering of the TAC's paragraphs. After paragraph 117, the numbering starts again at 100. *See* TAC at 10. That means there are duplicate paragraphs 100–117. When citing to one of those paragraphs, then, we will also add the relevant page number.

against Officer Flores, and (3) his state-law malicious-prosecution claim against Officers Flores and

Nuñez.

**FACTUAL AND PROCEDURAL HISTORY**

"At or around 7:31 pm on December 2, 2017, Sullenberger accidentally locked himself outside

his [Coral Gables] home when he was actively in preparation to go to the shooting range the next

morning." TAC ¶ 24.[2] "When attempting to gain entry into his home the ADT alarm was

triggered . . . in Emergency Panic Mode." *Id.* ¶¶ 25–26. Sullenberger "walk[ed] to his neighbor's house,

[Dr. Luis] Santamarina, and request[ed] to use their phone to contact his mother to explain the alarm

accidentally went off, have ADT cancel and have the police notified that no response was required."

*Id.* ¶ 27.[3] "At or around 7:51 pm, . . . Sullenberger retriev[ed] his shotgun from his residence (a back

house detached from the main residence)" and returned "to the front of his home placing the shotgun

on a small table." *Id.* ¶ 29.

Around this time, Officers Natalie Flores and Jecabseel Nuñez of the Coral Gables Police

Department arrived at Sullenberger's street but "d[id] not make contact with him." *Id.* ¶ 31.

Sullenberger, unaware of the officers' presence, "sat down and began the process of clearing shells

from his shotgun magazine tube as he was about to enter his home[.]" *Id.* ¶ 32. "At or around 7:53

Luis Santamarina arrive[d] to Sullenberger's residence and beg[an] to have a conversation." *Id.* ¶ 33.

But, "[a]t or around 7:54 pm[,] Sullenberger heard an unidentified person, actively concealing

themselves, standing on the public sidewalk, behind tall hedges." *Id.* ¶ 34. "This person did not arrive

in a police car, displaying blue and red police lights and sirens responding to an Emergency Panic

Alarm." *Id.* ¶ 35. "Sullenberger clearly stated to this person not to enter the property as they stood on

---

[2] Any minor grammatical errors that appear in our quotations of the TAC are from the original. Any alterations are indicated by brackets.

[3] The parties occasionally misidentify Dr. Santa*marina* as Dr. Santa*maria.*

the sidewalk, not visible to Sullenberger." *Id.* ¶ 36. "The person failed to announce their presence or identify themselves as law enforcement, leading to confusion and fear." *Id.* ¶ 38. "Sullenberger and Santamarina informed this person that Sullenberger was the legal resident." *Id.* ¶ 39. "This person," however, "entered Sullenberger's property," *id.* ¶ 40, and "Sullenberger feared for his life," *id.* ¶ 41.

"[N]ot know[ing] that this person was a police Officer," Sullenberger backed away, "removed his shotgun from the table behind him and backed away [some more]." *Id.* ¶¶ 42–43. "[T]his person in the dark did not reasonably appear to be an officer, arrived on foot, wearing dark navy or black clothing[.]" *Id.* ¶ 43. "This person did not ask Sullenberger or Santamarina for Identification." *Id.* ¶ 44. At some point—we don't know exactly when—Sullenberger apparently had reason to think that the individual was either a police officer or someone pretending to be a police officer, because he notes that the individual could have "be[en] a police impersonator with a police radio scanner going to a canceled alarm to commit a crime." *Id.* ¶ 48.

This individual—who, as we'll see, was our Defendant Officer Nuñez—approached Sullenberger with his service weapon drawn. *See* CCTV Footage at 19:55:20.[4] And alongside Officer Nuñez was Dr. Santamarina, who was trying to defuse the situation. *See ibid.* While speaking to (and gesticulating at) the two approaching men, Sullenberger—shotgun still clutched in his left hand—

---

[4] At this point, a CCTV camera mounted on Sullenberger's home began to record the action, and both Sullenberger and the Defendants rely on that same CCTV footage. The Defendants filed a Motion for Conventional Filing of Video Footage [ECF No. 46], which we granted, *see* January 24, 2023, Paperless Order [ECF No. 47]. Since both parties rely on it, we've watched it ourselves and will cite it throughout this Order. *Cf. Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) ("Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed. . . . Evidence is 'undisputed' in this context if its authenticity is unchallenged." (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002))); *see also McDowell v. Gonzalez*, 424 F. Supp. 3d 1214, 1223 (S.D. Fla. 2019) (Bloom, J.), *aff'd*, 820 F. App'x 989 (11th Cir. 2020) (per curiam) (finding that the incorporation-by-reference doctrine applies to video evidence—including body camera footage—where, as here, both parties referred to it in their motion-to-dismiss briefing).

slowly backed away. *See id.* at 19:55:20–25. Although the CCTV footage has no sound, it's clear from the men's body language and affect that they weren't discussing the weather: again, Sullenberger was brandishing a shotgun, which he refused to put down, while vigorously pointing at Officer Nuñez; Officer Nuñez, in turn, was aiming his pistol at Sullenberger while appearing to shout back at him; and Dr. Santamarina, for his part, was looking back and forth nervously at the other two while speaking and motioning with his arms in an apparent effort to deescalate the situation. *See id.* at 19:55:20–35. Sullenberger eventually moved across the yard towards Officer Nuñez and Dr. Santamarina before finally dropping his shotgun, which Officer Flores secured. *See id.* at 19:55:32–56:06.

With the shotgun out of the way, Officer Nuñez holstered his own gun, approached Sullenberger slowly, and then placed his hand on Sullenberger's outstretched wrist. *See id.* at 19:56:11–16.[5] A few seconds later, with the two men still talking to one another, Sullenberger removed his arm from Officer Nuñez's grip and backed away from him. *See id.* at 19:56:24–28. When Officer Nuñez took a step towards Sullenberger, Sullenberger threw what appeared to be a punch at Officer Nuñez. *See id.* at 19:56:31.[6] The two men then began to stand-up wrestle—with Dr. Santamarina trying to

---

[5] According to Sullenberger, upon "dropping the shotgun," he was "met by aggression and almost immediate attack from Nuñez." TAC ¶ 55. The CCTV footage shows that this is plainly untrue—as are *many* of his descriptions of what happened during the altercation. *See, e.g., id.* ¶¶ 56–58, 70, 77, 86, 92, 105 at 9, 109 at 9, and 113 at 10. Normally, in adjudicating a motion to dismiss, we would "accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). "But where a video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account." *Baker*, 67 F.4th at 1277–78 (cleaned up); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (noting—albeit in the summary-judgment context—that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts"). So, while we accept as true Sullenberger's account of everything that occurred *before* and *after* the events captured on CCTV, we'll also consider the video's unambiguous depiction of what happened *during* those 120 seconds.

[6] Sullenberger suddenly launched his arm forward—though we cannot say whether his fist was open or closed. Officer Nuñez then staggered backwards. *See id.* at 19:56:31.

break them up—and, for a second or two, Sullenberger managed to get Officer Nuñez in a kind of bear hug from behind. *See id.* at 19:56:31–34. Officer Nuñez quickly broke loose, however, and he and Sullenberger (with Dr. Santamarina beside them) crashed around the yard for several more seconds before falling over a low wall onto the sidewalk, where Officer Flores tased Sullenberger. *See id.* at 19:56:34–46.[7] With Sullenberger finally subdued, the officers arrested him. *See* TAC ¶ 147 ("The *false arrest* of Sullenberger represents a direct violation of his Fourth Amendment rights[.]" (emphasis added)).[8]

As we've noted, the video shows two officers who demonstrated remarkable restraint in the circumstances. Indeed, given his egregious conduct, Sullenberger is lucky to be alive. In any event, the State Attorney's Office eventually charged Sullenberger with two counts of resisting an officer with violence and with a firearm, two counts of attempted aggravated battery on a law enforcement officer, and two counts of attempted murder of a law enforcement officer in the second degree. *See* Arrest Affidavit [ECF No. 90] at 113–15.[9] But—after roughly three years of pursuing this prosecution—the State dropped all criminal charges against Sullenberger on December 14, 2020. *See* Second Amended Complaint (the "SAC") [ECF No. 34] ¶ 5; *see also* TAC ¶ 159 ("The proceedings against Sullenberger were terminated in a manner that indicated his innocence or at the very least, the insufficiency of evidence against him.").

On November 8, 2019—one year before Sullenberger's criminal charges were dropped and two years after his arrest—Sullenberger sued the City and Officers Flores, Nuñez, and Puga in

---

[7] Critically—as we'll see in our discussion of Sullenberger's § 1983 claim for excessive force against Officer Flores—the CCTV footage cuts off shortly after Officer Flores first deploys her taser.

[8] Our third Defendant-Officer—Jorge Puga, who would eventually be "assigned as Lead Investigator"—arrived on scene *after* the arrest. SAC ¶ 14 (cleaned up).

[9] We don't know how long Sullenberger was detained because he never tells us. *See generally* TAC; Plaintiff's Opposition to Defendant's Motion to Dismiss Third Amended Complaint (the "TAC MTD Response") [ECF No. 90].

Florida's Eleventh Judicial Circuit in and for Miami-Dade County.[10] In that state-court civil case, Sullenberger asserted counts of assault-and-battery against Officers Flores and Nuñez, false imprisonment against all Defendants, and negligence against the City. *See generally* Initial State-Court Complaint [State Docket Entry ("DE") No. 1]. The Defendants filed separate motions to dismiss, which the state court granted in part and denied in part. *See* State-Court Order on Defendants' Motions to Dismiss [State DE No. 35]. Specifically, the state court dismissed without prejudice the assault-and-battery claims against Officers Flores and Nuñez and the negligence claim against the City. *Id.* at 1–2. But it denied the motions to dismiss the false-imprisonment claim against all Defendants. *Id.* at 1.

Sullenberger responded with his first amended state-court complaint, asserting only assault-and-battery charges against Officers Flores and Nuñez and a false-imprisonment claim against all four Defendants. *See* First Amended State-Court Complaint [State DE No. 38]. The state court dismissed the assault-and-battery claims without prejudice for failure "to allege facts giving rise to independent torts" and dismissed[11] the false-imprisonment claim as to the officers (but not as to the City). *See* State-Court Order on Defendants' Motion to Dismiss Amended Complaint [State DE No. 54] at 1–2.

On September 10, 2021, Sullenberger filed his second (and final) amended state-court complaint. *See* Second Amended State-Court Complaint [State DE No. 55]. In it, he asserted assault-

---

[10] That action received Florida case number 2019-033136-CA-01, and the filings are publicly available at www2.miamidadeclerk.gov. As we discussed in our June 26, 2024, Order [ECF No. 95], we may take judicial notice of state-court proceedings and pleadings in resolving a motion to dismiss. *See Talley v. Columbus, Ga. Hous. Auth.*, 402 F. App'x 463, 465 n.4 (11th Cir. 2010) ("Although the district court was ruling on a motion to dismiss, the court properly examined extrinsic documents detailing [the plaintiff's] previous state and federal court cases[.]"); *see also Cave v. Stone*, 2021 WL 4427451, at *2 (S.D. Fla. Sept. 27, 2021) (Altman, J.) ("Even if the Motion [to Dismiss] hadn't advanced a factual challenge under Rule 12(b)(1), though, we'd likely take judicial notice of these extrinsic documents anyway. Federal Rule of Evidence 201 permits a federal court to take judicial notice of state-court records because, generally, those records 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting FED. R. EVID. 201(b))). And we do so here.

[11] The state court didn't say whether this dismissal was with or without prejudice. *See* State-Court Order on Defendants' Motion to Dismiss Amended Complaint [State DE No. 54].

and-battery claims against Officers Flores and Nuñez and a false-imprisonment claim against the City. *See generally ibid.*[12] The City denied all liability on the false-imprisonment claim, *see generally* City's Answer and Affirmative Defenses [State DE No. 57], and Officers Flores and Nuñez sought dismissal of the assault-and-battery claims, *see generally* Defendant Officers' Motion to Dismiss the Second Amended State-Court Complaint [State DE No. 58].

On June 15, 2022, while the state-court case was pending, Sullenberger filed this federal lawsuit *pro se. See* Initial Complaint [ECF No. 1]. In this federal case, Sullenberger sued Officers Puga, Flores, and Nuñez—as well as the City—under 42 U.S.C. § 1983, alleging a "violation of his Fourth Amendment right to be free of unlawful seizures." *Id.* ¶ 29. As redress, he sought compensatory damages for "actions taken by Defendants, including: unlawful and humiliating arrest, assault, battery, false imprisonment, and negligence." *Id.* ¶ 30. He also demanded punitive damages against the City for "recklessly disregarding [his] Constitutional right to be free of unlawful seizures." *Id.* ¶ 31. After Officer Puga filed a Motion to Dismiss [ECF No. 10], Sullenberger filed his First Amended Complaint [ECF No. 12], asserting claims under § 1983 against all four Defendants for violating *both* his "Fourth Amendment right to be free of unlawful seizures" *and* his right to "due process under the Fourteenth Amendment." First Amended Complaint ¶ 32. He also asserted state-law claims for unlawful arrest, assault, battery, false imprisonment, and negligence against all four Defendants. *Id.* ¶ 33.

On October 18, 2022, the *state* court discovered this new *federal* proceeding and dismissed Sullenberger's Second Amended State-Court Complaint. *See generally* Order of Dismissal [State DE No. 86]. According to the state court:

> Plaintiff filed a Notice of Removal to United States District Court [State DE No. 84] and attached a copy of First Amended Complaint filed in the Southern District of Florida. Plaintiff did not attach a Civil Cover Sheet indicating that this State Case had been removed to federal court. . . . Plaintiff stated on the record that it is his intention

---

[12] For whatever reason, Sullenberger didn't sue Officer Puga this time.

> to dismiss this action and proceed in federal court. . . . Based upon the
> Plaintiff's notice of removal and Plaintiff's stated intention to dismiss
> this action and proceed in federal court, this case is hereby dismissed.

*Id.* ¶¶ 3, 5, 7.[13]

Back in federal court, all four Defendants filed a Joint Second Motion to Dismiss [ECF No. 26]. Sullenberger responded with a Motion for Leave to File a Second Amended Complaint [ECF No. 31], which we granted, *see* December 6, 2022, Paperless Order [ECF No. 32]. In doing so, however, we warned Sullenberger that "[n]o further amendments [beyond the Second Amended Complaint] will be permitted." *Ibid.*

Sullenberger filed his SAC two days later. In it, Sullenberger advanced the following state-law claims: assault against Officers Flores and Nuñez (Count I), *see* SAC ¶ 17; battery against Officers Flores and Nuñez (Count II), *see id.* ¶¶ 18–22; false imprisonment against all Defendants (Count III), *see id.* ¶¶ 23–29; and malicious prosecution against a non-party, the State Attorney's Office (Count V), *see id.* ¶¶ 37–41. As for his federal claims, he shoehorned all of them into Count IV, which he unhelpfully titled "Section 1983, 1985." *See id.* ¶¶ 30–36. The gist of Count IV was that the Defendants (1) conspired to write a false arrest report to justify Sullenberger's arrest; (2) "deliberately and maliciously" brought and maintained an unlawful prosecution against him; and (3) harassed Sullenberger and his family "by revving their engines in front of [Sullenberger's] house in the middle of the night, flooding [the] house with their spotlights, parking on [Sullenberger's] street, and installing cameras on [the nearby] stop sign." *Ibid.*

---

[13] It's hornbook law that a *plaintiff* cannot remove a case from state to federal court. *See* 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed *by the defendant or the defendants*, to the district court of the United States[.]" (emphasis added)); *see also Rigaud v. Broward Gen. Med. Ctr.*, 346 F. App'x 453, 454 (11th Cir. 2009) (per curiam) (affirming a district court's conclusion that "a plaintiff . . . could not remove her own action").

The Defendants filed their Motion to Dismiss Sullenberger's Second Amended Complaint (the "SAC MTD") [ECF No. 45] on January 23, 2023, asking us to dismiss all five counts with prejudice. We granted the SAC MTD, dismissing Sullenberger's § 1985 claims *with prejudice* and his § 1983 claims *without prejudice*. *See* January 24, 2024, Order [ECF No. 80] at 15, 27. We also declined "to exercise our supplemental jurisdiction over Sullenberger's state-law claims until he [could] prove that his federal claims have merit." *Id.* at 31. Accordingly, we told Sullenberger that he "may file **ONE FINAL** amended complaint . . . in which he may assert § 1983 claims against the officers and the City. He may also advance whatever non-frivolous, state-law claims he thinks he still has. But Sullenberger will be given no more chances. If we dismiss his third amended complaint, we *will* dismiss it **with prejudice**." *Id.* at 31–32.

Sullenberger then submitted this (operative) TAC on February 23, 2024. In it, he now asserts fourteen counts against the various Defendants:[14]

Count I:     Violation of Fourth Amendment (Excessive Force) against Nuñez under § 1983

Count II:    Violation of Fourth Amendment (Excessive Force) against Flores under § 1983

Count III:   Violation of Fourth Amendment (Unlawful Entry) against Nuñez under § 1983

Count IV:    Violation of Fourth Amendment (Unlawful Entry) against Flores under § 1983

Count V:     False Arrest (False Imprisonment) against All Defendants

Count VI:    Municipal Liability (Failure to Train) against the City under § 1983

---

[14] Sullenberger lost track numbering his many counts—an understandable error given that his TAC resembles a list of Super Bowl winners. We'll therefore ignore Sullenberger's numbering scheme (asserting Counts VIII, IX, X, XI, X, XI, XII) and treat the final three claims as Counts XII, XIII, and XIV.

Count VII:       Malicious Prosecution against All Defendants

Count VIII:     Violation of Due Process (Failure to Conduct a Thorough Investigation) against Puga under § 1983

Count IX:      Violation of Due Process (Failure to Conduct a Thorough Investigation) against the City under § 1983

Count X:       Battery Claim against Nuñez

Count XI:      Battery Claim against Flores

Count XII:     Violation of Due Process (Abuse of Process) Arising from Unlawful Collusion and Coercion against the City

Count XIII:    Defamation Arising from False Arrest and Malicious Prosecution against the City

Count XIV:    False Arrest/Imprisonment against the City

*See generally* TAC.[15] Based on these claims, Sullenberger asks us to "award[ ] compensation for both [his] economic and non-economic losses." *Id.* at 28.[16]

---

[15] To resuscitate his case, Sullenberger tells us that "[he] feared for his life," that he didn't immediately "know that [Officer Nuñez] was a police officer," and that the Defendant-Officers could have been "police impersonator[s]." TAC ¶¶ 41, 43, 48. While these new details help make Sullenberger's initial actions more understandable, they have nothing to do with *the Officers'* reasons for behaving as they did—which is all that matters to the qualified-immunity inquiry. In the end, we're still left with two officers who—responding to a home's burglar alarm on a dark night—came across a man who was holding a shotgun in that home's yard. *See* TAC ¶¶ 25–26 ("When attempting to gain entry to his home the ADT Alarm was triggered . . . in Emergency Panic Mode."); *id.* ¶ 42 ("It was only when this person entered Sullenberger's property that Sullenberger backed away, *removed his shotgun* from the table behind him and backed away [some more]." (emphasis added)); CCTV Footage at 19:55:08 (showing Sullenberger backing away from the table, shotgun in hand). As we've said, the CCTV footage—which undermines much of Sullenberger's account—shows two officers acting with admirable self-restraint in the face of challenging and potentially dangerous circumstances.

[16] Sullenberger has also attached to the TAC the April 9, 2020, Affidavit of Andrew J. Scott, III (the "Scott Affidavit") [ECF No. 81-1]. Mr. Scott is the former Chief of Police of the Boca Raton Police Department, *see* Scott Affidavit ¶ 4, and a frequent expert witness in lawsuits against police officers, *see id.* at 25–30 (listing 33 lawsuits for which he has provided "testimony"). Mainly, Scott opines that Officers Nuñez and Flores could have been less confrontational with Sullenberger. *See, e.g., id.* ¶ 15 ("The officers were clearly inexperienced, developed what is often called 'combat policing' mental[ity], and failed to exercise appropriate de-escalation techniques which include: expanding time, slowing down time, and effective communication."); *id.* ¶¶ 16, 18–20, 34–36, 41–42. He also gives us his impression of the CCTV footage. *See, e.g., id.* ¶ 22 ("Initially, based on review of the surveillance video,

The Defendants filed their TAC MTD—which we adjudicate here—on March 15, 2024. They ask us to dismiss the TAC *with* prejudice because, among other things, "the 'new' factual allegations in the TAC are merely reimagined descriptions of prior allegations adding nothing to materially change the events or circumstances of the December 2, 2017[,] incident and fail to support a plausible claim for relief[.]" TAC MTD at 1. In their view:

> Sullenberger has filed six prior [c]omplaints against some or all of these Defendants always alleging some wrongdoing on behalf of the Defendants, and never conceding any wrongdoing of his own that led to his arrest. . . . [The] TAC . . . contains materially the same set of factual allegations as every previous [c]omplaint, and no new theory of liability which would transform those facts into a viable cause of action. As such, Defendants are entitled to dismissal of Plaintiff's TAC with prejudice.

*Id.* at 3.[17] With the exception of Officer Flores's second and third taser deployments and the propriety of the subsequent prosecution of Sullenberger for two counts of attempted murder of a law enforcement officer, we agree.

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this

---

understanding the application of the law, no evidence supports the arrest of Dr. Santamarina, who was present to help and support the police."); *see also id.* ¶¶ 24, 27–32, and 37–40. Since we're able to see the events depicted on the CCTV footage for ourselves, Scott's Affidavit is of little value here—except when he discusses Officer Puga's investigation, which we'll address in our analysis of Sullenberger's challenge to the propriety of that investigation. *See infra* at 55–62.

[17] The TAC MTD is ripe for resolution. *See* TAC MTD Response; *see also* Defendants' Reply in Support (the "TAC MTD Reply") [ECF No. 92]. We also note that Sullenberger has asserted quite a few additional facts in the TAC MTD Response that we see nowhere in the TAC (or in the exhibits attached to it). We will not consider these assertions, however, because—in adjudicating a motion to dismiss—we are limited to considering *only* those facts that a plaintiff asserts in his complaint (or the exhibits attached to it). *See Long v. Satz*, 181 F.3d 1275, 1278–79 (11th Cir. 1999) (rejecting factual assertions a plaintiff included in her "opposition to the motion to dismiss" because they were "[not] to be found in the complaint").

"plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "Plausibility" is not "probability," "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek*, 832 F.3d at 1246.

Of course, "*pro se* [filings], however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erikson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) ("We also construe the complaint liberally because it was filed *pro se*."). Still, while we treat *pro se* litigants with some leniency, "this leniency does not give a court license to serve as *de facto* counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action." *Schwarz v. Ga. Composite Med. Bd.*, 2021 WL 4519893, at *2 (11th. Cir. Oct. 4, 2021) (per curiam) (cleaned up). Notably, the requirement that "a complaint must contain sufficient facts, accepted as true, to state a claim for relief that is plausible on its face . . . also applies to *pro se* complaints." *Wells v. Miller*, 652 F. App'x 874, 875 (11th Cir. 2016) (per curiam); *see also Saunders*, 766 F.3d at 1266 (recognizing that *Twombly* and *Iqbal* apply to *pro se* complaints).

ANALYSIS

## I.    Sullenberger's Allegations

Before we can analyze the merits of Sullenberger's claims, we must decipher what he's alleging against the City and Officers Flores, Nuñez, and Puga.[18] Counts I–IV, VI, VIII, and IX are straightforward enough, since they explicitly reference § 1983. *See generally* TAC. Likewise, Counts XIII and XIV plainly arise under state law. *See* TAC ¶¶ 183–92. But Counts V, VII, and X–XII are less clear.

We'll start with Count V—"False Arrest (False Imprisonment) against All Defendants." We'll construe Count V as a § 1983 claim. While Sullenberger doesn't mention § 1983 anywhere in Count V, he does say that his "false arrest . . . represents a direct violation of his *Fourth Amendment rights*, which safeguard against unreasonable searches and seizures." *Id.* ¶ 147 (emphasis added). He also claims in Count V that the City's misconduct "is closely linked to the deprivation of Sullenberger's *federally protected rights*," and that these "systemic issues . . . endorse and perpetuate the continued unlawful practices leading to *constitutional violations*." *Id.* ¶ 152 (emphases added). Since Sullenberger addresses Count V to a violation of his *federal constitutional* rights, it fits neatly within the ambit of § 1983. *See*

---

[18] Officer Puga has been something of a peripheral figure in this litigation. As we just saw, Sullenberger has sued him in some—though not all—of the state- and federal-court complaints. *See supra* at 6–10. Because Sullenberger didn't name Officer Puga as a Defendant in the prior (Second Amended) Complaint, the Defendants argue that Officer Puga has been *permanently* dropped from this case, and that it's improper for Sullenberger to try to re-name him as a Defendant now. *See* MTD at 2 n.2 ("Sullenberger did not include Officer Puga in his [SAC], thereby dropping him as a party."). But the case the Defendants cite for this proposition—*Pugh v. Baker*, 2019 WL 760067 (S.D. Ga. Jan. 23, 2019)—doesn't support their argument. There, one of the defendants who was named in the initial complaint was not named in the first amended complaint. *See id.* at *4 ("Mr. Baker asserts that he is 'no longer a named Defendant in this action' because he was dropped from the case in Plaintiff's . . . Amended Complaint. Mr. Baker is correct: he is not, *at this time*, a party to this suit[.]" (cleaned up)). When the plaintiff named that previously dropped defendant in a second amended complaint, the court directed the U.S. Marshal to go ahead and "perfect service" on him. *See id.* at *5. In other words, the court *allowed* the plaintiff to prosecute her claims against that defendant *despite* the fact that he'd previously been dropped from the case.

13

*Motes v. Myers*, 810 F.2d 1055, 1056 (11th Cir. 1987) (construing claims against police officers involving alleged "deprivation of a liberty interest" as § 1983 claims); *Ball v. Ivey*, 2023 WL 3991069, at *2 (N.D. Ala. May 24, 2023) (construing a claim against police officers that involved an "unreasonable search and seizure" as "an unlawful search and seizure claim pursuant to the Fourth Amendment and § 1983"); *Cudger v. Stidwell*, 2020 WL 13660327, at *3 (N.D. Ga. Mar. 11, 2020) ("constru[ing]" a claim against a municipality premised on violations of the Fourteenth Amendment as a "Section 1983 claim"). Section 1983, after all, "provides a federal cause of action for persons subjected to the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' by persons acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State[.]'" *Shepherd v. Wilson*, 663 F. App'x 813, 817 (11th Cir. 2016) (per curiam) (quoting 42 U.S.C. § 1983); *see also Skinner v. City of Miami*, 62 F.3d 344, 347 (11th Cir. 1995) (noting that § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred'" (quoting *Graham v. Connor*, 490 U.S. 386, 393–94 (1989))). We'll therefore treat Count V as a § 1983 false-arrest claim.

Counts X and XI—in which Sullenberger asserts "battery" claims against Officers Nuñez and Flores, respectively—are a bit harder to track. TAC ¶¶ 166–77. As before, though, Sullenberger alleges in these counts that the officers "violat[ed]" his *Fourth Amendment rights* because their "unreasonable and excessive force used in th[ese] unwarranted batter[ies] was a clear infringement of his right to be secure against *unreasonable seizures*." *Id.* ¶¶ 169, 175 (emphasis added). At first glance, then, these claims too appear to arise under § 1983. Unfortunately, that construction runs up against the "well-settled rule that plaintiffs may not use § 1983 to vindicate state-law causes of action like assault and battery." *Sanders v. City of Dothan*, 671 F. Supp. 2d 1263, 1267 n.7 (M.D. Ala. Nov. 30, 2009); *see also McCants v. Jordan*, 2021 WL 1561496, at *9 n.13 (M.D. Fla. Apr. 21, 2021) (Covington, J.) ("[The plaintiff] cannot proceed on these claims because as a matter of law, the state torts of assault and battery are not a

cognizable basis for a § 1983 claim." (cleaned up)). And, if we were to read Counts X and XI as arising under "section 1983 to vindicate a federal right to be free from . . . battery by police officers," we'd have to "treat [them] as duplicative of the excessive-force claims." *Sanders*, 671 F. Supp. at 1267 n.7. We'll therefore construe the TAC (very) liberally and treat Counts X and XI as asserting *state-law* battery claims.

Counts VII and XII are more muddled still. Those counts are titled "Malicious Prosecution against All Defendants" and "Violation of Due Process (Abuse of Process) Arising from Unlawful Collusion and Coercion against the City," respectively. TAC ¶¶ 158–62, 178–82. And neither of these counts explicitly mentions *either* state *or* federal law. In Count VII, Sullenberger contends that "[t]he City, through its law enforcement officers and prosecutorial discretion, exhibited malice or a reckless disregard for Sullenberger's *rights*. . . . Sullenberger suffered significant damages, including . . . the *deprivation of liberty*." *Id.* ¶¶ 161–62 (emphasis added). In Count XII, Sullenberger alleges a "violation of due process (abuse of process) arising from unlawful collusion and coercion against the City." *Id.* at 26. In this latter count, Sullenberger goes on to say that "[t]he orchestration of plea deals contingent upon the waiver of civil rights lawsuits . . . not only compromise[s] the integrity of the justice system but also encroach[es] upon the *constitutional rights* of individuals[.]" *Id.* ¶ 179 (emphasis added). "This orchestrated effort to undermine the pursuit of justice and accountability through the manipulation of legal processes . . . infringes upon Sullenberger's *due process rights*[.]" *Id.* ¶ 181 (emphasis added). But these rights exist in both state and federal law. *See* U.S. CONST. amend. XIV (providing that no "State" shall "deprive any person of life, liberty, or property, without due process of law"); FLA. CONST., Art. I, § 9 ("No person shall be deprived of life, liberty or property without due process of law[.]"). We'll therefore analyze Counts VII and XII under *both* state and federal law.

This, then, is what we're left with:

| | |
|---|---|
| Count I: | § 1983 excessive force against Nuñez; |
| Count II: | § 1983 excessive force against Flores; |
| Count III: | § 1983 unlawful entry against Nuñez; |
| Count IV: | § 1983 unlawful entry against Flores; |
| Count V: | § 1983 false arrest/false imprisonment against all Defendants; |
| Count VI: | § 1983 failure to train against the City; |
| Count VII: | § 1983 (and state-law) malicious prosecution against all Defendants; |
| Count VIII: | § 1983 failure to conduct thorough investigation against Puga; |
| Count IX: | § 1983 failure to conduct thorough investigation against the City; |
| Count X: | State-law battery against Nuñez; |
| Count XI: | State-law battery against Flores; |
| Count XII: | § 1983 (and state-law) violation of due process arising from unlawful collusion and coercion against the City; |
| Count XIII: | State-law defamation against the City; and |
| Count XIV: | State-law false arrest/imprisonment against the City. |

Now that we have a better sense of the claims Sullenberger is advancing, we can begin analyzing them—starting with his federal claims.[19]

---

[19] The parties went back and forth on the question of timeliness in the *previous* round of motion-to-dismiss briefing. *See* SAC MTD at 5 ("Sullenberger's state and federal claims are time-barred by the statute of limitations. The federal claims, raised for the first time in this Court, were filed 6 months after the statute of limitations period had run."); SAC MTD Response [ECF No. 59] at 21–23 (arguing that the statute of limitations had tolled). Rather than resolve this issue in our January 24, 2024, Order, we said this: "If Sullenberger files a new action in state court or a third amended complaint here in federal court—and *should the Defendants (again) assert their statute-of-limitations defenses*—a deeper dive into [Sullenberger's] irregular pleading maneuver [*viz.*, attempting to 'remove' his own case to federal court]

## II.    Sullenberger's § 1983 claims

### a.  An introduction to Sullenberger's § 1983 claims against the Officers

In our prior order, we granted the individual Officers qualified immunity and dismissed (without prejudice) Sullenberger's § 1983 claims against them. *See* January 24, 2024, Order at 15–27. With a few exceptions, we'll do the same here—this time, *with* prejudice.

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v.*

---

may be warranted." January 24, 2024, Order at 6 n.14 (cleaned up & emphasis added). This time around, however, the Defendants *haven't* discussed timeliness (or the statute of limitations) at all. *See generally* TAC MTD; TAC MTD Reply. And we won't construe their request to "incorporate [their] same arguments" from their motion to dismiss Sullenberger's First Amended Complaint, *see* TAC MTD at 8 n.19, as an "assert[ion] of their statute-of-limitations . . . defenses," January 24, 2024, Order at 6. The Defendants have therefore abandoned—at least for purposes of this Order—any arguments they might have advanced about the TAC's timeliness. *See Murdock v. Am. Mar. Off. Union Nat'l Exec. Bd.*, 2022 WL 18024476, at *2 (S.D. Fla. July 13, 2022) (Scola, J.) ("[T]he Defendants 'incorporated by reference' into their motion [for summary judgment] multiple documents filed earlier in this case. . . . Through such an incorporation, the Defendants' instant motion well-exceeded the page limits provided in the Local Rules. The Defendants are reminded that they must abide by the limitations set forth in the Local Rules. If the Defendants desire additional pages in their briefing, they must move for such relief. The Defendants may not 'incorporate by reference' arguments made and facts presented in other documents, which serves only to circumvent the Local Rules and lead the Court through a paper maze of filings."); *see also Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004) ("By attempting to 'incorporate' all of the arguments it made below, [the party] attempts, in effect, to add twenty-five additional pages of lower court briefing to its forty-two page appellate brief. This makes a mockery of our rules governing page limitations and length[.]").

*Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). If the government official makes such a showing, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Ibid.* To qualify as clearly established, a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)).

"Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (cleaned up). In our District, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). In sum, "the doctrine of qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

In determining whether our Defendant-Officers were acting within their discretionary authority, we must keep in mind the different roles they played. Officers Nuñez and Flores responded to the burglar alarm, found Sullenberger, and subdued and arrested him, whereas Officer Puga only became involved during the subsequent investigation. Because Officers Nuñez and Flores were on-duty officers responding to a burglar alarm, *see* TAC MTD Response at 6, they were plainly acting within their discretionary authority when they arrived at Sullenbeger's home to investigate a possible

crime.[20] *See, e.g.*, *Peters v. Caldwell*, 2012 WL 13020713, at *8 (N.D. Ga. Sept. 10, 2012) ("Here, Defendant officers were acting within their discretionary authority in responding to an alarm [that had been] set off[.]"); *Turk v. Crytzer*, 2021 WL 4478616, at *5 n.10 (M.D. Fla. Sept. 30, 2021) (Honeywell, J.) (same); *Pellegrino v. Wengert*, 2016 WL 3690000, at *5 (S.D. Fla. July 12, 2016) (Bloom, J.) (holding that the officers were acting within their discretionary authority when they "respond[ed] to a request for assistance with a burglary"); *Hopson v. City of Birmingham*, 2017 WL 5714290, at *7 (N.D. Ala. Nov. 28, 2017) (finding that the defendant-officers "acted within the scope of their discretionary authority when they investigated . . . burglary allegations and entered [a] [r]esidence"). They were also acting within their discretionary authority when they arrested Sullenberger. *See, e.g.*, *McDowell v. Gonzalez*, 820 F. App'x 989, 991 (11th Cir. 2020) (per curiam) ("A police officer generally acts within the scope of his discretionary authority when making an arrest."); *Howell v. City of Lithonia*, 397 F. App'x 618, 620 (11th Cir. 2010) (per curiam) ("Here, making an arrest clearly fell within the scope of [the defendant's] authority as a police officer.").

Likewise, Officer Puga was acting in his discretionary authority when he performed the functions of a "lead investigator." TAC ¶ 23; *see also McGinley v. Jetton*, 2013 WL 6768352, at *10 (M.D. Fla. Dec. 19, 2013) (Kovachevich, J.) (finding that several law-enforcement defendants "were acting within their discretionary authority" when they participated in various investigations of a fatal vehicle accident); *Wood v. Bailey*, 2022 WL 10278705, at *5 (M.D. Ala. Aug. 5, 2022) ("As an investigator in the District Attorney's Office, it was clearly within [the defendant's] discretionary authority to assist

---

[20] Sullenberger's allegations about the three Officers are consistent with our conclusion that they were acting within their discretionary authority. *See* TAC ¶ 1 ("At or around 7:53 pm, Defendant Officers Nuñez and Flores, *acting under the authority of the City in their official capacity as law enforcement officers*, unlawfully entered Sullenberger's property without a warrant or exigent circumstances, employed excessive force, falsely arrested Sullenberger, and in doing so, egregiously violated Sullenberger's constitutional rights." (emphasis added)); *id.* ¶ 4 ("Defendant Officer Nuñez was, at all relevant times, *a police officer employed by the Coral Gables Police Department* and *acting under color of state law*." (emphases added)); *id.* ¶ 5 (same for Officer Flores); *id.* ¶ 6 (same for Officer Puga).

in investigating, charging, and prosecuting crimes."); *Riebsame v. Prince*, 267 F. Supp. 2d 1225, 1237 (M.D. Fla. 2003) (Presnell, J.) (holding that a sheriff-defendant was acting "within the scope of [his] discretionary authority" when he "supervised the investigations into [the arrestee-plaintiff's] multiple complaints").

Because all three Officers were acting within their discretionary authority, the "burden shift[s] to the plaintiff to establish that the defendant[s] violated clearly established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). As we'll see, except for his § 1983 excessive-force claim against Officer Flores, his state-law battery claim against Officer Flores, and his state-law, malicious-prosecution claims against Officers Flores and Nuñez, Sullenberger fails to meet this burden.

### b. An introduction to Sullenberger's § 1983 claims against the City

Sullenberger has also asserted § 1983 claims against the City.[21] But "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). "Respondeat superior or vicarious liability will not attach under § 1983." *Ibid.*; *see also Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1307 (11th Cir. 2001) ("The law is clear that a municipality cannot be held liable for the actions of its employees under § 1983 based on a theory of respondeat superior."); *Phillips v. City of West Palm Beach*, 2018 WL 3586179,

---

[21] Sullenberger spends a great deal of time criticizing the Coral Gables Police Department for not requiring its officers to use body cameras. *See, e.g.*, TAC ¶ 51 ("The City's failure to mandate body cameras indicates a systemic issue of deliberate indifference towards citizens' rights."); *id.* ¶ 52 ("The lack of body cameras or any recording devices on any of the officers involved demonstrates a lack of transparency and accountability and permitted gross violation of Sullenberger's right to due process."); *id.* ¶ 72 ("The City's indifference to the need for body cameras fosters an environment where officers' misconduct goes unchecked."); *id.* ¶ 116 at 16 ("The City's lack of a mandatory body camera policy at the time of this incident for its officers, coupled with its apparent endorsement of officers' actions despite documented evidence of rights violations, establishes a de facto policy that is both permissive and supportive of such violations."). But he never connects these complaints to a specific cause of action—nor does he suggest that this policy somehow violated one of his constitutional rights. And, because body cameras are a relatively new tool that only some police departments use, we're not sure what kinds of rights a person would have to compel his local police department to issue such a mandate. In any event, since Sullenberger hasn't claimed any such right, we won't further discuss his repeated references to the City's body-camera policy.

at *9 (S.D. Fla. July 26, 2018) (Bloom, J.) ("We have consistently refused to hold municipalities liable [for § 1983 claims] under a theory of respondeat superior." (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997))).

To causally connect municipal conduct to a constitutional violation, a § 1983 plaintiff must allege that the City has a "policy or custom that caused his injury." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (cleaned up). "A policy is a 'decision that is officially adopted by the [law enforcement agency], or created by an official of such a rank that he or she could be said to be acting on behalf of [the law enforcement agency].'" *Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1299 (11th Cir. 2023) (quoting *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1356 (11th Cir. 2022)). And "[a] custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." *Ibid.* (quoting *Christmas*, 51 F.4th at 1356). Notably, a plaintiff cannot establish an illegal policy or custom based *only* on the unconstitutional conduct the government officials directed at him. *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality. A pattern of similar constitutional violations is ordinarily necessary." (cleaned up)); *see also Marantes v. Miami-Dade Cnty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (per curiam) ("To establish the existence of a custom, the plaintiff must show a 'longstanding and widespread practice.'" (quoting *Craig*, 643 F.3d at 1310)).

For these reasons—among others—all of Sullenberger's § 1983 claims against the City fail.

### c.  The § 1983 claims

We'll take Sullenberger's federal claims in chronological order—*i.e.*, the order in which the events underlying each claim occurred.

#### i.  Counts III & IV (Unlawful Entry against Officers Nuñez and Flores)

These claims are Sullenberger's weakest. According to Sullenberger, Officers Nuñez and Flores—lacking either warrants or Sullenberger's consent—"intentionally committed an act of entry

onto Sullenberger's property without probable cause or exigent circumstances." TAC ¶¶ 143, 145. The Officers thus "violated Sullenberger's Fourth Amendment right against unreasonable searches and seizures." *Ibid.* Elsewhere in the TAC, Sullenberger adds:

> Officers Nuñez and Flores did not possess a warrant authorizing their entry onto his property. The absence of such a judicially sanctioned document alone renders their entry legally indefensible. . . . At no juncture did Sullenberger provide consent for the officers to enter his premises. On the contrary, he expressly communicated his desire for the unidentified individuals to remain off his property, a request blatantly disregarded by the officers. . . . The officers' delayed arrival, half an hour following the accidental triggering of an alarm, further negates any assertion of urgency or imminent threat. . . . The actions of Officers Nuñez and Flores contravened established law enforcement protocols regarding entry onto private property. Their failure to announce their identity, coupled with the absence of visible indications of their official capacity (such as marked vehicles or uniforms), compounded the illegality of their entry.

*Id.* ¶ 114. Because we've already established that Officers Flores and Nuñez were acting within their discretionary authority when they responded to Sullenberger's burglar alarm, we now ask whether "(1) the officers violated [his] constitutional rights, specifically his Fourth Amendment right[ ] to be free from unlawful entry onto property," and, if so, "(2) whether those rights were clearly established." *Swofford v. Eslinger*, 671 F. Supp. 2d 1289, 1301 (M.D. Fla. 2009) (Scriven, J.).

The Officers (it's true) didn't have a warrant, didn't obtain Sullenberger's consent, and (taking Sullenberger at his word) failed to identify themselves when they walked up. At the same time, Sullenberger is, of course, wrong to suggest that the Officers weren't wearing uniforms; we can see their uniforms clearly in the CCTV footage. Either way, Sullenberger's Fourth Amendment claims fail because, even without a warrant or consent, the Officers were entitled to rely on the Fourth Amendment's exigent-circumstances exception.

As a preliminary matter, Sullenberger's probably right that the Officers entered the curtilage of his home when they stepped onto his yard—and we agree that his curtilage is protected by the Fourth Amendment. *See United States v. Dunn*, 480 U.S. 294, 300 (1987) ("[T]he Fourth Amendment

protects the curtilage of a house and . . . the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."); *see also United States v. Holmes*, 143 F. Supp. 3d 1252, 1258 (M.D. Fla. 2015) (Corrigan, J.) ("A person's home is at the core of the Fourth Amendment's protection against unreasonable searches and seizures. This protection extends to the curtilage or area immediately surrounding and associated with the house. Where officers without a warrant gather information in the curtilage of the house, they engage in an unreasonable search unless their conduct is explicitly or implicitly permitted by the homeowner." (citing *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013))); *Swofford*, 671 F. Supp. 2d at 1302 ("Warrantless entry into the home or curtilage is unreasonable and, therefore, in violation of the Fourth Amendment, subject to only two exceptions: consent or 'exigent circumstances.'" (quoting *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007))).

Exigent circumstances are "situations in which 'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'" *McClish*, 483 F.3d at 1240 (quoting *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1986)). Examples of exigent circumstances include the need "to break up a violent fight, to prevent the destruction of evidence, to put out a fire in a burning building, to pursue a fleeing suspect, to rescue a kidnapped infant, and to attend to a stabbing victim." *Id.* at 1240–41 (cleaned up). Stopping a possible burglary also qualifies as an exigent circumstance. *See Montanez v. Carvajal*, 889 F.3d 1202, 1208–09 (11th Cir. 2018) ("[W]e hold that if police have probable cause to suspect a residential burglary—whether they believe the crime is currently afoot or has recently concluded—they may, without further justification, conduct a brief warrantless search of the home to look for suspects and potential victims."); *United States v. McCullough*, 457 F.3d 1150, 1164 (10th Cir. 2006) ("Although we have never directly addressed the issue, our sister circuits appear to unanimously agree, and reasonably so in our view, 'that an officer may lawfully enter

a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress.'" (quoting *United States v. Brown*, 449 F.3d 741, 748 (6th Cir. 2006))).

Our case is a lot like the Eleventh Circuit's decision in *Montanez*. In that case, on "a springtime afternoon," a police officer "was driving his unmarked patrol car through a neighborhood that had been experiencing a rash of daytime burglaries." 889 F.3d at 1205. As he drove, he noticed a young man "who was standing on the sidewalk in front of [a] residence . . . and who appeared to be looking around nervously while talking on a cell phone." *Ibid*. The officer "became suspicious of [the young man], who[m] [the officer] said 'seemed anxious' and 'kind of hunched' as he paced up and down in front of the house" before "walk[ing] down a side street toward the back of the dwelling." *Ibid*. As [the officer] observed [the first young man] approach the back door, he saw another young man . . . 'huddling' nearby" whom the officer thought could be "positioning himself to act as a 'lookout' while [the first young man] broke into the house." *Ibid*. The officer "radioed for backup, describing the unfolding situation as a 'burglary in progress.'" *Ibid*.

When a second officer arrived at the home, the two young men were still "near the back door" of the residence. *Ibid*. The officers exited their vehicles with their weapons drawn and "ordered [the two young men] to the ground, where they placed them in handcuffs." *Ibid*. The first officer then "entered the home's back door and stepped through a small vestibule to a second door, which led to the home's interior and was slightly ajar." *Id*. at 1206. "Without crossing the threshold, [he] leaned through the second door and shouted, 'Sheriff's office, come out if anybody's in there, sheriff's office.'" *Ibid*. He heard nothing and "went back outside." *Ibid*. The officers then searched the two young men and discovered that one of them "had two kitchen knives in his pants pockets," which the officer thought could have carved "pry marks" he'd observed near the home's backdoor. *Ibid*. Neither young man's identification card listed the address of the home in question. *See ibid*. The officers thus "concluded that they had interrupted an ongoing burglary" and "formally arrested" the two young

men. *Ibid.* Additional officers arrived, some of whom "entered the home's main structure" *twice* to check "for additional perpetrators or potential victims" and to conduct a "sweep." *Ibid.* "[D]uring the second entry, the officers saw in plain view what they believed to be marijuana and associated drug paraphernalia," which led them to an even more detailed investigation, more entries, and the eventual issuance of a search warrant. *See ibid.* But "the authorities never filed any charges" against the two men. *Ibid.*

The young men and the homeowner then sued the officers, asserting (among other things) an "unlawful-entry" claim under § 1983. *Id.* at 1207. The officers eventually moved for summary judgment on that count (as well as the others) "based on qualified immunity," though the district court denied their motion. *Ibid.* On appeal, the officers argued that "the first two warrantless entries into [the] residence—[the first officer's] initial 10-second entry announcing the police's presence and the officers' ensuing four-minute sweep of the house—were justified by 'exigent circumstances,' or at the very least that no binding precedent 'clearly established' (for qualified-immunity purposes) that those searches were invalid." *Ibid.*

The Eleventh Circuit found it "clear . . . that the officers were acting within the scope of their discretionary authority at all relevant times," so, "in order to defeat qualified immunity [the homeowner] ha[d] to show both (1) that the officers violated his constitutional rights and (2) that those rights were clearly established at the time of the searches in question." *Ibid.* The Eleventh Circuit next noted that, although "searches and seizures inside a home without a warrant are presumptively unreasonable," *id.* at 1208 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)), "police may enter a private premises and conduct a search if 'exigent circumstances' mandate immediate action," *ibid.* (quoting *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)). "The principal question," the Circuit observed, "is whether exigent circumstances justified—and thus rendered 'reasonable'—the officers' first two warrantless entries into [the] house." *Ibid.* The court concluded "that they did,"

reasoning that, "if police have probable cause to suspect a residential burglary—whether they believe the crime is currently afoot or has recently concluded—they may, without further justification, conduct a brief warrantless search of the home to look for suspects and potential victims." *Id.* at 1208–09. As the Circuit explained:

> Our holding—that police investigating what they reasonably believe to be a residential burglary (whether ongoing or recently concluded) may conduct a limited warrantless search of the house to look for potential suspects and victims—comports with the Fourth Amendment's reasonableness requirement, as well as the common wisdom that the textual criterion embodies: It would make no sense to compel an officer confronting a suspected burglary to quit the scene to procure a warrant, thereby jeopardizing the premises, the prospect of catching the culprits, and the safety of potential victims inside the house. What the Supreme Court said about the exigent-circumstances situation that it considered in *Michigan v. Fisher* applies equally in this case: "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here." 558 U.S. 45, 49 (2009) (per curiam).
>
> The rule that we recognize today has the added benefit of clarity. As the Supreme Court has emphasized, "a responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001). Rather, because "the Fourth Amendment has to be applied on the spur (and in the heat) of the moment," the "object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." *Id.* Our holding—pursuant to which the burglary itself creates (or more accurately *is*) the exigency that justifies a limited warrantless entry to search for suspects and victims—provides police, citizens, and reviewing courts the sort of "readily administrable" standard that the Supreme Court has deemed essential in the Fourth Amendment context. *Id.*

*Id.* at 1210–11. The Eleventh Circuit then applied this approach to the facts before it.

> Accordingly, whether the first two entries into [the] residence were constitutionally permissible turns on whether the officers had probable cause to suspect a burglary. If they did, then they could enter—and it seems clear to us that they did. Just before the incident, [the first officer] had been driving through an area that he knew was

experiencing a spate of daytime burglaries. He observed [the first young man] walking around—seemingly nervously—while talking on a cell phone in front of a house whose driveway had no cars in it. He then watched [the young man] take an unusual path around the house to the back door, where he also observed [the second young man] move into what appeared to be a lookout position. After detaining and searching the men, [the first officer] found two kitchen knives in [the first young man's] pockets, and observed what seemed to be fresh— and matching—pry marks near the handle of the home's back door. Finally, [the young men's] IDs listed addresses different from the house's. Under these circumstances, it was perfectly reasonable for the officers to conclude that they had interrupted a burglary.

Given the reasonableness of that conclusion, the officers' first two entries were lawful. [The] 10-second entry into the home's vestibule to announce the police's presence . . . served to alert not only additional perpetrators but also potential victims that law enforcement was on the scene and in control. Moreover, to meet the exigencies of the situation, a brief sweep of the home's main structure was warranted and appropriate. Just as an additional perpetrator likely wouldn't have just surrendered in response to [the first officer's] call, an incapacitated or unconscious victim likely couldn't have answered it. [The officers] therefore sensibly searched the home—looking only in places where a person could be found—and while doing so happened to notice what appeared to be marijuana and drug paraphernalia sitting in plain view on a counter. The officers acted no more broadly than was necessary to address and attend to the exigencies posed by the suspected burglary. Their conduct, therefore, did not offend the Fourth Amendment.

*Id.* at 1211–12.

Our case—at least as far as the alleged unlawful entry goes—is similar. Even more so than the officers in *Montanez*, our Defendants had good reason to believe that a burglary was "currently afoot or ha[d] recently concluded." *Id.* at 1208. After all, Sullenberger's "ADT Alarm" had been "triggered in *Emergency Panic Mode.*" TAC ¶¶ 25–26 (emphasis added). And, when our Defendants arrived at the home in the dark of night, they found a man standing in the yard *holding a shotgun. Id.* ¶¶ 37, 42. While Sullenberger identified himself as the homeowner, the Defendants didn't need to take him at his word. Any burglar could make such a claim. Indeed, our Officers' entry was far *less* intrusive than was the entry in *Montanez*. Whereas our Officers did nothing more than walk onto Sullenberger's front lawn,

the officers in that case actually entered the home twice—and the second entry involved a full protective sweep of the house, which uncovered illegal contraband. Our Officers' warrantless entry onto Sullenberger's property was therefore justified by the exigent-circumstances exception to the warrant requirement and "did not offend the Fourth Amendment." *Montanez*, 889 F.3d at 1212.[22]

Because Sullenberger has failed to show that the Officers violated his Fourth Amendment rights, we **DISMISS** his § 1983 unlawful-entry claims against them.

### ii.    Count V (False Arrest against all Defendants)

According to Sullenberger, "the Defendants lacked any objective, reasonable grounds to believe that [Sullenberger] had committed, was committing, or was about to commit a crime on his own property. The Defendants' actions were predicated on unfounded suspicions and a profound misinterpretation of the situation, devoid of any evidentiary support." TAC ¶ 146. "The Defendants," Sullenberger says, "cannot justify the false arrest on the grounds of exigent circumstances, as none existed at the time of Sullenberger's apprehension. He posed no immediate threat to the officers or the public, and there was no imminent risk of evidence destruction or flight from prosecution that could possibly justify bypassing his constitutional rights." *Id.* ¶ 148. "The haste with which the Defendants proceeded to arrest Sullenberger," he continues, "without conducting a proper and thorough investigation, underscores the arbitrary nature of their actions. A minimal effort to objectively assess the situation would have revealed the absence of any criminal activity on Sullenberger's part." *Id.* ¶ 150. Because the Officers had probable cause to arrest Sullenberger for at least two crimes, these claims fail.

---

[22] We recognize, of course, that *Montanez* came to the court on summary judgment—whereas we're here adjudicating a motion to dismiss. But that doesn't really matter here because the circumstances of the Officers' entry onto Sullenberger's property aren't really in dispute—the only exception being Sullenberger's allegation that the Officers weren't wearing uniforms, an allegation that's *both* irrelevant to the unlawful-entry claim *and* plainly belied by the CCTV. So—again, with the exception of the irrelevant uniform issue—Sullenberger, *even* accepting his allegations as true, hasn't stated a plausible, unlawful-entry claim under the Fourth Amendment.

"Qualified immunity will shield [police officers] from a claim of false arrest without probable cause if there was arguable probable cause, *i.e.*, if a reasonable police officer, knowing what [the Defendants] knew, could have believed there was probable cause for the warrantless arrest." *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999). And "the correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022). The scope or degree of that criminal activity is irrelevant because, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Lorenzo v. City of Tampa*, 259 F. App'x 239, 241 (11th Cir. 2007) (per curiam) (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Also, "[p]robable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (emphasis added). This means that "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey v. Bd. of Cnty. Com'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992).

Taking Sullenberger's allegations as true—except where they conflict with the CCTV footage—our Officers had (at least) arguable probable cause to arrest him. *First*, as we've said, they had a perfectly legitimate reason for responding to his home: the activated security alarm. *See* TAC ¶¶ 25–26 ("When attempting to gain entry to his home[,] the ADT Alarm was triggered . . . in Emergency Panic Mode."). *Second*, when they arrived, the Officers found Sullenberger outside the home holding a shotgun. *See* CCTV Footage at 19:55:02. *Third*, the Officers had no way of knowing for certain whether Sullenberger was a lawful resident of the home (or a burglar), whether he lawfully owned the weapon he was brandishing, or what he intended to do with that weapon. *Fourth*,

Sullenberger refused to drop the weapon for nearly a whole minute after the Officers arrived—even though Officer Nuñez approached Sullenberger with his own gun drawn and was clearly ordering him to comply with his commands. *See id.* at 19:55:02–53.[23] *Fifth*, Sullenberger unquestionably resisted the Officers when they tried to detain him by refusing to surrender himself, removing his arm from Officer Nuñez's grip, punching (or striking) Officer Nuñez, wrapping his arms around Officer Nuñez in a bear hug, and evading the Officers in the moments before he was tased. *See id.* at 19:55:53–56:46. Taken together, that's plenty of probable cause—and certainly *arguable* probable cause—to justify an arrest for two separate crimes: (1) "exhibiting" or openly carrying a firearm;[24] and (2) resisting arrest.[25] *See Davis v. City of Apopka*, 78 F.4th 1326, 1334–35 (11th Cir. 2023) (noting that probable cause depends on the "totality of the circumstances" and adding that a "substantial chance [of criminal activity] is all that is required, 'not an actual showing of such activity'" (quoting *Wesby*, 583 U.S. at 57)).

For the crime of brandishing a shotgun, the Eleventh Circuit's decision in *Pierre v. City of Miramar, Fla., Inc.*, 537 F. App'x 821 (11th Cir. 2013) (per curiam), supports our conclusion here. After hearing "banging on the front door of his home," the owner in that case searched his yard for burglars

---

[23] Again, Sullenberger claims that he dropped the shotgun as soon as he "identified" Officer Nuñez as a police officer. *See* TAC ¶ 54. We accept that as true. But, as we've said, the operative question in this analysis is what a reasonable officer *in Nuñez's position* would have done when confronted, in the dead of night, with a shotgun-wielding Sullenberger.

[24] "If any person having or carrying any . . . firearm . . . shall, in the presence of one or more persons, exhibit the same in a rude, careless, angry, or threatening manner, not in necessary self-defense, the person so offending shall be guilty of a misdemeanor of the first degree." Fla. Stat. § 790.10. Similarly, under Fla. Stat. § 790.053(1), "[e]xcept as otherwise provided by law and in subsection (2), it is unlawful for any person to openly carry on or about his or her person any firearm[.]" As we'll explain shortly, *infra* at 31 & n.26, Sullenberger wasn't charged with violating either of these statutes, but the Officers had probable cause to charge him with violating both—especially the open-carry restriction.

[25] "Whoever knowingly and willfully *resists*, obstructs, or *opposes* any officer . . . in the lawful execution of any legal duty, by offering or doing violence to the person of such officer . . . commits a felony of the third degree." Fla. Stat. § 843.01 (emphasis added). Likewise, "[w]hoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree." *Id.* § 843.02. These two crimes are known as resisting an officer with and without violence, respectively.

while holding a baseball bat and a shotgun. *Id.* at 823. During that search, the owner discussed the banging with his neighbor, who said he would call the police. *Ibid.* The owner reentered his house— and, a short while later, several police officers arrived. *Ibid.* Those officers interviewed the neighbor and eventually phoned the homeowner, ordering him to come out of his house with his hands up. *Ibid.* When the owner complied, the officers searched his house and found the shotgun the homeowner had been carrying around earlier. *Ibid.* Even though the homeowner told the officers that he owned the shotgun, *id.* at 826, they arrested him and charged him with: (1) the reckless display of a weapon, in violation of FLA. STAT. § 790.10; and (2) openly carrying a weapon, in violation of FLA. STAT. § 790.053, *id.* at 823. The homeowner later sued the officers and the city, asserting § 1983 claims for false arrest and false imprisonment. *Id.* at 825–26. The district court granted the defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6), *id.* at 823, and the Eleventh Circuit affirmed, *id.* at 826. "Based on the facts known to Defendant Officers at the time of [the homeowner's] arrest," the Eleventh Circuit explained, "probable cause existed to suspect that [he] was guilty of violating [the open-carry statute]. Thus, [the homeowner] cannot state a claim for relief under section 1983 that is plausible on its face." *Ibid.*

For three reasons, our facts present an even stronger case of qualified immunity. *One*, Pierre never actually brandished the firearm in the officers' presence—which means *both* that they never saw him publicly displaying the weapon *and* that they were never endangered by it. Our officers, of course, arrived on a dimly lit scene in the middle of the night to find an unknown man who continued to hold a shotgun for nearly a minute *in their presence* after they arrived. *Two*, Pierre immediately complied with the officers' commands, whereas Sullenberger (it's clear from the video) refused to drop the shotgun

for almost a whole minute while Officer Nuñez approached him with his gun drawn. *Three*, Pierre (unlike Sullenberger) never resisted the officers when they tried to arrest him.[26]

As we've indicated, however, the Officers *also* had arguable probable cause to arrest Sullenberger for resisting arrest with violence—a crime with which he was eventually charged. *See generally* Arrest Affidavit. As we've explained, under Florida law, "[w]hoever knowingly and willfully resists, obstructs, or opposes any officer . . . in the lawful execution of any legal duty, by offering or doing violence to the person of such officer or legally authorized person, commits a felony of the third degree[.]" FLA. STAT. § 843.01. The CCTV footage makes clear that Sullenberger did all these things: He resisted, obstructed, and opposed an officer who was lawfully executing a legal duty (entering the curtilage of a home to check on an emergency burglar alarm) by offering violence against that officer—and he did all this well after he could see that the Officers were wearing police uniforms. Plus (it goes without saying), the Officers also had probable cause to arrest him for the lesser offense of resisting an officer *without* violence. *See* FLA. STAT. § 843.02 ("Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree[.]").

On this issue, the Eleventh Circuit's decision in *Zivojinovich v. Barner*, 525 F.3d 1059 (11th Cir. 2008), is instructive. The officers in that case—responding to a disturbance at a Ritz Carlton—"were lawfully executing their legal duty by informing [a rowdy and disruptive New Year's Eve reveler] that he was no longer allowed to be on the Ritz's property, escorting him out, and giving him a trespass warning." *Id.* at 1071. "As [the reveler] and the deputies were entering the stairwell [to leave], [the

---

[26] We recognize that Sullenberger wasn't charged with any of the three firearms offenses we've mentioned. But *Pierre* makes clear that he easily could have been, and (as we've said) "[p]robable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners*, 891 F.3d at 969 (emphasis added).

reveler] lurched forward [and] pulled his arm partially free of [the officer's] grip." *Id.* at 1064 (cleaned up). The officer pushed the reveler and—with the help of his partner—"attempt[ed] to handcuff" him. *Ibid.* A "struggl[e]" ensued, which ended only after the officers tased the reveler. *Ibid.* Although the reveler was "tried for resisting an officer with violence," he ultimately pled "no contest to resisting *without* violence." *Id.* at 1065 (emphasis added). After his plea, the reveler sued the officers under § 1983, asserting—among other things—claims of excessive force. *Id.* at 1061–62. The district court granted summary judgment for the officers, *id.* at 1065, and the Eleventh Circuit affirmed, *id.* at 1073. Along the way, the Eleventh Circuit found that "the deputies had probable cause to arrest [the reveler] for resisting arrest without violence" because he had "disobeyed a command by members of law enforcement to sit while they executed their lawful duties." *Id.* at 1072. Our case is very similar. Like the reveler who "lurched forward" and "pulled his arm partially free of [the officer's] grip," *id.* at 1064, Sullenberger pulled his arm away from Officer Nuñez's grip. Of course, Sullenberger then engaged in a level of resistance that far exceeded anything the reveler in *Zivojinovich* tried. As we've said, Sullenberger struck Officer Nuñez, put him in a bear hug, and then grappled with him before the two men fell over a low wall. The holding in *Zivojinovich* thus supports our Officers' request for qualified immunity here.[27]

As *Zivojinovich* teaches, because our Officers had arguable probable cause to arrest Sullenberger—*both* for brandishing the shotgun *and*, separately, for resisting arrest—they didn't violate his Fourth Amendment right to be free from unreasonable seizures. *Cf. Baxter v. Roberts*, 54 F.4th 1241, 1265 (11th Cir. 2022) ("[A] warrantless arrest *without* probable cause violates the Fourth Amendment

---

[27] *See also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558–59 (11th Cir. 1993) (finding qualified immunity for officers who arrested a restaurant manager who'd "raised his hands to [one officer]" because "a reasonable officer . . . could have interpreted [the manager's] raising of hands as resistance," giving the officers "probable cause to arrest").

and forms a basis for a section 1983 claim." (quoting *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) (cleaned up & emphasis added))).

We can also dispose of Sullenberger's false-arrest claim against the City. In this claim, Sullenberger says only the following:

> The systemic inadequacies such as, inadequate training, particularly in de-escalation techniques, which is closely linked to the deprivation of Sullenberger's federally protected rights[,] within the Coral Gables Police Department, as evidenced by this case and other well-documented incidents, reflect an operational custom or policy. Such systemic issues, left unaddressed by the City, effectively endorse and perpetuate the continued unlawful practices leading to constitutional violations.

TAC ¶ 152. This claim fails for two reasons. *One*, as we just explained, the Officers *didn't* falsely arrest (or falsely imprison) Sullenberger because they had arguable probable cause to arrest him for at least two crimes. Since the Officers didn't violate Sullenberger's Fourth Amendment rights, the City cannot be vicariously liable for any such violation. *See, e.g.*, *McDowell*, 424 F. Supp. 3d at 1230 (dismissing a § 1983 vicarious-liability claim against a supervising officer where the subordinate officer "did not violate Plaintiff's Fourth Amendment rights when he arrested Plaintiff based on probable cause"). *Two*, even if the Officers *had* falsely arrested him, Sullenberger's allegation of "systemic inadequacies" in the City is far too vague to justify relief. TAC ¶ 152.

"[A] municipality can be sued under § 1983, but it cannot be held liable *unless* a municipal policy or custom caused the constitutional injury." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993) (emphasis added); *accord Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1116 (11th Cir. 2005) ("[O]nly when a 'policy or custom' of the municipality inflicts the injury does [vicarious] § 1983 liability exist." (cleaned up)). Sullenberger never identifies any City policy or custom that might have caused his injury. Although he alleges that the City inadequately trained its officers, he's already brought a failure-to-train claim against the City in Count VI (which we'll analyze separately, *see infra* § II(c)(vi)). And we won't allow him to proceed on

duplicative claims. *See Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 n.1 (S.D. Fla. 2023) (Altman, J.) ("Because Count III's allegations reappear (essentially verbatim) in Count IV—and since Count III's cause of action is identical to the part of Count IV that's directed at the [the same defendant]—we now dismiss Count III as duplicative of Count IV." (cleaned up)); *Harrison v. Digital Health Plan*, 183 F.3d 1235, 1237 n.1 (11th Cir. 1999) ("We find no error in the district court's . . . dismissal of plaintiff's claim . . . as duplicative[.]").

We therefore **DISMISS** Sullenberger's § 1983 false arrest/false imprisonment claims against all Defendants.

### iii.    Counts I–II (Excessive Force against Officers Nuñez and Flores)

In his § 1983 excessive-force claims, Sullenberger alleges that both Officers "intentionally committed an act that violated Sullenberger's Fourth Amendment right not to be arrested or imprisoned without probable cause";[28] that this "conduct caused injury"; that the Officers were "acting under color of state law as . . . police officer[s]"; and that "[n]o reasonable police officer could have believed that probable cause existed to arrest or imprison Sullenberger for a criminal offense on his own property." TAC ¶¶ 132–33, 135–36, 138, 140–41. As to Officer Nuñez specifically, Sullenberger alleges that the "tactics" employed were "malicious, calculated, and/or premeditated, excessive force with deliberate indifference to Sullenberger's health and welfare, causing great bodily harm." *Id.* ¶ 134. Officer Nuñez, Sullenberger says, "used the [short] wall [at the edge of Sullenberger's yard] as a pivot point to aggressively direct Sullenberger headfirst into the concrete[,] causing serious injury to Sullenberger. Nuñez did not place Sullenberger into the grass, he intentionally with force sent [him] headfirst into the concrete[.]" *Id.* ¶ 58. According to Sullenberger, Officer Nuñez's "use of a 'hip toss' maneuver on Sullenberger, who was not resisting, exemplifies excessive and unnecessary force."

---

[28] We won't address the false-arrest allegations Sullenberger slips into these excessive-force counts because (as we've seen, *supra* § II(c)(ii)) he's brought standalone false-arrest claims under both Florida and federal law. *See* TAC ¶¶ 146–53, 187–92.

*Id.* ¶ 70. As for Officer Flores, Sullenberger alleges that her "use of excessive force against [him], [when he] was not posing a threat and was on his own property, constituted an unreasonable seizure by use of her City-issued taser weapon for 16 continuous seconds in violation of the Fourth Amendment." *Id.* ¶ 139; *see also* TAC MTD Response ¶ 37 (asserting that Officer Flores activated her taser for "3 cycles").

After careful review, we find that Sullenberger falls well short of stating a valid excessive-force claim against Officer Nuñez—though he's done *just enough* to state a claim against Officer Flores. "[W]hen an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." *Horn v. Barron*, 720 F. App'x 557, 562–63 (11th Cir. 2018) (per curiam) (cleaned up); *see also Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) ("[T]he right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" (quoting *Graham*, 490 U.S. at 396). And "this Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). Instead, "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of *excessive* force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (emphasis added).

In deciding whether officers used excessive force, a court must determine "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (cleaned up). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Lee*, 284 F.3d at 1197 (quoting *Graham*, 490 U.S. at 396 (cleaned up)). In assessing the "reasonableness" of the force

the officer used, we look to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Generally, "we do not second guess these decisions where the amount of force applied was not grossly disproportional to [the arrestee's] resistance[.]" *Flowers v. City of Melbourne*, 557 F. App'x 893, 895 (11th Cir. 2014). And, "[i]n deciding whether the force deliberately used is, constitutionally speaking, 'excessive,'" we use an objective measure of reasonableness—that is, we "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *see also Powell v. Snook*, 25 F.4th 912, 921 (11th Cir. 2022) ("We view the facts from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and we balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." (cleaned up)).

"In deciding whether the Officers deployed excessive force against [the arrestee], we'll have to separate the force they used *before* he was [subdued] from the force they employed *after* he was subdued because, generally speaking, '[w]hen jailers continue to use substantial force against a prisoner who has clearly *stopped resisting*—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive.'" *Williams v. Mallet*, 707 F. Supp. 3d 1340, 1355 (S.D. Fla. Dec. 19, 2023) (Altman, J.) (quoting *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 953 (11th Cir. 2019)); *see also Cendan v. Trujillo*, 779 F. App'x 688, 690 (11th Cir. 2019) (per curiam) (noting that the Eleventh Circuit "has repeatedly found it clearly established under the Fourth Amendment 'that officers may not use excessive force against a non-resisting suspect who has already been subdued'" (quoting *Reese v. Herbert*, 527 F.3d 1253, 1274 n.33 (11th Cir. 2008))). The latitude a police officer enjoys in using force to effectuate a lawful arrest turns largely on this question of timing. *Compare Horn*, 720 F. App'x at 564 (finding that "the force applied by [a defendant-officer] in effecting

[a compliant but not yet handcuffed suspect's] arrest—a soft hands, straight arm bar takedown technique, by which he gained control of her by taking hold of her left arm, putting his right arm over her left arm, and using gravity and his own weight to bring her to the ground"—was arguably "unnecessary" but "not unlawful"), *Manners*, 891 F.3d at 974–75 (holding that "tackling," "punching," and deploying a taser on a resisting suspect was not "excessive"), *and Morris v. City of Lakeland*, 2023 WL 2403883, at *6 (M.D. Fla. Mar. 8, 2023) (Covington, J.) (concluding that "strikes" to a suspect's "face" were "objectively reasonable" because the suspect was "resisting arrest"), *with Quinette v. Reed*, 805 F. App'x 696, 705 (per curiam) (11th Cir. 2020) (finding that a two-handed shove to a non-resisting detainee was excessive), *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (a "single punch to the stomach" to a non-resisting detainee was excessive), *and Lee*, 284 F.3d at 1198 ("slam[ming]" an "arrested, handcuffed, and completely secured" individual's head against a car trunk was excessive).

Since we've already found that Sullenberger hasn't accurately recounted everything that happened on December 2, 2017, let's consider again what we *actually see* on the CCTV footage. After Sullenberger placed the shotgun down on the table beside him, Officer Nuñez walked up to him slowly, holstered his firearm, and placed his hand on Sullenberger's shoulder. *See* CCTV Footage at 19:56:16. The two men then appeared to speak with each other for a moment before Sullenberger moved backwards. *See id.* at 19:56:16–28. Officer Nuñez then stepped towards Sullenberger, who responded with a strike of some kind towards the Officer's head, which caused the Officer to stagger backwards. *See id.* at 19:56:31. The two men then began to stand-up wrestle—with Dr. Santamarina trying to break them up—and, for a second or two, Sullenberger managed to wrap his arms around Officer Nuñez in a kind of bear hug from behind. *See* CCTV Footage at 19:56:31–34. Officer Nuñez quickly broke loose, though, and, as the two men struggled, they toppled over a low wall onto the sidewalk, where Officer Flores tased Sullenberger—by now, *out* of the camera's view. *See id.* at 19:56:34–46. Sullenberger is therefore right to say that Officer Nuñez performed a "hip toss"

maneuver, TAC ¶¶ 50, 70, and that Officer Flores tased him, *id.* ¶ 139. But his claim that he "was not resisting," *id.* ¶ 70, is absurd. As we've seen, Sullenberger initiated the struggle by pulling away from, striking at, and wrestling with Officer Nuñez. Because Sullenberger was unquestionably resisting Officers Nuñez and Flores, the force they used to subdue him—with the critical exception of Officer Flores's sixteen-second taser application (which we'll discuss below)—was *nowhere near* excessive.

We'll begin with Officer Nuñez's "hip toss," which sent Sullenberger over the low wall and onto a sidewalk. On this part of the encounter, we find the Eleventh Circuit's decision in *Taylor v. Taylor*, 649 F. App'x 737 (11th Cir. 2016) (per curiam), probative. There, a deputy sheriff arrived at a store parking lot to arrest a suspect who had been making threatening telephone calls. *See id.* at 740. The deputy found the suspect and informed her that "he had warrants for her arrest" and that she "know[s] what we've got to do.'" *Ibid.* (quoting record). The woman answered that "it ain't right that you gonna lock me up for something I ain't done now." *Ibid.* (quoting record). The exchange continued for a few more seconds before the deputy "yell[ed]" that he "had had 'enough.'" *Ibid.* (quoting record). "[W]ithout warning," the 6'1, 280-pound deputy then "grabbed [the woman] and slammed her head face first into the trooper's patrol car several feet away" before handcuffing her. *Id.* at 741. This face slam significantly injured the woman. *See ibid.* Seeking redress, she sued several officers under § 1983, alleging, among other things, that the deputy had used excessive force against her. *See ibid.* But the district court granted summary judgment for the deputy—again, on qualified-immunity grounds—and the Eleventh Circuit affirmed. *See id.* at 741–42, 747.

In *Taylor*, the Eleventh Circuit instructed district courts to make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *id.* at 745–46 (quoting *Graham*, 490 U.S. at 396–97), and to remember that "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the

39

severity of the alleged offense," *id.* at 746 (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003)). In *Taylor*, the Circuit found it significant that the deputy had deployed force *only* to "restrain[ ]" the plaintiff, and that he had used *no* force *after* she was restrained. *Id.* at 746 (observing that, *after* a plaintiff is restrained, "even *de minimis* force will support a claim for excessive force"). The Circuit thus felt "constrained to conclude that, under [its] precedent, the force used to subdue and arrest [the plaintiff] was not excessive." *Ibid.*

The court reached a similar result in *Alexandre v. Ortiz*, 789 F. App'x 169 (11th Cir. 2019) (per curiam). In that case, police officers attempted to clear a crowd that had formed on a Miami street shortly after the Miami Heat won the NBA championship. *See id.* at 171. The plaintiff—who was in the crowd—"complied with the officers' order to move to the sidewalk, [but] once there yelled 'we are on the sidewalk. Get the fuck out of here and do your business.'" *Ibid.* (quoting record). "Seconds later, without any warning, [the defendant-officer] grabbed [the plaintiff] in a headlock around the neck and pulled him into the alcove of [an] apartment building," taking him to the ground. *Id.* at 171–72. The plaintiff eventually sued several defendants, including the officer who tackled him, claiming excessive force. *See ibid.* The district court denied the officer's motion for summary judgment, *see ibid.*, but the Eleventh Circuit reversed, *see id.* at 175. In the Circuit's view, "the force used here by [the arresting officer] was no more severe than the force we have described as *de minimis* and lawful in other materially similar cases." *Ibid.* Indeed, "[w]hile the use of gratuitous force when a suspect is not resisting arrest violates the Fourth Amendment, the application of de minimis force, without more, will not support an excessive force claim and will not defeat an officer's qualified immunity." *Ibid.* (cleaned up). And, "[e]ven assuming that [the plaintiff] was not resisting, [the defendant officer] was allowed to use some force in effectuating [his] arrest." *Ibid.*

Like the officers in *Taylor* and *Alexandre*, Officers Flores and Nuñez were attempting to effectuate a lawful arrest. And, like the plaintiffs in those two cases, Sullenberger didn't comply with

the Officers' requests. But that's where the comparisons end, because Sullenberger's conduct was far more egregious—and the Officers' responses far more proportional—than the plaintiff's conduct in either *Taylor* or *Alexandre*. At most, those plaintiffs merely mouthed off to the police. Sullenberger, by contrast, brandished a shotgun, struck at Office Nuñez with his right hand, and began wrestling with him—ultimately placing him in a kind of bear hug from behind. Given all this, Sullenberger is lucky to be alive. Under clear Eleventh Circuit precedent, in short, the force Officer Nuñez deployed when he "hip tossed"—or tackled—Sullenberger onto the sidewalk wasn't remotely excessive under the circumstances.

Officer Flores's taser applications present a more difficult question. Again, Sullenberger alleges that she tased him for "16 continuous seconds." TAC ¶ 139. As a threshold matter, "[t]he use of a taser is not categorically unconstitutional. We have found that the use of a taser can be appropriate in a wide array of situations." *Charles v. Johnson*, 18 F.4th 686, 701 (11th Cir. 2021). "The only question is whether [the defendant-officer's] use of a taser constitute[s] excessive force under the totality of the circumstances. To lose qualified immunity, the circumstances must show that the force was clearly excessive." *Ibid.* So, on the one hand, "[i]n a difficult, tense, and uncertain situation, the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Zivojinovich*, 525 F.3d at 1073 (cleaned up); *see also Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) ("[W]here a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or officer." (cleaned up)).

On the other hand, the Eleventh Circuit has "explicitly held—and thus clearly established—that employing a taser on a compliant, nonthreatening suspect violates the Constitution." *Stryker v. City of Homewood*, 978 F.3d 769, 775 (11th Cir. 2020). "The critical time period for purposes of determining whether the repeated use of a taser on an arrestee constituted unconstitutional excessive

force spans just before the first activation through the time of the final taser deployment. Even if the arrestee's resistance justified deployment of a taser initially, if he has stopped resisting during this time period, further taser deployments are excessive." *Glasscox v. City of Argo*, 903 F.3d 1207, 1214 (11th Cir. 2018) (cleaned up) (quoting *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016)); *Masters v. City of Independence, Mo.*, 998 F.3d 827, 837 (8th Cir. 2021) ("[The officer] continued to deploy his Taser after [the plaintiff] was clearly no longer resisting arrest. [He] . . . asserts there is 'no bright line' on how long an officer may tase a suspect. But there is: An officer may not continue to tase a person who is no longer resisting, threatening, or fleeing."); *Goodwin v. City of Painesville*, 781 F.3d 314, 324, 328 (6th Cir. 2015) ("[E]ven previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance. . . . [Plaintiff] had a clearly established constitutional right not to be tasered when he was at most offering passive resistance to an officer[.]"). In the end, accepting all of Sullenberger's well-pled allegations as true, we find that, although Officer Flores's *initial* deployment of her taser was reasonable, Sullenberger has plausibly pled that her *subsequent* deployments were not.

We'll begin with the Eleventh Circuit's decision in *Baker*. There, a police officer and multiple paramedics responded to a car accident and found the driver of the rear-ending vehicle—the eventual plaintiff—"still in the driver's seat." *Baker*, 67 F.4th at 1273. The driver stepped out of the vehicle but refused to sit on a nearby stretcher—despite being asked to do so thirteen times by paramedics. *See ibid.* The driver also refused to produce his driver's license and, instead, tried to light up a cigarette. *See ibid.* One of the paramedics told the primary officer that he suspected the driver "was (1) under the influence, (2) a diabetic, or (3) having a seizure." *Ibid.* When the officer "grabbed [the driver's] arm" in preparation for a blood-glucose check, the driver said: "[G]et off me, man[.]" *Ibid.* The driver eventually tried to get back into his car, breaking free of the officer's grasp and telling the officer to "chill" and to "get the fuck off [him]." *Id.* at 1274. Eventually, the driver sat himself partially in the

driver's seat, at which point the officer "grabbed [his] left arm" and "pull[ed]." *Ibid*. The driver called

the officer a "bitch," "resisted," "reached" for the officer, and "moved toward him." *Ibid*. At that

point, the officer "fired [his] taser, hitting [the driver] in the stomach." *Ibid*. Nevertheless, the driver

"fought the taser's charge" and continued resisting. *Ibid*. Around this time, a second officer arrived,

and—together with the first officer—manage to "subdue[ ]" the driver without any additional taser

applications. *Ibid*.

The driver—litigating *pro se*—sued both officers and the city, asserting (among others) an

excessive-force claim under § 1983. *See id.* at 1275. The defendants filed a joint motion to dismiss,

which the district court granted, dismissing the driver's claims with prejudice. *See ibid*. On the claim of

"excessive force in violation of the Fourth and Fourteenth Amendments," the district court found

that the officer "was entitled to qualified immunity." *Ibid*. On appeal, the Eleventh Circuit affirmed.

*See id.* at 1282. In the Circuit's view:

> The circumstances confronting [the officer] included that [the driver]
> had just rear-ended someone, was not following the paramedics' or
> [the officer's] commands, and instead attempted three times to go back
> to his vehicle, even successfully reentering it once. Under these
> circumstances, a reasonable officer on the scene would perceive that
> [the driver], at best, was not safe to drive his vehicle, or, at worst, might
> try to flee using his vehicle (which itself could be used as a deadly
> weapon), thereby endangering [the officer], the paramedics, and nearby
> motorists because of [the driver's] apparent state of disorientation.

*Id.* at 1279–80.

Plus, the court continued, when the officer "tried to remove [the driver] from the car verbally

and physically," he was met with "resistance." *Id.* at 1280. The Eleventh Circuit concluded that the

officer's *single* use of his taser was "justified because of (1) [the driver's] repeated failure to comply

with [the officer's] commands, (2) [the driver's] unsafe driving that had just caused an automobile

accident, (3) [the driver's] repeated efforts to get back in the vehicle, (4) [the driver's] physical

resistance to [the officer's] attempts to remove him from the vehicle, and (5) the tense, uncertain, and

rapidly evolving series of events." *Id.* at 1280–81. Since the officer didn't violate the plaintiff's constitutional rights, the Eleventh Circuit had no reason to "reach the other qualified immunity question"—*viz.*, whether the officer had violated a constitutional right that was *clearly established.*

For two reasons, the situation Officer Flores confronted was even more tense (and more dangerous) than the facts the officer confronted in *Baker. One*, while *Baker* involved a mere car accident and an unarmed (if intoxicated) man sitting in a car, our Officers responded in the middle of the night to an activated burglar alarm and found an armed man standing on the front yard of the (potentially) burglarized home. *Two*, unlike the driver in *Baker*, who simply rebuffed the officer's attempts to arrest him, our Plaintiff struck the officer and then engaged him in a dangerous (and protracted) wrestling match that only ended when Officer Flores tased him. Officer Flores, in short, had *far more* reason than the *Baker* officer to deploy her taser on Sullenberger. As the Eleventh Circuit has said, "in a difficult, tense, and uncertain situation, the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Baker* at 1281 (cleaned up) (quoting *Zivojinovich*, 525 F.3d at 1073).

But we cannot see (on the CCTV footage) what happened after Sullenberger fell over the low wall and onto the sidewalk—which means that, from that point forward, we must accept Sullenberger's well-pled factual allegations as true. And Sullenberger specifically alleges that, after the *initial* taser discharge, Officer Flores tased him for "16 continuous seconds," TAC ¶ 139, even though by that time he "posed [no] threat to the officers or anyone else," *id.* ¶ 57. As a result of this prolonged taser attack, Sullenberger says that he suffered "significant physical and emotional harm." *Id.* ¶ 73. In other words, we must accept Sullenberger's allegation that, for sixteen seconds, Officer Flores continued to apply her taser *after* he had ceased resisting. At this point of the case, that's enough to state a viable claim.

In *Glasscox*, following a brief chase, an officer stopped a vehicle on the shoulder of a busy highway after other drivers had called the police to report that the vehicle had been driving "erratically." 903 F.3d at 1210. The officer approached the vehicle and ordered the driver out. *Ibid.* When the driver didn't immediately comply—it would become apparent later that the driver was a diabetic suffering a bout of hypoglycemia—the officer deployed his taser for a five-second cycle. *Id.* at 1211. After that cycle, the driver—who was "howl[ing] and writh[ing] in pain"—attempted to remove the taser wires from his chest. *Ibid.* The officer almost immediately deployed his taser for another five-second cycle, during which the driver was "shaking, screaming, and writhing in pain." *Ibid.* When the officer then yelled, "I'll give it to you again! Get out of the car!" the driver responded, "I'll get out if you just me leave me alone!" *Ibid.* Within seconds, the officer tased the driver a third time, and then a fourth, for a cumulative taser application of twenty seconds. *Id.* at 1211–12. Finally, the officer removed the driver from the vehicle and handcuffed him. *Id.* at 1212.

In the driver's subsequent § 1983 excessive-force lawsuit against the officer, the district court denied the officer's motion for summary judgment, concluding that a reasonable jury could find that the officer "violated [the driver's] clearly established right to be free from the excessive use of force." *Ibid.* On appeal, the Eleventh Circuit affirmed, reasoning that, while the officer's *initial* taser deployment was reasonable, a jury could find the subsequent deployments excessive because of the driver's "lack of resistance," his "no longer [being engaged] in any dangerous or violent behavior," and his resulting "physical and psychological injuries." *Id.* at 1215–16. And the officer wasn't entitled to qualified immunity, the Circuit said, because "clearly established law" had already "established that administering multiple taser shocks can amount to excessive force." *Id.* at 1218 (first citing *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009); and then citing *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997)). So, while the officer "may have been justified in deploying his taser to subdue [the plaintiff] who had just led him on a high-speed chase for several miles," the officer's "repeated deployment of the taser

amounted to excessive force prohibited by the Fourth Amendment." *Id.* at 1220. And, because "our law clearly established that such a use of force was excessive, the district court properly denied qualified immunity." *Ibid.*

As in *Glasscox*, Officer Flores was trying to subdue a man she rightly perceived as dangerous. And, like the plaintiff in *Glasscox*, Sullenberger wasn't complying with police instructions. That's why (again) the initial taser application was reasonable. But, as in *Glasscox*, a reasonable jury could find that Officer Flores's decision to continue tasing a man who no longer "posed a threat to the officers or anyone else," TAC ¶ 57, was excessive.

We therefore **GRANT** the TAC MTD to the extent the Defendants seek dismissal of Sullenberger's § 1983 excessive-force claim against Officer Nuñez. But we **DENY** their motion to dismiss Sullenberger's § 1983 excessive-force claim against Officer Flores (for her continued deployment of the taser after he allegedly stopped resisting).

### iv.    Count VII (Malicious Prosecution against All Defendants)

Recall that the State Attorney's Office eventually charged Sullenberger with two counts of resisting an officer with violence and with a firearm, two counts of attempted aggravated battery on a law enforcement officer, and two counts of attempted murder of a law enforcement officer in the second degree. *See* Arrest Affidavit at 113–15. According to Sullenberger, "[t]he City, through its agents (Officers Nuñez, Flores, and Puga), initiated [these] criminal proceedings against [him] . . . predicated on the officers' subjective accounts of the incident, which were neither corroborated nor thoroughly investigated." TAC ¶ 158. Specifically, "Defendant[s] Nuñez and Flores provided grossly fabricated statements to the lead investigator Puga resulting in the unwarranted seizure of Sullenberger"—his December 2, 2017 arrest—"and subsequent 3-year prosecution." *Id.* ¶ 23. "The proceedings against Sullenberger," he adds, "were terminated in a manner that indicated his innocence or[,] at the very least, the insufficiency of evidence against him. Such termination

underscores the baselessness of the charges and vindicates Sullenberger." *Id.* ¶ 159. "At no juncture

did the City possess probable cause to pursue criminal charges against Sullenberger," *id.* ¶ 160, and

the subsequent "decision to prosecute, absent a diligent investigation in the face of contradictory

evidence, reflects an intent to harm or a gross indifference to the injustice being perpetrated against

Sullenberger," *id.* ¶ 161. In the affidavit Sullenberger attached to the TAC, Chief Scott asserts that,

"[a]s a result of [Officer Puga's] inexperience, the investigation into this incident was flawed resulting

in the baseless criminal charges of attempted murder of a police officer against Mr. Sullenberger."

Scott Affidavit ¶ 54. These malicious-prosecution claims fail under § 1983, but they survive under

state law.

**Malicious Prosecution Under § 1983**. Under federal law, "[m]alicious prosecution is a

violation of the Fourth Amendment and is a viable constitutional tort cognizable under § 1983." *Smith*

*v. Mitchell*, 856 F. App'x 248, 249 (11th Cir. 2021) (citing *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir.

2003)). "In order to '[t]o establish a federal malicious prosecution claim under § 1983, a plaintiff must

prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of [his]

Fourth Amendment right to be free of unreasonable seizures.'" *Paez v. Mulvey*, 915 F.3d 1276, 1285

(11th Cir. 2019) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004)).

"The constituent elements of the Florida common-law tort of malicious prosecution include:

(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and

without probable cause, (3) that terminated in the plaintiff accused's favor; and (4) caused damage to

the plaintiff accused." *Ibid.* (cleaned up) (quoting *Kesler*, 323 F.3d at 882).[29] And the Fourth

---

[29] Florida courts will sometimes break the four common-law elements into six. *See Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986) (listing the elements for malicious prosecution under Florida law as "(1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of

Amendment violation "requires a seizure 'pursuant to legal process.'" *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)). Seizures pursuant to legal process are, essentially, arrests that take place after some legal process occurs to justify them. "[W]arrant-based seizures fall within this category," as do "seizures following an arraignment, indictment, or probable-cause hearing." *Ibid.* Seizures pursuant to legal process violate the Fourth Amendment "when legal process *itself* goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Ibid.* (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)); *see also Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330 (11th Cir. 2024) ("A [§ 1983] 'malicious prosecution' claim is that an officer used a constitutionally deficient legal process *to effectuate an arrest*—here, an allegedly defective warrant." (emphasis added)). To plead a § 1983 malicious-prosecution claim, then, a plaintiff "must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams*, 965 F.3d at 1165.[30]

"In contrast," "seizures *without* legal process, such as warrantless arrests," do not give rise to malicious-prosecution claims. *Id.* at 1157–58 (emphasis added); *see also Donley v. City of Morrow*, 601 F. App'x 805, 813 (11th Cir. 2015) (per curiam) ("[W]arrantless arrest cannot serve as the predicate Fourth Amendment seizure for purposes of [the plaintiff's] § 1983 malicious prosecution claim."). When, for example, two individuals are arrested "on-the-spot" "at 3:00 a.m. while . . . walking from a gym across [a] parking lot" by officers who happen to be patrolling the area, those "warrantless arrests

---

probable cause for such proceeding; (5) the presence of malice therein; (6) damage conforming to legal standards resulting to plaintiff" (cleaned up)). But, since both tests include the same elements (broken into either four or six pieces), this breakdown doesn't change the substantive requirements of a malicious-prosecution claim under Florida law.

[30] The Eleventh Circuit no longer follows the rule it developed in *Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010), under which "standards for malicious prosecution and false arrest are coextensive [such] that a plaintiff can prevail on a claim of malicious prosecution *without establishing that the legal process justifying his seizure was invalid.*" *Williams*, 965 F.3d at 1164 (emphasis added).

[are] not seizures pursuant to legal process and cannot support . . . [§ 1983] malicious prosecution claims." *Martin v. Miami-Dade Cnty.*, 2024 WL 1434329, at *6 (11th Cir. Apr. 3, 2024) (on appeal from the denial of a motion to dismiss, reversing the denial of qualified immunity as to the plaintiffs' § 1983 malicious prosecution claims).

Sullenberger's § 1983 malicious-prosecution claim fails because he hasn't alleged that he suffered a *seizure* that was *pursuant to some legal process*.[31] His December 2, 2017 arrest is the only "seizure" he describes in the TAC. Of course, that arrest *wasn't* pursuant to a warrant, an arraignment, an indictment, or a probable-cause hearing. It was "on-the-spot" and "without legal process," like the arrests in *Martin. Id.* at *6–7. And, although he was (presumably) indicted and arraigned—which constitutes legal process for purposes of a § 1983 malicious-prosecution claim—*at some point*[32] after he made bail (on the afternoon of December 3, *see* SAC MTD Response ¶ 73), he never alleges that he was thereafter arrested or detained *again*. In other words, he's alleged a seizure with no accompanying legal process and legal process with no accompanying seizure. That's not enough.

---

[31] For this claim, we'll assume that Sullenberger has met the four common-law elements of a malicious-prosecution claim with respect to the aggravated-battery and attempted-murder counts. At the same time, we find that he *hasn't* satisfied those elements with respect to the resisting-arrest counts because the Defendants had probable cause to charge him with resisting an officer with violence (as we discussed *supra* § II(c)(ii)). This finding doesn't doom Sullenberger's malicious-prosecution claims, however, because "the any-crime rule does not apply to claims of malicious prosecution under the Fourth Amendment. Centuries of common-law doctrine urge a charge-specific approach, and bedrock Fourth Amendment principles support applying that approach in the context of the charges that justified a defendant's seizure." *Williams*, 965 F.3d at 1162. In other words, "a Fourth Amendment malicious-prosecution claim may succeed when a baseless charge is accompanied by a valid charge." *Chiaverini v. City of Napoleon*, 144 S. Ct. 1745, 1750 (2024); *see also Elmore v. Fulton Cnty. Sch. Dist.*, 605 F. App'x 906, 915 (11th Cir. 2015) (per curiam) ("Generally, in contrast to false-arrest claims, 'probable cause as to one charge will not bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking.'" (quoting *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 682 (7th Cir. 2007))).

[32] We don't know exactly when he made bail because he never tells us. Plus, the docket associated with his Miami-Dade County criminal case number, F17-22950, is unavailable.

**Malicious Prosecution Under Florida Law**. On top of that, Sullenberger can't assert his *state-law*, malicious-prosecution claim against *the City*, either, because "Florida law 'bars an action for malicious prosecution against the state or its subdivisions arising from malicious acts of their employees.'" *Davis v. City of Apopka*, 734 F. App'x 616, 623 (11th Cir. 2018) (quoting *Johnson v. Fla. Dep't of Health & Rehab. Servs.*, 695 So. 2d 927, 930 (Fla. 2d DCA 1997)); *see also* FLA. STAT. § 768.28(9)(a) ("The state or its subdivisions are not liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.").

We come out the other way, though, on Sullenberger's *state-law* claim for malicious prosecution against Officers Nuñez and Flores. While "[t]he common law elements of malicious prosecution [under § 1983] are the same as required under Florida law," *Davis*, 734 F. App'x at 622 n.8, Florida law doesn't require (as the Fourth Amendment does) seizure pursuant to legal process, *see, e.g., Phelan v. City of Coral Gables*, 415 So. 2d 1292, 1294 (Fla. 3d DCA 1982) (observing that, under Florida law, a Fourth Amendment seizure isn't required). And, as we've hinted, Sullenberger *has* stated a plausible state-law claim for malicious prosecution against Officers Nuñez and Flores—a claim that's predicated on the Officers' (alleged) decision to fabricate evidence, which the State then used to charge Sullenberger with two accounts of aggravated battery and two counts of attempted murder of a law enforcement officer.

On the first element, Sullenberger has sufficiently alleged that "a criminal prosecution [was] instituted or continued by the present defendant." *Paez*, 915 F.3d at 1285. Although prosecutors (not police officers) institute prosecutions in Florida, a police officer can be liable for malicious prosecution "[i]f the defendant's persuasion is the determining factor in inducing the [prosecutor's] decision or if he gives information which he knew to be false and so unduly influences the authorities[ ]"—in other

words, if the officer was the "legal cause" of the prosecution. *McCraney v. Barberi*, 677 So. 2d 355, 356–57 (Fla. 1st DCA 1996). Here, Sullenberger says that the charges against him "were predicated on [the Officers'] subjective accounts of the incident, which were neither corroborated nor thoroughly investigated," TAC ¶ 158, and that "Defendant[s] Nuñez and Flores provided grossly fabricated statements to the lead investigator Puga resulting in the unwarranted seizure of Sullenberger and subsequent 3-year prosecution," *id.* at ¶ 23. That's sufficient for now to show that the Officers' (allegedly) false reports and fabricated evidence were the "legal cause" of the prosecution. *McCraney*, 677 So. 2d at 357.

On the second element, Sullenberger has sufficiently alleged that the aggravated battery and attempted-murder charges against him were brought "with malice and without probable cause." *Paez*, 915 F.3d at 1285.[33] We'll start with probable cause. "Probable cause" in this context "is defined as '[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.'" *Goldstein v. Sabella*, 88 So. 2d 910, 911 (Fla. 1956) (quoting *Dunnavant v. State*, 46 So. 2d 871, 874 (Fla. 1950)). "To establish probable cause, it is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a reasonable belief, based on facts and circumstances known to him, in the validity of the claim." *Ibid.*; *accord Endacott v. Int'l Hosp., Inc.*, 910 So. 2d 915, 922 (Fla. 3d DCA 2005) (same). "What facts and circumstances amount to probable cause is a pure question of law. Whether they exist or not in any particular case is a pure question of fact. The former is exclusively for the court; the latter for the jury." *City of Pensacola v. Owens*, 369 So. 2d 328, 330 (Fla. 1979).

---

[33] These two sub-elements (malice and lack of probable cause) must be proved separately. *See Miami-Dade County v. Asad*, 78 So. 3d 660, 664 (Fla. 3d DCA 2012) ("Malice is a fact to be proven by the plaintiff as it is a necessary ingredient of the charge of malicious prosecution and it is not synonymous with want of probable cause." (cleaned up)).

There aren't enough factual allegations in the TAC for us to determine—as a matter of law—whether the Officers had probable cause to believe that Sullenberger intended to kill them. Based on what we can see in the CCTV footage, we can say that they *did* have probable cause to *arrest* Sullenberger for resisting arrest. *See supra* § II(c)(ii). But the CCTV footage has no sound—and it cuts out once Sullenberger falls over the low wall at the outer edge of the yard. So, while the Officers *may* have heard something—or seen something at close range—that led them to believe Sullenberger intended to kill them, we don't have enough facts, at this stage of the case, to say that they were justified as a matter of law in believing that he did. We must therefore accept his account—that he "posed no threat" to kill the Officers, TAC ¶ 109—and presume that the Officers *didn't* have probable cause to arrest him on the attempted-murder charges. Similarly, the CCTV footage doesn't allow us to conclude, at this stage, that the Officers had probable cause to arrest Sullenberger for aggravated battery. Under Florida law, "[a] person commits aggravated battery who, in committing battery, intentionally or knowingly causes great bodily harm . . . or uses a deadly weapon." FLA. STAT. § 784.045(1)(a). We're in no position to assess whether the bodily harm the Officers suffered justified this charge. And, although "using" a deadly weapon even "includes *holding* a deadly weapon without actually touching the victim with the weapon," *Severance v. State*, 972 So. 2d 931, 934 (Fla. 4th DCA 2007) (emphasis added), the CCTV footage shows Sullenberger *putting down* his shotgun before tussling with Officer Nuñez, *see* CCTV Footage at 19:55:32–56:06.

As to malice, Sullenberger says that "[t]he City, through its law enforcement officers and prosecutorial discretion, exhibited malice or a reckless disregard for Sullenberger's rights." *Id.* ¶ 161. The Defendants characterize this allegation as "conclusory." TAC MTD at 24. For two reasons, we disagree. *One*, in federal court, plaintiffs may allege malice generally. *See* FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see also Duquesne v. City of Miami Beach*, 2012 WL 3061603, at *7 (S.D. Fla. July 26, 2012) ("Furthermore, Plaintiff has

explicitly alleged malice, which may be alleged generally." (citing FED. R. CIV. P. 9(b))).[34] *Two*, Sullenberger—who, again, is proceeding *pro se*—has rather clearly articulated his view that these charges were totally fabricated by the two officers. *See, e.g.*, TAC ¶ 23 ("Defendant[s] Nuñez and Flores provided grossly fabricated statements to the lead investigator Puga . . . ."). That's more than sufficient for now to support his claim that they acted with malice. *See Blackshear v. City of Miami Beach*, 799 F. Supp. 2d 1338, 1347–48 (S.D. Fla. 2011) (Graham, J.) (holding that the plaintiff sufficiently alleged malice where he averred that the defendant-officer deliberately falsified police reports).

On the third element, there's no dispute that the prosecution against Sullenberger "terminated in [his] favor." *Paez*, 915 F.3d at 1285; *see also Duquesne*, 2012 WL 3061603, at *7 ("[T]hat the criminal charges against [the plaintiff] were dropped . . . is sufficient to allege a bona fide termination."). Again, Sullenberger says that "[t]he proceedings against [him] were terminated in a manner that indicated his innocence or[,] at the very least, the insufficiency of evidence against him," TAC ¶ 159, and the Defendants never contest this proposition, *see generally* TAC MTD.

As for the final element, Sullenberger has sufficiently alleged that the criminal prosecution "caused [him] damage." *Paez*, 915 F.3d at 1285. He, after all, claims that, "[a]s a direct consequence of the City's actions, [he] suffered significant damages, including reputational harm, emotional distress, legal expenses, and deprivation of liberty. These damages are a direct result of the City's malicious prosecution and warrant redress." TAC ¶ 162.[35] Sullenberger, in short, has stated a plausible state-law, malicious-prosecution claim against Officers Flores and Nuñez.

---

[34] Florida law likewise allows plaintiffs to allege malice generally. *See* FLA. R. CIV. P. 1.120 ("Malice, intent, knowledge, mental attitude, and other condition of mind of a person may be averred generally.").

[35] Sullenberger only mentions the City here. Were he proceeding *with* counsel, this would be a problem because (as we've said) Sullenberger cannot assert a state-law, malicious-prosecution claim against the City. But, because Sullenberger is proceeding *pro se*—and given that he's brought his malicious-prosecution claims against "*all* Defendants," TAC at 23 (emphasis added), we'll "construe [his]

At the same time, Sullenberger has failed to assert a plausible malicious-prosecution claim against Officer Puga. In his only malicious-prosecution allegation against Officer Puga, Sullenberger concedes that Puga did little more than receive (and believe) false and fabricated information from Officers Flores and Nuñez. *See* TAC ¶ 23 ("Defendant[s] Nuñez and Flores provided grossly fabricated statements to the lead investigator Puga resulting in the unwarranted seizure of Sullenberger and subsequent 3-year prosecution."). Sullenberger alleges that Officer Puga's failure to "corroborate [ ]or thoroughly investigate" the other officers' statements "exhibited malice or a reckless disregard for Sullenberger's rights." *Id.* ¶¶ 158, 161. That's not enough. As we've explained (*see supra* at 47), to state a viable malicious-prosecution claim, Sullenberger must show that Officer Puga acted "with malice *and without probable cause*." *Smith*, 856 F. App'x at 249 (emphasis added). He can allege malice generally, *see Duquesne*, 2012 WL 3061603, at *7, but he must plead the lack of probable cause with more specificity, *see Iqbal*, 556 U.S. at 678.[36]

And the problem for Sullenberger is that he *never* says that Officer Puga lacked probable cause to include the resisting-arrest, aggravated-battery, and attempted-murder charges in the arrest affidavit. In fact, he seems to plead just the opposite. According to Sullenberger, Officer Puga relied on the

---

complaint liberally," *Saunders*, 766 F.3d at 1266, and treat this damages allegation as applying to *all* Defendants—including the Officers.

[36] The malice—also called the "legal malice" or "technical malice"—element of a malicious-prosecution claim "requires . . . an intentional act performed without justification or excuse" and "can be inferred from . . . a lack of probable cause, gross negligence, or great indifference to the rights of others." *Olson v. Johnson*, 961 So. 2d 356, 361 (Fla. 2d DCA 2007) (first citing *Reed v. State*, 837 So. 2d 366, 368–69 (Fla. 2002); and then citing *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1357 (Fla. 1994)). Sullenberger may plead malice generally at this stage, so we have to accept his allegation that Officer Puga conducted his investigation maliciously. But Sullenberger *really* seems to be saying that Officer Puga's investigation was *flawed* because he didn't investigate the other officers' accounts. *See* Scott Affidavit ¶ 54 ("As a result of [Officer Puga's] inexperience, the investigation into this incident was *flawed* resulting in the baseless criminal charges of attempted murder of a police officer against Mr. Sullenberger." (emphasis added)). We'll note that at least one Florida DCA has held that a *flawed* investigation isn't automatically *malicious* or *reckless*. *See, e.g.*, *Lee v. Geiger*, 419 So. 2d 717, 719 (Fla. 1st DCA 1982) (directing verdict for the defendant-officer where, as here, the officer "at most" exercised "poor judgment in conducting in his investigation," which "[did] not constitute legal malice").

other officers' firsthand, eyewitness accounts of their altercation with Sullenberger. *See* TAC ¶¶ 123–24 (describing "Officer Puga's admitted reliance solely on the statements of Officers Nunez and Flores regarding the incident on December 2nd," in which they were "directly involved"). But "[a defendant-officer] [is] entitled to rely upon the information [a firsthand witness] gave him[.]" *City of Clearwater v. Williamson*, 938 So. 2d 985, 990 (Fla. 2d DCA 2006) (cleaned up); *see also Weissman v. K–Mart Corp.*, 396 So. 2d 1164, 1167 (Fla. 3d DCA 1981) ("First hand knowledge by an officer is not required; the receipt of information from someone who it seems reasonable to believe is telling the truth is adequate."). In other words, as we'll explain in greater detail below, *see infra* § II(c)(v), Officer Puga was entitled to rely, in composing the arrest affidavit, on the Officers' eyewitness accounts, and he wasn't required to go out and collect video evidence or find additional witnesses to interview.

We therefore **GRANT in part** the TAC MTD as to Count VII. Specifically, we **DISMISS** Sullenberger's malicious-prosecution claim (against all Defendants) under § 1983, and we **DISMISS** his state-law, malicious-prosecution claims against the City and Officer Puga. But we **DENY** the TAC MTD on Sullenberger's state-law claim for malicious prosecution against Officers Flores and Nuñez.

### v. Counts VIII–IX (Due Process Violation for Failure to Conduct a Thorough Investigation against Officer Puga and the City)

In Count VIII, Sullenberger alleges the following against Officer Puga:

> The Fifth and Fourteenth Amendments guarantee the right to due process, which includes the right to a fair and impartial investigation by law enforcement officials. Officer Puga's failure to conduct such an investigation deprived Sullenberger of this fundamental right. The reliance solely on the statements of Officers Nuñez and Flores, without any attempt to corroborate their accounts or consider Sullenberger's perspective, constitutes a biased and one-sided investigation, falling significantly short of the due process requirements.
>
> [ . . . ]
>
> As a law enforcement officer, Officer Puga had a duty to conduct a thorough and impartial investigation into the incident. His failure to do so, as evidenced by his own deposition, demonstrates a clear

> dereliction of this duty that amount[s] to a deliberate indifference [to]
> Sullenberger's rights. The lack of a comprehensive investigation,
> including the failure to interview Sullenberger or any other potential
> witnesses, directly contributed to the deprivation of Sullenberger's
> constitutional rights.

TAC ¶¶ 163–64. Elsewhere in the TAC, Sullenberger says that "Officer Puga did not follow the City's

Uniform Division Protocols" because he, "acting in his official capacity as a law enforcement officer,"

"exhibited a clear failure to uphold the standards of a thorough and impartial investigation, a

cornerstone of procedural due process[.]" *Id.* ¶¶ 121–22. "The foundation of this argument,"

Sullenberger continues, "rests on Officer Puga's admitted reliance solely on the statements of Officers

Nuñez and Flores regarding the incident on December 2." *Id.* ¶ 123.[37]

In his Affidavit in support of the TAC, Chief Scott adds that "the investigation into this

incident was flawed resulting in the baseless criminal charges of attempted murder of a police officer

against Mr. Sullenberger." Scott Affidavit ¶ 54. According to Scott:

> Officer Puga agreed, as the lead investigator, he was required to locate
> evidence and conduct a complete investigation. Officer Puga testified
> he failed to follow Coral Gables Police Department's standard
> operating procedure on conducting a criminal investigation. Ofc. Puga
> did not sketch the alleged crime scene. He did not collect video
> evidence of the incident. He did not interview any witnesses including
> [Dr.] Santamarina. . . . He        failed        to       interview
> Mr. Sullenberger. . . . Officer Puga testified . . . that he did not know
> the United States Supreme Court case titled *Brady v. Maryland*, 373 U.S.
> 83 (1963) requiring law enforcement to notify the State Attorney's
> Office of any exculpatory evidence on behalf the defendant.

*Id.* ¶¶ 55, 57. In essence, Sullenberger is alleging that Officer Puga violated his due-process rights by

(1) relying only on the Officers' A-Form statements; (2) failing to interview Sullenberger,

Dr. Santamarina, or any other witnesses; (3) not sketching out the alleged crime scene; (4) not

collecting video evidence; and (5) not knowing the holding of *Brady v. Maryland*.

---

[37] For this proposition, Sullenberger quotes an exchange from Officer Puga's deposition. *See* TAC
¶ 127.

Unfortunately for Sullenberger, shoddy, sloppy, or lazy police work doesn't—by itself—necessarily constitute a due-process violation.[38] On this issue, we find the Eleventh Circuit's decision in *Hendricks v. Sheriff, Collier County*, 492 F. App'x 90 (11th Cir. 2012) (per curiam), helpful. In that case, a dozen or so young people had gathered at a house party. At some point during the night, several individuals were told to leave "because they were drunk and loud." *Id.* at 91. Some time later—and some distance away from the party—a few of the men who had been at the party got into a fight. *See ibid.* Two of the "victims" from the fight "called the Sheriff's Department to report that four white males in a black Suburban attacked them," and they provided a portion of the Suburban's license-plate number. *Ibid.* A deputy sheriff located the vehicle back at the house party, called the victims to the home, and conducted a "show up." *Ibid.* During that "show up," the victims identified the four assailants. *See ibid.* One of the alleged assailants "immediately admitted his involvement" and "alerted the deputies that three others"—*i.e.*, not the individuals the victims had identified—"were actually the . . . perpetrators." *Ibid.* But the deputies "refused to listen to [this] story or [the] alibi, but instead arrested [the four young men the victims had identified as the assailants]." *Ibid.* These young men "were charged with 'felony battery' and 'robbery—armed with other weapon,' but were never indicted or prosecuted." *Ibid.* The four young men then sued the deputy sheriffs, "alleging various civil rights violations under 42 U.S.C. § 1983 as well as state law torts." *Ibid.*

As relevant here, the plaintiffs asserted several false-arrest claims against the deputies, which the district court dismissed on summary judgment. *See id.* at 92. On appeal, the plaintiffs "assert[ed] that the deputies' investigation at the scene of the arrest was constitutionally deficient insofar as the deputies ignored available evidence." *Id.* at 94. Specifically, the arrestees "argue[d] that the officers failed to interview others who had been present at [the house party] . . . who could have verified that

---

[38] We're not sure whether Sullenberger is alleging a *procedural* or a *substantive* due-process violation. Either way, Sullenberger's due-process claims fail.

[the arrestees] never left the party[.]" *Ibid.* Indeed, as we've seen, the young man who admitted his involvement "volunteered the names of the three other people who were actually with him when the victims were confronted, yet the officers ignored [him] and did not ask for more information." *Ibid.* The arrestees therefore "urge[d] [the Eleventh Circuit] to hold that because there [was] doubt as to whether the deputies conducted a thorough investigation at the time of the arrest, summary judgment was inappropriate on the false arrest claims." *Ibid.* In affirming the district court's summary-judgment order, the Eleventh Circuit held that "the officers had probable cause to arrest that was not fraudulently obtained and that arose independently from their own observations—*i.e.*, the victims' positive identification of [the arrestees] as their attackers." *Ibid.*

Sullenberger's claim is, for two reasons, even weaker than the one the Eleventh Circuit confronted in *Hendricks*. For one thing, the officers in *Hendricks* hadn't observed the crime themselves—they'd simply taken the victims (strangers from the community) at their word. Here, by contrast, Officer Puga was getting his information from two police officers who'd witnessed Sullenberger's misconduct firsthand. For another, the officers in *Hendricks* totally ignored credible information—from one of the culprits himself—that the men they were arresting were not the assailants. Officer Puga, on the other hand, merely failed to proactively seek out certain information. But we've found no case—and Sullenberger hasn't cited any—for the novel proposition that an officer has some constitutional obligation to interview *every possible* witness before he drafts his A-form.[39]

---

[39] The plaintiffs in *Hendricks* (it's true) had brought false-arrest—not due-process—claims. As we've said, however, Sullenberger has cited no case—and we haven't found any—for his view that an arrestee has a due-process right to have an investigating officer interview *every possible* witness before drafting his A-form. So, even if we assumed that Officer Puga's failure to interview Sullenberger and Dr. Santamarina constituted a violation of Sullenberger's due-process rights—and we assume no such thing—Sullenberger would've failed to show that this supposed right "was clearly established by pointing to a 'materially similar case' decided by the Supreme Court, [the Eleventh Circuit Court of Appeals], or the Florida Supreme Court." *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)). And this isn't one of those situations

Consider also *Monk v. Morris*, 2018 WL 8787548 (M.D. Fla. Sept. 27, 2018) (Scriven, J.). The officer there responded to a 911 call from the front-desk employee of a hotel after "a hysterical woman and her [adult] son, later identified as the 'victims,' came to the front desk and requested help because the alleged female victim had been pistol-whipped." *Id.* at *1. The officer and her partner—who arrived later—interviewed the victims, who identified another hotel guest as the assailant. *Id.* at *2. The officers examined the woman's injuries, photographed her hotel room, searched various databases for information on the alleged assailant, and interviewed a third-party hotel guest. *Id.* at *3. A day or two later, the second officer drafted a "criminal affidavit based on the 'totality of the evidence collected by [the officers] and others from the [police department],' and 'personally determined that probable cause existed for the arrest of [the alleged assailant]." *Ibid.* A judge signed the warrant, and the alleged assailant "was charged with armed burglary of a dwelling, robbery, and being a felon in possession of a firearm." *Ibid.* Several days later, the assailant—who had learned of the warrant—contacted the State Attorney's Office "to advise that he was the victim of identity theft, that he was in Michigan at the time of the incident, and that he had not lived in Florida for many years." *Ibid.* Despite these protestations, the man was later arrested in Michigan on criminal charges that were eventually dropped. *See id.* at *4.

Believing that his rights had been violated, the arrestee brought § 1983 claims against the officers—asserting, among other things, that the second officer "violated his Fourth Amendment rights by failing to conduct a thorough investigation to establish probable cause and 'recklessly rel[ied] upon the biased, inadequate, and incompetent investigation' of [the first officer], which according to [the arrestee] contained misguided reliance on false victim statements." *Id.* at *6. According to the plaintiff, the second officer "'unreasonably and recklessly turned a blind eye . . . [to] available

in which a defendant "so obviously violated the constitution that prior case law is unnecessary." *Id.* at 1255 (cleaned up).

exculpatory evidence' as well as omitted several facts from the affidavit, which [the alleged assailant] contend[ed] would have negated probable cause." *Ibid*. These omitted facts included (1) that the victims "were under the influence of drugs when they identified the [arrestee]"; (2) that "one of the victims lied about the reason for their hotel stay"; (3) that "the victims' description of the crime scene was inconsistent with [the first officer's] observation"; and (4) that one of the victims "had an extensive criminal history, including two charges of providing false information to law enforcement." *Id.* at *7. Despite all these reasons to distrust the supposed victims, the district court granted the defendant's motion for summary judgment. *Id.* at *9.

As Judge Scriven explained, "[a] law enforcement officer recklessly disregards the truth when he should have recognized the error [in a warrant application], or at least harbored serious doubts as to the facts contained therein." *Ibid*. (quoting *Daniels v. Bango*, 487 F. App'x 532, 537 (11th Cir. 2012)). "Yet officers do not have 'an affirmative obligation to seek out exculpatory information of which the officer is not aware' or 'track down every lead' before making a probable cause determination." *Ibid*. (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1551–52 (11th Cir. 1994)). Applying that law to the facts before her, Judge Scriven found that "the record does not demonstrate such material inconsistencies that should have compelled the officer to find no probable cause," and she concluded that, "[e]ven assuming [the alleged assailant's] allegations are true, [he] cannot demonstrate that [the second officer] recklessly disregarded the truth or that his reliance on false or otherwise unreliable victim statements renders him unreasonable or reckless in determining probable cause." *Id.* at *7–8.

Officer Puga likewise did "not have 'an affirmative obligation to seek out exculpatory information of which [he] [was] not aware'" or to "'track down every lead' before making a probable cause determination." *Id.* at *6 (quoting *Kelly*, 21 F.3d at 1551–52). As in *Monk*, Officer Puga was entitled to rely on the statements he received from Officers Flores and Nuñez. Indeed, and (again) for two reasons, Sullenberger's claim against Officer Puga is weaker than the analogous claim in *Monk*.

*One*, the plaintiff in *Monk* identified four exculpatory facts the officers had, for whatever reason, omitted from their report. Sullenberger hasn't identified *any* exculpatory information he could have offered to Officer Puga—nor can we think of any. If, for instance, he or Dr. Santamarina had told Officer Puga that he (Sullenberger) was at all times compliant and subdued—which is what Sullenberger tells *us* in his TAC—that claim would have been directly contradicted by the CCTV footage. *Two*, the officers in *Monk* proceeded only on the allegations of two civilians they'd never met before. Here, by contrast, Officer Puga based his report on the allegations of two sworn officers who had witnessed the entire event.

In short, Sullenberger's due-process claim fails because he hasn't shown that there's a due-process right—let alone a *clearly established* due-process right—to have an investigating officer interview every possible witness, sketch out the alleged crime scene, collect video evidence, or "know" about *Brady*.[40] *See generally* TAC; TAC MTD Response.

As for Sullenberger's similar claim against the City in Count IX, he adds only this:

> The City is liable for the actions of its officers, including Officer Puga, particularly when those actions result in constitutional violations. The City's failure to ensure that its officers are adequately trained and supervised in conducting thorough and impartial investigations constitutes a policy of deliberate indifference to the constitutional rights of individuals like Sullenberger.

---

[40] We don't mean to suggest that *Brady* doesn't create a due-process protection—it does. What we're saying is that Sullenberger's due-process rights weren't violated simply because Officer Puga didn't, in some nonspecific way, "know" about *Brady*. Law enforcement officers "have no duty to disclose exculpatory and impeachment evidence to the defense." *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996). Their "obligation [is] to disclose *Brady* evidence only *to the prosecutor*, who in turn must disclose it the accused." *Ibid.* (emphasis added). An officer may not, of course, "conceal exculpatory or impeachment evidence" from the prosecutor. *Id.* at 1569. So, if Sullenberger had alleged that Officer Puga's failure to educate himself about *Brady* had caused Puga to withhold (inadvertently or otherwise) exculpatory evidence, then he might have alleged a due-process violation. But he doesn't mention *Brady* at all. *See generally* TAC; TAC MTD Response. The concept of *Brady* only appears in the Scott Affidavit—and even Scott only mentions *Brady* to help establish Officer Puga's alleged "inexperience and lack of training." Scott Affidavit ¶ 57. That's not nearly enough to state a plausible due-process claim.

TAC ¶ 165. This claim against the City fails for the reasons we just outlined with respect to Officer Puga. *See supra* at 59–60. But it also fails for a separate (and simpler) reason: The City isn't vicariously liable for Officer Puga's conduct under § 1983. *See Cook*, 402 F.3d at 1116 ("[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." (quoting *City of Canton*, 489 U.S. at 385)). Sullenberger is thus wrong to suggest that "[t]he City is liable for the actions of its officers[.]" TAC ¶ 165. And Sullenberger's failure-to-train allegation appears as a standalone claim in Count VI (which we'll discuss in a moment), so we'll dismiss it from the due-process claim he's asserted here in Count IX. *See Harrison*, 183 F.3d at 1237 n.1 ("We find no error in the district court's . . . dismissal of plaintiff's claim . . . as duplicative[.]").

We, in short, **DISMISS** Counts VIII and IX of the TAC—Sullenberger's due-process claims against Officer Puga and the City.

### vi.    Count VI (Failure to Train against the City)

In Count VI, Sullenberger alleges that the City failed to properly train its officers. In his words:

> At the core of this claim lies the City's deliberate indifference to the fundamental necessity of comprehensive and continuous training for its officers on critical aspects such as lawful entry, use of force, arrest procedures, and the sacrosanct nature of citizens' constitutional rights. This indifference, by its very nature, has cultivated an environment where constitutional breaches are not anomalies but the foreseeable outcome of systemic neglect.

> The City's inaction and lackluster approach to training and oversight have coalesced into a de facto municipal policy or custom. This policy not only tolerates but tacitly endorses the infringement of constitutional rights, as evidenced by the actions of the [Defendant officers]. A [G]oogle search will unearth multiple published articles highlighting the gross violation of citizens' civil rights by the City and its Police Department.

> The City's failure . . . is the direct and proximate cause of the tangible and intangible injuries sustained by Sullenberger, manifesting as physical harm, emotional trauma, and the egregious violation of his Fourth and Fourteenth Amendment rights.

[ . . . ]

> The City's neglect in fulfilling its duty to ensure that its officers are
> well-trained and adhere to constitutional mandates has emerged as the
> moving force behind the violations experienced by Sullenberger. It is
> this lack of institutional control and the resultant permissive
> atmosphere that emboldened Defendant Officers to act in a manner
> antithetical to the principles of justice and due process.

TAC ¶¶ 154–57. Sullenberger augments this claim with similar allegations that appear elsewhere in the

TAC. *See id.* ¶ 66 ("The City's failure to train officers adequately in de-escalation techniques is evident

in the [Defendant] officers' aggressive approach [to Sullenberger]."); *id.* ¶ 76 ("The incident and

deliberate indifferent training constitutes a policy and/or custom that caused lasting trauma to

Sullenberger[.]"); *id.* ¶ 85 ("The use of excessive force in this case is symptomatic of a lack of proper

training and oversight by the City."); *id.* ¶ 125 ("The failure to conduct a thorough investigation is not

a mere oversight but a deliberate indifference to the rights of Sullenberger," which is "further

compounded by the systemic failure of the City to ensure that its officers are adequately trained and

supervised in conducting investigations that adhere to constitutional protections.").

This claim, too, falls short. We've previously described the conditions under which a city may

be held liable under § 1983 for its failure to train or supervise its employees. *See Johnson v. Israel*, 576 F.

Supp. 3d 1231, 1262–64 (S.D. Fla. Dec. 22, 2021) (Altman, J.); *Rebalko v. City of Coral Springs*, 2020 WL

6446042, at *23 (S.D. Fla. Nov. 3, 2020) (Altman, J.). For starters, "[a] municipality's culpability for a

deprivation of rights is at its *most tenuous* where a claim turns on a failure to train." *Anderson v. Fulton*

*Cnty. Gov't*, 485 F. App'x 394, 396 (11th Cir. 2012) (per curiam) (emphasis added). At the same time,

the Supreme Court has held that, in "limited circumstances," a municipality may be liable for failing

to train or supervise its employees. *City of Canton*, 489 U.S. at 387; *see also Williams v. DeKalb Cnty.*, 327

F. App'x 156, 160 (11th Cir. 2009) (per curiam) ("A police department's failure to train or supervise

its officers can constitute a 'policy' sufficient to trigger governmental liability but only in limited

circumstances[.]"). These circumstances arise when a city's "employees cause a constitutional injury as

a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1188 (11th Cir. 2011).

Although a city "rarely will have an express written or oral policy [or custom] of inadequately training or supervising its employees," *Gold*, 151 F.3d at 1350, the Supreme Court has said that a city may be liable for implementing such a policy or custom when its failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact," *City of Canton*, 489 U.S. at 388. "To establish . . . such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. "Without notice that . . . training [or supervision] is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen [a policy] that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

While "[e]stablishing notice of a need to train or supervise is difficult," *AFL-CIO*, 637 F.3d at 1189, "[a] city may be put on notice in two ways," *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009). *First*, "[a] pattern of similar constitutional violations by untrained [or unsupervised] employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train [or supervise]." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). *Second*, where "the need for more or different training is so obvious, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. "This 'so obvious' situation is rare, and the Court has only hypothesized that it might be met in extreme circumstances— as where a municipality provides its officers with firearms and then fails to give those officers *any* training on the use of deadly force." *Johnson*, 576 F. Supp. 3d at 1263 (citing *City of Canton*, 489 U.S. at 390).

We'll begin our analysis of Sullenberger's failure-to-train claim, then, by reiterating what we said in *Johnson*. The police officers there approached Johnson, who was sitting in his SUV in the parking lot of an apartment building. *See Johnson*, 576 F. Supp. 3d at 1239. The officers ordered Johnson to "provide his license, registration, and insurance card." *Ibid.* Because Johnson was moving slowly and asking questions, the officers became furious and "snatched" his phone, "ordered [him] out of the car," "placed [him] in handcuffs," and "sat him on the bumper of his truck." *Ibid.* They then brought Johnson to the jailhouse—and impounded his car—only for the on-duty lieutenant to order his immediate release. *See id.* at 1240. After the State Attorney's Office dropped all charges, *ibid.*, Johnson sued, asserting—among other things—a § 1983 claim against the city for "failure to properly train or supervise" the officers. *Id.* at 1262. We dismissed this claim because—other than merely alleging that "the City has a 'history' of failing to 'properly' train or supervise its officers"—the driver "fail[ed] to plausibly allege that there [was] *anything* wrong with the City's training or supervision." *Id.* at 1263. In other words, we couldn't say what "the City's policy" was or "what (if anything) [wa]s improper about it" because "Johnson never [told] us." *Ibid.* Johnson (we said) had given us "nothing more than the kinds of 'legal conclusions masquerading as facts' that courts have routinely found insufficient to state a claim." *Ibid.* (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004)). And, as to notice, we found that Johnson's "vague allusions to prior complaints and settlements . . . [we]ren't enough to show that the City was on notice of any deficiency in its practices." *Id.* at 1264.

Our case is just the same. Like the driver in *Johnson*, Sullenberger alleges that the City has given its officers inadequate training in "lawful entry, use of force, arrest procedures, and the sacrosanct nature of citizens' constitutional rights." TAC ¶ 154. But he never identifies any City policies or explains how these policies fall short. Like Johnson, Sullenberger simply tells us that the City's policies—whatever they are—are insufficient. That's not good enough. *See Watts v. City of Hollywood*,

146 F. Supp. 3d 1254, 1272 (S.D. Fla. 2015) (Altonaga, J.) (dismissing a "negligent-training" claim where the complaint didn't "contain any allegations describing a particular training program, let alone allegations highlighting why such a training program is defective and how the defect is a widespread problem"); *Grimm v. City of Boca Raton*, 2015 WL 4483974, at *6 (S.D. Fla. July 22, 2015) (Marra, J.) (finding "inadequate" the "conclusory allegation that [the defendant] 'failed to give adequate training'").

As to notice, Sullenberger refers to a hypothetical "[G]oogle search [that will] unearth multiple published articles highlighting the gross violation of citizens' civil rights by the City and its Police Department." TAC ¶ 155. He then inserts a wholly conclusory assertion that "[t]he record of multiple incidents in [t]he City, where officers have been documented assaulting individuals, only to subsequently provide false accounts of the events, illustrates a troubling pattern of behavior that is antithetical to the principles of justice and fairness." *Id.* ¶ 118(i). This won't do, either. A plaintiff can't bootstrap his own municipal-liability claim—say, that a defendant-city is liable for beating him and falsifying evidence against him—by blithely recharacterizing what happened to *him* as part of some broader practice. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (finding no pattern of constitutional violations where the plaintiff couldn't "show that any [prior instances] involved factual situations that are substantially similar to the case at hand"); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (declining to impose municipal liability where the plaintiff "never demonstrated that past complaints of police misconduct had any merit"); *see also Iqbal*, 556 U.S. at 681 ("It is the *conclusory* nature of [the] allegations . . . that disentitles them to the presumption of truth." (emphasis added)). If a plaintiff could get by on a municipal-liability claim simply by alleging, in conclusory terms, that the city in question routinely beats arrestees, falsifies evidence, etc., then every complaint would automatically circumvent the general rule that a city *cannot* be forced into discovery whenever one of the city's officers is alleged to have done something wrong. And that's just not the law. *See, e.g., Ford*

*v. Dixon*, 2022 WL 2181096, at *7 (N.D. Fla. May 17, 2022) (Cannon, Mag. J.) (collecting cases for the view that, when a plaintiff brings a municipal-liability claim, he "must [already] have a factual basis to support his claims against the [city]"), *report and recommendation adopted*, 2022 WL 2176503 (N.D. Fla. June 16, 2022) (Collier, J.). In short, a plaintiff "cannot allege a municipal liability claim hoping that discovery will *reveal* facts to support the claim." *Ibid.* (emphasis added).

Because Sullenberger hasn't told us *anything* about the City's training regimen—aside from his conclusory assertion that, whatever that regimen is, it's insufficient—and given that Sullenberger hasn't identified even a single prior incident that would've put the City on notice of the need to provide additional training, we **DISMISS** Count VI—his failure-to-train claim against the City.

###### vii. Count XII (Due Process Violation for Collusion and Coercion against the City)

Sullenberger's final federal claim is a bit hard to follow. In Count XII's first paragraph, Sullenberger focuses on the supposedly "intricate entanglement of civil liabilities with criminal prosecution, as evidenced by the negotiation dynamics surrounding Dr. Santamarina's agreement with the City, facilitated by Special Counsel Israel Reyes," in which the City dropped its criminal charges against Dr. Santamarina "in exchange for [him] relinquishing any [civil-rights] claims against the City[.]" TAC ¶ 178. But Dr. Santamarina isn't a party to this action. And "[w]ith few exceptions"—none of which Sullenberger has identified, *see generally* TAC—"'a litigant may only assert his own constitutional rights or immunities,'" *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1264 (11th Cir. 2023) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)). This part of Count XII is therefore irrelevant.

Count XII goes on to say—in general and unhelpful terms—that "[t]he orchestration of plea deals contingent upon the waiver of civil rights lawsuits against the City and its police force, particularly in Sullenberger's case, underscores a blatant misuse of prosecutorial discretion. . . . This strategic conflation of criminal and civil matters by the City and the State Attorney's Office, aimed at

insulating the police department from accountability, constitutes an egregious abuse of the legal process." TAC ¶ 179. Sullenberger then tries to connect this general statement about plea agreements to *his* case:

> The . . . retraction of a pre-trial intervention offer to Sullenberger, predicated on his refusal to waive his right to pursue civil action, epitomizes vindictive prosecution, contravening the principles of fairness and impartiality inherent in due process.
>
> The involvement of the City's legal counsel in suppressing an internal investigation into the incident, coupled with the State Attorney's Office's retention of pertinent information, forms a pattern of conduct aimed at obscuring police misconduct and shielding the City from civil liability. This orchestrated effort to undermine the pursuit of justice and accountability through the manipulation of legal processes not only infringes upon Sullenberger's due process rights but also erodes public trust in the judicial system.

*Id.* ¶¶ 180–81. Sullenberger, in short, is complaining about two different things: (1) a plea deal the State offered him, in which the State agreed to reduce (or eliminate) the criminal charges against him in exchange for his promise *not* to sue the City; and (2) some malfeasance by the City and the State Attorney's Office during an internal investigation. Again, this claim is meritless.

The first issue—the State's offer of a plea in exchange for a promise not to sue—is fairly common and doesn't violate the Due Process Clause. As the Supreme Court has explained: "Because release-dismissal agreements may further legitimate prosecutorial and public interests, we reject [a] holding that all such agreements are invalid *per se*." *Town of Newton v. Rumery*, 480 U.S. 386, 397 (1987). Indeed, when an "agreement [is] voluntary," there's "no evidence of prosecutorial misconduct," and "enforcement of the agreement [will] not adversely affect the relevant public interests." *Id.* at 398; *cf. Penn v. City of Montgomery*, 381 F.3d 1059, 1063 (11th Cir. 2004) (citing *Rumery* and holding that a "release

agreement was valid and [was] a bar to [a plaintiff's] pursuit of civil claims" against the city and its police officers).[41]

In our case, Sullenberger didn't accept the State's offer, so we don't even get to the threshold questions of whether the agreement was voluntary, whether it resulted from prosecutorial misconduct, or whether it furthered legitimate state interests. And, even if Sullenberger *had* accepted the agreement, he never alleges in his complaint—or suggests in his briefing—that any such agreement would have been involuntary, that the *prosecutors* ever concealed or fabricated evidence, or that a plea agreement for a man who brandished a weapon, struck a police officer, and then wrestled that officer would (somehow) adversely "affect the relevant public interests." *Rumery*, 480 U.S. at 398.

Sullenberger's second complaint—about some (as-yet unidentified) malfeasance during an internal investigation—doesn't constitute a due-process violation, procedural or substantive. "A procedural due process violation occurs when a state actor deprives a party of a constitutionally protected liberty or property interest through a constitutionally inadequate process," and a "substantive due process violation occurs when a state actor deprives a party of certain fundamental rights, regardless of the process used to effectuate that deprivation." *Frank v. Lake Worth Util.*, 464 F. App'x 802, 805 (11th Cir. 2012) (cleaned up). But we've found no case suggesting that a city violates some "constitutionally protected liberty . . . interest" (or "fundamental right[ ]"), *ibid.*, when it "suppress[es] [an] internal investigation," TAC ¶ 181. In fact, the Eleventh Circuit has suggested that there is no such right. *See Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002) (finding that an arrestee "ha[d] no substantive right of any kind to an investigation of her excessive force complaint by [law enforcement], much less one created by the Constitution," and that there didn't appear to be

---

[41] Admittedly, the plaintiff in *Penn* challenged her release agreement under Alabama law—not the U.S. Constitution. But we don't think that matters much here—and Sullenberger never says that it does.

"any federal or state court decision, statute, regulation or other source of law that g[ave] [the arrestee] an entitlement to an internal investigation by [law enforcement] of her complaints of police brutality").

We therefore **DISMISS** Count VII, Sullenberger's due-process, collusion-and-coercion claim against the City.

### III.   Sullenberger's State-Law Claims

#### a.   Counts X–XI (Battery against Officers Nuñez and Flores)

In his battery claims (Counts X–XI), Sullenberger alleges that:

> [the officers] engaged in physical contact with Sullenberger that went far beyond the bounds of reasonable law enforcement conduct. The force employed was neither necessary nor proportional to the situation at hand, as Sullenberger posed no immediate threat to the officers or public safety. . . . The officers' decision to physically engage with [Sullenberger] was not predicated on any lawful arrest or defensive necessity. Instead, it was an unwarranted escalation resulting in the application of excessive force. . . . The actions . . . were intentional and resulted in physical harm. . . . The use of a takedown maneuver, the prolonged application of a taser, and the forceful propulsion of Sullenberger onto the ground were deliberate acts that directly caused physical injury and emotional distress. . . . The battery . . . also constitutes a violation of Sullenberger's Fourth Amendment rights . . . to be secure against unreasonable seizures. . . . Law enforcement officers are duty-bound to exercise care and restraint in their interactions with civilians. [The officers] breached this duty through [their] aggressive actions, which were neither justified by the circumstances nor necessary for the performance of their official duties.

*Id.* ¶¶ 166–70, 172–73, 175–76.

Under Florida law, "[a] police officer may be liable for the use of excessive force (*i.e.*, battery) while effectuating a lawful arrest. . . . If an officer uses excessive force, the 'ordinarily protected use of force . . . is transformed into a battery.'" *Kimbrel v. Clark*, 385 So. 3d 1124, 1128 (Fla. 1st DCA 2024) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). "Police officers receive a presumption of good faith, however, as to the use of force applied during a lawful arrest." *Ibid.* And "[o]fficers are only liable for damage where the force used is 'clearly excessive.'" *Ibid.* (quoting *City of*

*Miami*, 672 So. 2d at 47); *see also Lester v. City of Tavares*, 603 So. 2d 18, 19–20 (Fla. 5th DCA 1992) ("[O]rdinary incidents of [an] arrest . . . do not give rise to an independent tort."). Indeed, "[l]aw enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" *City of Miami*, 672 So. 2d at 47 (quoting Fla. Stat. § 776.05(1) (1995)). "A battery claim for excessive force," therefore, "is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Ibid.* Finally, Florida law requires a plaintiff asserting battery claims arising from actions the officers took in the scope of their employment to show that the officers acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights [or] safety." Fla. Stat. § 768.28(9)(a).

As we explained in analyzing Sullenberger's battery claims under § 1983, *see supra* § II(c)(iii), the CCTV footage makes clear that the quantum of force the Officers used while the camera was rolling was reasonable. We therefore—and for the same reasons we articulated in assessing Sullenberger's *federal* excessive-force claims (Counts I–II)— **GRANT** the Defendants' motion to dismiss Sullenberger's state-law battery claim against Officer Nuñez (Count X), but we **DENY** the motion to dismiss his state-law battery claim against Officer Flores (Count XI).

### b.  Count XIII (Defamation against the City)

In Count XIII, Sullenberger asserts a defamation claim against the City. Here, he alleges the following:

> The City, through its official channels and public forums, published information related to Sullenberger's arrest, which was based on false testimony and unfounded allegations. This public dissemination transformed the false arrest into a widely known and discussed topic . . . .
>
> By explicitly using Sullenberger's photograph, name, and details associated with the arrest, the City ensured that the defamatory statements were unmistakably attributed to him . . . .

> The City's portrayal of Sullenberger as a criminal element, especially in the context of promoting its crime-fighting initiatives, has caused significant harm to his personal and professional reputation.
>
> [ . . . ]
>
> The City acted with at least negligence, if not actual malice, in using Sullenberger's case as a promotional tool without due diligence regarding the veracity of the charges or the legitimacy of the arrest.

TAC ¶¶ 183–86. This doesn't come close to stating a defamation claim.

Under Florida law, "[d]efamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). To state a plausible defamation claim, a Florida plaintiff must allege "certain facts such as the identity of the speaker, a description of the statement, and provide a time frame within which publication occurred." *Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1309 (M.D. Fla. 2021) (Byron, J.) (cleaned up), *aff'd* 2021 WL 5858569 (11th Cir. Dec. 10, 2021); *see also Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1328–29 (S.D. Fla. 2012) (Seitz, J.) ("In the absence of the necessary facts— when statements were made—and an adequate description of the statements, the defamation claim . . . must be dismissed[.]").

Sullenberger has failed to state a plausible defamation claim because he hasn't attached the allegedly defamatory statements, described their contents, or told us when (or by whom) they were made. We don't even know whether there was one statement or many. Since we have no idea what the City said about Sullenberger, we have no way of evaluating whether that statement (or statements) was (or were) defamatory. *See Five for Entm't*, 877 F. Supp. 2d at 1328 (dismissing a defamation claim where the plaintiff—who "did not even attach the article containing the [allegedly defamatory] statements"—failed to provide "necessary facts"); *Malhotra v. Aggarwal*, 2019 WL 3425161, at *3 (S.D.

Fla. July 30, 2019) (Gayles, J.) (finding that a defendant failed to state a defamation counterclaim because he didn't provide "an adequate description of the statements, when they were made, and to whom").

We therefore **DISMISS** Count XIII, Sullenberger's state-law defamation claim against the City.

### c. Count XIV (State-Law False Arrest/False Imprisonment against the City)

In his final claim (Count XIV), Sullenberger sues the City for "false arrest and/or false imprisonment, pursuant to [the City's] waiver of sovereign immunity under Florida Statute § 768.28."[42] TAC ¶ 188. According to Sullenberger, "[t]he City of Coral Gables, via Officers Nuñez and Flores, unlawfully detained and deprived Sullenberger of his liberty" and "intentionally detained Sullenberger under circumstances that were unreasonable and unwarranted" because the "officers did not have probable cause to arrest Sullenberger[.]" *Id.* ¶¶ 189–91. This claim fails for the same reasons as Sullenberger's § 1983 claims for false arrest and false imprisonment—*viz.*, because the officers *did* have probable cause to arrest him for the crimes of brandishing a firearm and resisting an officer with violence. *See supra* § II(c)(ii); *see also Asad*, 78 So. 3d at 669 ("Probable cause is an affirmative defense to a false arrest claim."); *Lewis v. Morgan*, 79 So. 3d 926, 929–30 (Fla. 1st DCA 2012) (affirming a trial court's dismissal of a false-arrest claim because the officers had probable cause to arrest the plaintiff).

On this issue, the Eleventh Circuit's decision in *Andrade v. Sheriff of Lee County*, 2023 WL 6389812 (11th Cir. Sept. 29, 2023), is dispositive. The police officers in that case responded to a local beach after they learned that a man had groped a woman there. *Id.* at *1. As the officers went to arrest the man, his female "acquaintance" (not the woman who had been groped) "followed the arresting officers to their patrol vehicle." *Ibid.* The acquaintance "approached the vehicle while the officers

---

[42] This statute provides that, "[i]n accordance with s. 13, Art. X of the State Constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act." FLA. STAT. § 768.28(1).

placed [the man] in the back seat, yelling at the officers." *Ibid.* "The officers ordered [her] to back away," which she did—only to "return[ ] to the vehicle and again yell[ ] at the officers." *Ibid.* "The officers again ordered [the acquaintance] to back away," which she did. *Ibid.* But, by then, other individuals were involved, and a "scuffle ensued"—a scuffle the acquaintance did not initiate. *Ibid.* One of the officers "secured [the acquaintance] on the ground with his knee and hand, stood her up, and handcuffed her." *Ibid.* The acquaintance was charged with "resisting a police officer without violence." *Ibid.* The acquaintance later sued the officers under § 1983 and state law, asserting claims of false arrest, false imprisonment, excessive force, malicious prosecution, and battery (among others). *Ibid.* "The district court granted summary judgment for the officers on all the claims." *Ibid.* Although the woman didn't appeal the court's denial of her § 1983 claims, she did appeal—among other things—the court's ruling on her state-law false-arrest claim (the same claim we're evaluating here). *Ibid.* But the Eleventh Circuit affirmed, finding—based on video footage—that the officers *had* probable cause to arrest the acquaintance because they "were engaged in the lawful execution of their legal duty by arresting [the alleged groper], transporting him to the patrol car, securing the area for their investigation, and ordering [the acquaintance] to back away from the car. And [the acquaintance], by combination of her words and conduct, obstructed and resisted that lawful duty when she defied that order." *Id.* at *4.

Our case is even easier than *Andrade* because, while our facts are somewhat similar, our Plaintiff's conduct was far worse. In our case, unlike what the officers confronted in *Andrade*, Sullenberger *actually caused* the altercation by refusing to submit to the officer, pulling his hand from the officer's grip, striking the officer, putting the officer in a bear hug, and wrestling with the officer. *Andrade*, then, likewise supports our Officers here. We therefore **DISMISS** Count XIV, Sullenberger's state-law, false-arrest/false-imprisonment claim against the City.

*         *         *

We've already granted Sullenberger leave to amend his complaint *twice* before. *See* December 6, 2022, Paperless Order; January 24, 2024, Order at 31–32. We therefore need not—and will not—give him any more chances to plead the causes of action we've dismissed in this Order. *See Woldeab v. Dekalb Cnty. Bd. of Educ.*, 885 F.3d 1289, 1291 (11th Cir. 2018) ("Where a more carefully drafted complaint might state a claim, a [*pro se*] plaintiff must be given at least *one chance* to amend the complaint before the district court dismisses the action with prejudice." (cleaned up & emphasis added)). This is especially so because we've already warned Sullenberger that he may "file **ONE FINAL** amended complaint," that he "will be given no more chances," and that, "[i]f we dismiss his third amended complaint, we *will* dismiss it **with prejudice**." January 24, 2024, Order at 31–32. For the reasons we've already explained, we're also confident that any further amendment of the claims we're dismissing here would be futile. And, when amendment would be futile—*i.e.*, when the "amended complaint would still fail at the motion-to-dismiss or summary judgment stage"—a "district court . . . may deny leave [to amend]." *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020)); *see also Jemison v. Mitchell*, 380 F. App'x 904, 907 (11th Cir. 2010) (per curiam) ("Dismissal with prejudice is proper . . . if a more carefully drafted complaint could not state a valid claim." (cleaned up)).

C<small>ONCLUSION</small>

After careful review, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss the Third Amended Complaint [ECF No. 86] is **GRANTED in part** and **DENIED in part**, as outlined in this Order.

2.  The Plaintiff's claims are **DISMISSED with prejudice** with the following exceptions:

    a.  His § 1983 excessive-force claim against Officer Flores as it relates to her taser applications after he toppled over the low wall with Officer Nuñez and allegedly stopped resisting;

    b.  His state-law battery claim against Officer Flores as it relates to those taser applications;

    c.  His state-law malicious-prosecution claim against Officers Flores and Nuñez as it relates to the two charges of aggravated battery and the two charges of attempted murder of a law enforcement officer.

3.  We will proceed to summary judgment *__on these three counts only__*.

4.  The Clerk of Court shall **REOPEN** this case and **TERMINATE** Officer Puga and the City as Defendants from this litigation.

5.  An amended scheduling order will follow.

**DONE AND ORDERED** in the Southern District of Florida on January 15, 2025.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record
      Simon Gerald Sullenberger, *pro se*